Argued and submitted July 30, 2004, Oregon Laws 2003, chapter 67, sections 5, 6, 7, and 8, *as amended by* Oregon Laws 2003, chapter 625, sections 10, 11, and 12, declared void; final sentence in Oregon Laws 2003, chapter 67, section 10(3), declared void; in all other respects, petitioners' claims for relief denied or dismissed March 3, reconsideration denied April 26, 2005

Richard STRUNK,
Donald Reed, Carol Booker, Larry Blumenstein,
Alan Lively, Merlene Martin, William Smee,
Denise Jacobsen, and Susanna Rhodes,
*Petitioners,*

*v.*

PUBLIC EMPLOYEES RETIREMENT BOARD,
State of Oregon, State of Oregon by and through the
State Board of Higher Education, North Douglas School
District, Deschutes County, Portland School District,
City of Salem, South Lane School District,
and Oregon Health Sciences University,
*Respondents.*

Pamela BURT,
Nori J. McCann-Cross, Gerald Frost, Nancy B. Miller,
Bradd A Swank, Linda Zuckerman, Vicky J. Johnson,
Stephen D. Krohn, and Claudia L. Howells,
*Petitioners,*

*v.*

PUBLIC EMPLOYEES RETIREMENT BOARD,
Marion County, Oregon Department of Justice,
Oregon Department of Transportation,
Oregon Judicial Department, and State of Oregon,
*Respondents.*

Dave DAHLIN,
*Petitioner,*

*v.*

PUBLIC EMPLOYEES RETIREMENT BOARD
(Dawn Morgan, Janice Deringer, Mark Gardiner,
Jeanne Garst, Glenn Harrison, Todd Schwartz,
George Russell, Steven Bjerke),
Theodore Kulongoski,
Governor, State of Oregon,
*Respondents,*

*and*

LEAGUE OF OREGON CITIES
and Oregon School Boards Association,
*Intervenors.*

Daniel EVANS,
Wayne Dykes, Charles French, Jim Botwinis,
Gary Harkins, and James Michaud,
*Petitioners,*

*v.*

CITY OF GRANTS PASS,
Josephine County, Multnomah County,
the City of Eugene, and the State of Oregon,
*Respondents.*

Martha SARTAIN,
*Petitioner,*

*v.*

PUBLIC EMPLOYEES RETIREMENT BOARD,
State of Oregon, and State of Oregon, by and through the
Oregon Department of Transportation,
*Respondents,*

*and*

LEAGUE OF OREGON CITIES
and Oregon School Boards Association,
*Intervenors.*

Michael O. WHITTY,
Dennis Ulsted, and H. Thomas Andersen,
*Petitioners,*

*v.*

PUBLIC EMPLOYEES RETIREMENT BOARD
and SAIF Corporation,
*Respondents,*

*and*

LEAGUE OF OREGON CITIES
and Oregon School Boards Association,
*Intervenors.*

(SC S50593 (Control); S50647; S50645;
S50532; S50686; S50685)
(Cases Consolidated)

108 P3d 1058

149-a

Gregory A. Hartman, Bennett, Hartman, Morris & Kaplan, LLP, Portland, argued the cause for petitioners Richard Strunk, Donald Reed, Carol Booker, Larry Blumenstein, Alan Lively, Merlene Martin, William Smee, Denise Jacobsen, and Susanna Rhodes. With him on the briefs were Michael J. Morris and Aruna A. Masih, Bennett, Hartman, Morris & Kaplan, LLP, Portland.

J. Michael Alexander, Swanson, Lathen, Alexander & McCann, PC, Salem, argued the cause and filed the briefs for petitioners Pamela Burt, Nori J. McCann-Cross, Gerald Frost, Nancy B. Miller, Bradd A Swank, Linda Zuckerman, Vicky J. Johnson, Stephen D. Krohn, and Claudia L. Howells.

Richard J. Birmingham, Birmingham, Thorson & Barnett, PC, Seattle, Washington, argued the cause and filed the briefs for petitioner Dave Dahlin.

John E. Hoag, Eugene, argued the cause for petitioners Daniel Evans, Wayne Dykes, Charles French, Jim Botwinis, Gary Harkins, and James Michaud. With him on the briefs was Daryl Garrettson, McMinnville.

Brian R. Talcott, Dunn, Carney, Allen, Higgins & Tongue, LLP, Portland, argued the cause for petitioner Martha Sartain. With him on the briefs were Scott A. Jonsson and James M. Hillas, Dunn Carney, Allen, Higgins & Tongue, LLP, Portland.

Michael O. Whitty, Eugene, argued the cause and filed the briefs for himself and for petitioners Dennis Ulsted and H. Thomas Andersen.

James P. Baker, Orrick, Herrington & Sutcliffe, LLP, San Francisco, California, argued the cause and filed the briefs for respondent Public Employees Retirement Board.

Stephen S. Walters, Stoel Rives, LLP, Portland, argued the cause and filed the briefs for respondents State of Oregon, State Board of Higher Education, Marion County, Oregon Department of Justice, Oregon Department of Transportation,

Oregon Judicial Department, Theodore Kulongoski, and SAIF Corporation. With him on the briefs were Charles F. Hinkle, Jeremy D. Sacks, Andrew M. Altschul, and Amy Edwards, Stoel Rives, LLP, Portland.

William F. Gary, Harrang Long Gary Rudnick, PC, Eugene, argued the cause and filed the briefs for respondents North Douglas School District, Deschutes County, Portland School District, City of Salem, South Lane School District, Oregon Health Sciences University, League of Oregon Cities, Oregon School Boards Association, City of Grants Pass, Josephine County, Multnomah County, and City of Eugene. With him on the briefs were Sharon A. Rudnick, Jerome Lidz, and Karla Alderman, Harrang Long Gary Rudnick, PC, Eugene.

Edward J. Brunet, Portland, filed the brief for *amici curiae* Associated Oregon Industries, Oregon Business Association, Oregon Business Council, and Portland Business Alliance.

Ron Ledbury, Portland, filed the brief for himself *amicus curiae*.

DE MUNIZ, J.

Balmer, J., concurred and filed an opinion.

Durham, J., concurred in part and dissented in part, and filed an opinion in which Riggs and Kistler, JJ., joined.

## DE MUNIZ, J.

These six original jurisdiction petitions, which we have consolidated for review, raise contractual and constitutional challenges to certain amendments that the 2003 Legislative Assembly made to the Public Employees Retirement System (PERS). The amendments at issue derive primarily from two separate, but related, enactments. The first, House Bill (HB) 2003 (2003), Oregon Laws 2003, chapter 67, is known as the PERS Reform and Stabilization Act of 2003 and alters PERS in a variety of respects. The second, HB 2004 (2003), Oregon Laws 2003, chapter 68, affects the actuarial equivalency factors used to compute retired PERS members' service retirement allowances.[1]

We have considered both the factual and legal aspects of the challenges that the petitions present. Having done so, and for the reasons set out below, we conclude that the provisions of Oregon Laws 2003, chapter 67, *as amended by* Oregon Laws 2003, chapter 625, that eliminate the annual assumed earnings rate credit[2] to PERS Tier One members'[3] regular accounts impair a contractual obligation of the PERS contract in violation of Article I, section 21, of the Oregon Constitution.[4] We further conclude that the provision of

---

[1] After the enactment of those bills, the legislature made further amendments to both, HB 3020 (2003); Or Laws 2003, ch 625, and later amended HB 2003 even further, HB 2020 (2003); Or Laws 2003, ch 733. With the final form of the substantive enactments now incorporated into the 2003 edition of the Oregon Revised Statutes, there are a number of sources from which to cite. In an effort to promote clarity, and unless to do so would detract from that purpose, we shall refer to the statutory provisions at issue by their designations in the session laws, *e.g.*, "Oregon Laws 2003, chapter 67, section 1," and refer to the legislation as a whole as the "2003 PERS legislation."

[2] The assumed earnings rate is the rate of investment return that the Public Employees Retirement Fund is assumed to earn over 50 to 75 years. That earnings assumption facilitates the calculation of the funding necessary to maintain the system on an actuarially sound basis. The assumption has changed from time to time. From 1975 through 1978, the assumed earnings rate was seven percent. In 1979, the Public Employees Retirement Board (PERB) increased the assumed earnings rate to seven and one-half percent. In 1989, PERB increased the rate again, this time to its current level of eight percent.

[3] A Tier One member is a PERS member who joined PERS before January 1, 1996.

[4] Article I, section 21, of the Oregon Constitution provides, in part:

"No * * * law impairing the obligation of contracts shall ever be passed[.]"

Oregon Laws 2003, chapter 67, section 10(3), that, in effect, temporarily suspends annual cost-of-living adjustments to the service retirement allowances of certain retired Tier One members breaches an obligation of the PERS contract. In all other respects, we conclude that petitioners' challenges to the 2003 PERS legislation are not well taken.

## I. PRELIMINARY CONSIDERATIONS

### A. *Jurisdiction*

■ Oregon Laws 2003, chapter 625, section 17(1), provides:

> "Jurisdiction is conferred on the Supreme Court to determine in the manner provided by this section whether the implementation of actuarial equivalency factor tables under section 2 or 4, chapter 68, Oregon Laws 2003 (Enrolled House Bill 2004), breaches any contract between members of the Public Employees Retirement System and their employers, or violates any constitutional provision, including but not limited to impairment of contract rights of members of the Public Employees Retirement System under section 21, Article I, of the Oregon Constitution, or clause 1, section 10, Article I, of the United States Constitution."[5]

Oregon Laws 2003, chapter 625, section 17a, contains essentially identical operative wording, except that the grant of jurisdiction pertains to determinations "whether the provisions of chapter 67, Oregon Laws 2003 (Enrolled House Bill 2003)" breach any PERS contract or violate any constitutional provision.

The 2003 PERS legislation contains other jurisdictional and quasi-jurisdictional provisions as well. We have

---

[5] This is not the first instance in which the legislature has conferred jurisdiction specifically on this court to determine the validity of legislative or constitutional changes to PERS. In those prior instances, the "rule of necessity" required the court to adjudicate the claims. *See Oregon State Police Officers' Assn. v. State of Oregon*, 323 Or 356, 361 n 3, 918 P2d 765 (1996); *Hughes v. State of Oregon*, 314 Or 1, 5 n 2, 838 P2d 1018 (1992) (both discussing that doctrine). To the extent that the justices of this court either have, or arguably could be said to have, a financial stake in the outcome of this litigation, we likewise conclude that the rule of necessity requires that we decide the contractual and constitutional challenges that the legislature has directed us to adjudicate.

considered every statutory jurisdictional prerequisite and, with the three exceptions explained below, have determined that each of the petitioners in each of these consolidated cases is properly before this court and that each petition presents a justiciable controversy.[6]

■ The first of the three claims that fall short of the jurisdictional or justiciability requirements is petitioner Dahlin's claim for relief under 42 USC section 1983.[7] With respect to that claim for relief, petitioner Dahlin states that he "is advancing no new impairment arguments under Section 1983, but rather, [is] utilizing that section as a procedural vehicle to raise his United States Constitutional claims * * * [and] as one method by which he may recover his costs and attorney fees in this action." Respondents assert, correctly we conclude, that petitioner Dahlin's section 1983 claim falls outside the legislature's limited grant of original jurisdiction to this court, quoted above. Contrary to petitioner Dahlin's implicit assertion that the legislation allows multiple avenues for presenting challenges, the only "procedural vehicle[s]" that the legislature has authorized for review of the 2003 PERS legislation in this court as original matters are the petitions to which that legislation refers. Those petitions do not include the federal statutory claim that section 1983 provides. We therefore dismiss petitioner Dahlin's section 1983 claim.

■ The second problematic claim is petitioner Dahlin's challenge to an aspect of the 2003 PERS legislation that, effectively, temporarily suspends annual cost-of-living adjustments (COLAs) as to certain retired Tier One members. *See* Or Laws 2003, ch 67, § 10(3), *as amended by* Or

---

[6] The number of parties and claims has narrowed during the pendency of these proceedings. We perceive of no benefit to the public, the bench, or the bar in explaining the evolution of these cases in detail.

[7] 42 USC section 1983 provides, in part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"

Laws 2003, ch 625, § 13 (so providing). Section 10 applies to only members who:

"(a) Established membership in [PERS] before January 1, 1996, * * *;

"(b) Receive a service retirement allowance calculated under ORS 238.300(2)(b)(A); and

"(c) Have an effective date of retirement that is on or after April 1, 2000, and before April 1, 2004."

Or Laws 2003, ch 67, § 10(5).[8] Petitioner Dahlin, however, is not a retired PERS member, and, as an active Tier One member, the provisions that he seeks to challenge respecting the COLA suspension do not apply to him. On that basis, respondents jointly assert that he lacks standing to pursue that particular challenge. We agree. *See, e.g., Brumnett v. PSRB*, 315 Or 402, 405, 848 P2d 1194 (1993) (for party to have standing, court's decision must have some practical effect on party's rights).

■ Petitioner Dahlin's attempts to avoid the foregoing conclusion are not well taken. First, he argues that he has brought his claims as a class action and that "members of the class have standing to raise this claim." Regardless of the legal validity of that assertion, nothing in the pleadings or the record supports the proposition that petitioner Dahlin sought to maintain a class action. Second, petitioner Dahlin argues that respondents have waived any objection to his standing. Standing, however, is an aspect of justiciability, *McIntire v. Forbes*, 322 Or 426, 433, 909 P2d 846 (1996), and justiciability is not waivable, *Barcik v. Kubiaczyk*, 321 Or 174, 186-87, 895 P2d 765 (1995). Accordingly, we dismiss petitioner Dahlin's petition to the extent that it seeks to challenge the temporary COLA suspension.

■ The third problematic matter concerns claims that *Strunk* petitioners have advanced—and in which *Burt, Dahlin,* and *Evans* petitioners have joined—challenging Oregon Laws 2003, chapter 67, sections 14b(1)(b) and (2), *as*

---

[8] Oregon Laws 2003, chapter 625, section 13(6), amended Oregon Laws 2003, chapter 67, section 10, to make that section applicable as well to "the alternate payees and beneficiaries of members described in subsection (5) of this section."

*amended by* Oregon Laws 2004, chapter 625, section 31, which provide as follows:

> "(1) If the Public Employees Retirement Board [(PERB)] is required to correct one or more of the erroneous benefit calculation methods identified in *City of Eugene et al. v. State of Oregon*, Case Nos. 99C-12794, 00C-16173, 99C-12838 and 99C-20235, [PERB] shall recover the cost of benefits erroneously paid to retired members as a result of those erroneous benefit calculations by one or both of the following methods:
>
> "* * * * *
>
> "(b) [PERB] may treat all or part of the present value of the benefits erroneously paid and payable to retired members as a result of the erroneous benefit calculations as an administrative expense of the Public Employees Retirement System, to be paid exclusively from future income of the Public Employees Retirement Fund, and to be amortized over an actuarially reasonable period not to exceed 15 years.
>
> "(2) In no event may the cost of erroneous benefit calculation methods identified in *City of Eugene et al. v. State of Oregon* be considered an employer liability or charged to employers through employer contributions."

As one of their arguments in response to petitioners' challenges to sections 14b(1)(b) and (2), respondents argue that those challenges "are either moot or not yet ripe for adjudication." We agree with the latter contention.

■ This court long has held that, for a claim to be justiciable, "[t]he controversy must involve present facts as opposed to a dispute which is based on future events of a hypothetical issue." *Brown v. Oregon State Bar*, 293 Or 446, 449, 648 P2d 1289 (1982); *see also State ex rel v. Funk*, 105 Or 134, 155, 199 P 592, *overruled on demurrer*, 209 P2d 113 (1922) ("courts pass upon concrete cases and not abstract propositions of law"). As the *City of Eugene* litigation presently stands—and it is that litigation upon which sections 14b(1)(b) and (2) are predicated—PERB has agreed not to act under those sections. Whether the status quo will change remains to be seen.[9] What is certain is that, at this time, petitioners' challenge to those sections is premature. Accordingly, we dismiss the claim as not ripe for adjudication.

---

[9] We discuss the *City of Eugene* litigation, which presently is under advisement in this court, later in our opinion. At this point, it suffices to note that the plaintiffs

## B. *De Novo and Plenary Review*

■■ This court best fulfills its obligation to interpret the laws of this state after a trial court and the Court of Appeals have had an opportunity to consider and refine the factual and legal issues. *See, e.g., Western Helicopter Services v. Rogerson Aircraft*, 311 Or 361, 370, 811 P2d 627 (1991) ("Our experience with cases on direct appeal or in which we are exercising our original jurisdiction has taught us that the issues and arguments in both kinds of cases often are not as well defined or as focused as are the issues and arguments in cases in which discretionary review is sought after the case has filtered through the lens of a Court of Appeals decision."). Those considerations notwithstanding, for these proceedings, the legislature has directed this court to determine all issues as original matters in this court. To comply with that directive, this court appointed a special master to conduct the trial of all factual issues and to assemble the record. We now conduct a *de novo* review of the evidentiary record and a plenary review of the legal issues presented.

## C. *The Evidentiary Record*

The court appointed now-Chief Judge David Brewer of the Oregon Court of Appeals to act as Special Master on the court's behalf in these proceedings and to hold an evidentiary hearing, rule on prehearing matters, and make recommended findings of fact. The Special Master completed that assignment in commendable fashion, and his efforts warrant this court's grateful acknowledgment. He guided these cases through a two-week evidentiary hearing, oversaw the creation of a voluminous record, and prepared a comprehensive written report, including extensive recommended findings of fact. That report has gone virtually unchallenged before this court, and, unless specifically noted, we have adopted those recommended findings of fact.

Although the parties challenge only a few of the Special Master's specific recommended findings of fact, they have drawn freely from the evidentiary record to advance factual assertions that were not contained in the Special Master's

---

and the defendants (but not the intervenors) in that litigation have entered into a settlement agreement that provides, among other things, that PERB will not use the methods that section 14b specifies to remedy the errors that the trial court identified.

report. As appropriate—that is, when relevant and proved by a preponderance of the evidence—this court has made independent findings in response to those factual assertions.

### D. *Motions to Compel Production*

■ We address a final preliminary consideration. Petitioners in two of the proceedings, *Strunk* and *Dahlin,* twice moved the Special Master to compel the production of documents that they unsuccessfully had sought to obtain in discovery from respondent Public Employees Retirement Board (PERB). PERB had withheld production of those documents on the ground that the documents, which related to advice that the Attorney General had given to PERB concerning the actuarial equivalency factors used to compute retired members' benefits, constituted privileged lawyer-client communications. The Special Master refused to compel production of the documents.

Petitioner Dahlin and *Strunk* petitioners have assigned the rulings of the Special Master as error. We uphold the Special Master's refusal to compel the production of the documents, because, in our view, the documents are not relevant to any claim at issue in these proceedings.

Having resolved the preliminary considerations that these matters present, we proceed to an overview of PERS generally and of the parties and their claims and defenses.

## II. BACKGROUND

A brief summary of the history and operation of PERS, as well as the changes that the 2003 PERS legislation made to the system, provide context for the parties' arguments. As the Special Master noted in his report, "[t]he statutory, administrative, historical, and operational backgrounds against which both the 2003 legislation and the instant claims have arisen are exceedingly complex." The summary that follows borrows heavily from the Special Master's written report. More fully developed discussions about particular aspects of the system are set out later as we address the parties' specific arguments.

## A. *PERS Before the 2003 Legislation*[10]

### 1. *General Considerations*

In one form or another, Oregon has provided its public employees with a retirement plan, as a contractual benefit of public employment, since 1945. Funding for the system comes from three sources: (1) employee member contributions, presently set at six percent of salary; (2) employer contributions, in an amount actuarially determined to be necessary when added to the employee member contributions to cover the cost of accrued and projected future service retirement allowances payable to retired members; and (3) investment earnings on those contributions. The assets, taken together, constitute the Public Employees Retirement Fund (the fund) and are used to pay the costs of the system: member service retirement allowances and administrative expenses. Except for variable account funds, which we discuss below, all PERS funds are commingled for investment purposes.

PERB administers PERS and acts as trustee for the fund. PERB conducts its operations through a director and staff that PERB employs, and PERB administers the system in consultation with the PERS actuary.[11] PERB sets employer contribution rates, adopts actuarial equivalency factors and assumed earnings rates, establishes reserve accounts, and allocates annual earnings to accounts and reserves. The Oregon Investment Council (OIC) invests the assets of the fund.[12]

---

[10] For ease of reference, we use the present tense, recognizing that the 2003 PERS legislation has changed the system significantly. We have included citations to various PERS statutes in place before 2003 later in this opinion, in the course of analyzing petitioners' claims.

[11] PERB employs the PERS actuary to perform various statutory functions. *See, e.g.*, ORS 238.360(3)(b) (2001) (PERB shall arrange for actuarial services for PERS); ORS 238.605 (2001) (actuary shall prepare reports for PERB).

[12] PERB holds the fund assets in trust, which, as noted, OIC invests. Before the 2003 PERS legislation, OIC had five members: three members whom the Governor appointed, one of whom was required to be a PERB member; the State Treasurer; and the PERS director (appointed by PERB), who was a nonvoting member. ORS 293.706 (2001). OIC now has six members: the State Treasurer; the PERS director (still a nonvoting member); and four members whom the Governor appoints, none of whom is required to be a PERB member. ORS 293.706.

## 2. *Membership in and Funding of PERS*

Public employees of participating employers become PERS members upon completing six months of uninterrupted service.[13] Every PERS member has a regular "account" in PERS. The member's regular account consists of the member's contributions to the system and earnings that PERB has credited to those contributions. In addition, in 1967, the legislature enacted an optional variable annuity account program for members who are willing to have their contributions and benefits fluctuate with the equity markets. A member who participates in the variable annuity account program has two member accounts: a regular account and a variable account. Members' contributions to their variable accounts are paid into the Variable Annuity Account and are invested solely in the Oregon Equity Fund.[14]

For purposes of this litigation, there are two categories of PERS members. "Tier One" members are public employees who joined PERS before January 1, 1996. Tier One members are entitled to a guaranteed minimum rate of return on their regular accounts based on the assumed earnings rate. To ensure that sufficient assets exist to pay

---

[13] ORS 238.015(1) provides:

"No person may become a member of the system unless that person is in the service of a public employer and has completed six months' service uninterrupted by more than 30 consecutive working days during the six months' period. Every employee of a participating employer shall become a member of the system at the beginning of the first full pay period of the employee following the six months' period. Contributions for new members shall first be made for those wages that are attributable to services performed by the employee during the first full pay period following the six months' period, without regard to when those wages are considered earned for other purposes under this chapter. All public employers participating in the Public Employees Retirement System established by chapter 401, Oregon Laws 1945, as amended, at the time of repeal of that chapter, and all school districts of the state, shall participate in, and their employees shall be members of, the system, except as otherwise specifically provided by law."

[14] PERB allocates earnings on variable accounts by first paying a proportionate share of administrative expenses and then crediting the remainder to members' variable accounts. PERB never has funded a reserve from variable account earnings.

Historically, employer funds were not invested in the Variable Annuity Account. To the extent that that account outperformed the regular account, employers were required to contribute additional amounts to match those earnings. In 2000, employers began participating in the Variable Annuity Account.

guaranteed benefits to Tier One members at the assumed earnings rate, PERS maintains a "gain-loss reserve." In years when fund earnings exceed the assumed earnings rate, PERB deposits a portion of those excess earnings into the gain-loss reserve. In years when fund earnings are less than the assumed earnings rate, PERB uses funds from the reserve to make up the difference.

PERS members who joined the system on or after January 1, 1996, are known as "Tier Two" members. Unlike Tier One members, Tier Two members have no earnings guarantee on their regular accounts and, correspondingly, do not benefit from the fund's gain-loss reserve.[15]

Crediting of member accounts occurs annually as of December 31 of each calender year. At the beginning of each calendar year, PERB reviews changes in the value of the fund since the beginning of the previous year. PERB staff determines the fund's value using standard accounting methods. Based on the fund's annual growth, PERB allocates earnings to various accounts within the fund on an "equal crediting" basis; that is, every dollar within the fund receives the same percentage share of earnings regardless of the account to which that dollar is designated.[16]

The PERS actuary also recommends the adoption of employer contribution rates in an "Actuarial Valuation" that usually issues as of December 31 in odd-numbered years. Employers begin paying newly established contribution rates on July 1 of the following year. Employer contribution rates

---

[15] As noted later in this opinion, all petitioners who remain part of these cases are Tier One members of PERS, either active or retired. The summary offered below therefore primarily focuses on aspects of PERS that relate to Tier One members.

[16] In years in which the earnings on the fund equal or exceed the guaranteed earnings rate, PERB statutorily is required to "set aside * * * such part of the income as [PERB] may deem advisable, not exceeding seven and one-half percent of the combined total of such income, which moneys so segregated shall remain in the fund and constitute therein a reserve account." ORS 238.670(1). Before 1980, PERB funded a contingency reserve account, as set out in that statute, but it has not done so since 1979.

In 1969, PERB began investing the fund in equity markets. Since then, the actual earnings of the fund, overall, substantially exceeded the assumed earnings rate. Historically, PERB credited members' regular accounts with earnings in excess of the assumed earnings rate when fund earnings exceeded that rate.

consist of two components: the employer's normal cost toward payment of members' service retirement allowances and the amount necessary to amortize any unfunded actuarial liability (UAL). The normal cost component of the employer contribution rate is based on the PERS actuary's best estimate of the amount needed to pay service retirement allowances to current members in the future. The adjustment of the employer contribution rate either for UAL or actuarial surplus is based on the difference between an employer's account balance and the projected future service retirement allowances payable to its employee members. If an actuarial surplus exists, then the employer pays less than the normal cost rate. If the employer has a UAL, then PERB adds an additional, amortized charge to the employer's normal cost rate.[17]

### 3. Service Retirement Allowance Formulas

There are three formulas available for calculating a PERS member's service retirement allowance, commonly known as the Pension Plus Annuity, the Full Formula, and the Money Match. The Pension Plus Annuity, which is available to only members who contributed to PERS before August 21, 1981, consists of the sum of an annuity component and a pension component. The annuity component is composed of the actuarial equivalent of the member's account balances at retirement. The pension component, funded by the employer, is equal to one percent of the member's final average salary (1.35 percent for legislators and police and fire employees) for each service year.

The Full Formula also includes an annuity component composed of the actuarial equivalent of the member's account balances at retirement and a pension component; however, the pension component is calculated differently than under the Pension Plus Annuity. The Full Formula first calculates a member's service retirement allowance by

---

[17] Between 1977 and 2001, PERS employer contribution rates ranged from a high of 11.84 percent to a low of 9.15 percent of payroll. Between 1975 and 1997, the average normal cost for employers ranged between 7.09 and 9.33 percent of payroll, and the average rate at which employers paid amortized UAL during that same period ranged from zero to 3.24 percent of payroll. The three highest UAL rates occurred between 1975 and 1979.

multiplying the member's final average salary by a factor set at 1.67 percent (two percent for legislators, police officers, and firefighters) and then multiplying the resulting figure by the member's years of membership. That service retirement allowance then is funded using the actuarial equivalent of the member's account balances at retirement (the annuity component) and employer contributions required to make up the difference (the pension component).

Under the Money Match, a member's service retirement allowance is calculated by determining the sum of the actuarial equivalent of the member's account balances at retirement (the annuity component) and then adding a sum in an equal amount that is charged to the employer, *i.e.*, the "match" (the pension component). The resulting service retirement allowance therefore amounts to twice the actuarial equivalent of the member's account balances at retirement.

At retirement, a PERS member receives a service retirement allowance based on the formula that produces the highest pension amount among the foregoing three alternative formulas.[18] By the late 1980s, members who retired with 30 years of creditable service received a service retirement allowance equal to approximately 63 percent of their final average salary. By the early 1990s, that figure had increased to 66 percent and, between 1996 and 2002, increased to 85 percent. In 2000, the average PERS retired member with 30 years of creditable service retired at the age of 53 with a service retirement allowance equal to 106 percent of the member's final average salary.[19]

---

[18] Until 1997, PERB assumed that most member service retirement allowances would be calculated under the Full Formula. By that time, however, the Money Match had emerged as the dominant formula. We agree with the Special Master's finding that the Money Match became the primary formula for calculating service retirement allowances because of (1) the structure of PERS; (2) the dramatically fluctuating investment markets of the late 1990s and early 2000s; and (3) certain of PERB's administrative practices concerning reserves, earning allocations, and the variable annuity account program.

[19] As the Special Master noted in his report, those percentages, which commonly are referred to as "replacement ratios," understate the extent to which service retirement allowances under PERS replace a member's preretirement salary, because, among other reasons, any Social Security benefits that a retired member may become eligible to receive are not included in the member's retirement income.

Regardless of the formula used to determine a retired member's service retirement allowance, PERS historically has increased such allowance through annual COLAs. Such COLAs are based on the Consumer Price Index and are capped at two percent of each member's allowance. If the index increases by more than two percent for the year, then the increase above two percent is "banked" and may be added to the member's COLA in later years when the index increases by less than two percent.

Finally, in addition to the benefits described above, members who retired before 1991 receive an increase in benefits to remedy unlawful taxation on retirement income benefits attributable to service before 1991. *See generally Hughes v. State of Oregon*, 314 Or 1, 838 P2d 1018 (1992) (legislature's repeal of income tax exemption statute as to PERS members' retirement benefits constituted breach of PERS contract, requiring legislatively created remedy).

When a PERS member retires, PERB transfers the member's account balances to the Benefits-In-Force reserve account (BIF), together with an amount from the employer's accumulated contributions. The amount transferred from the employer's account is that which PERB has determined is necessary to pay the member's service retirement allowance. PERB also regularly "trues up" the BIF by recalculating the funds necessary to pay all expected service retirement allowances for retired members. If PERB's actuary determines that the BIF is insufficient to pay those allowances, then PERB deducts from all employer accounts the amounts necessary to eliminate the deficiency. Conversely, if the BIF is overfunded, then PERB adds the overage to all employer accounts. For accounting purposes, PERB does not make adjustments to individual employer accounts; instead, PERB maintains a balancing account that shows the actuary's "trueing up" calculations.

4. *Recent Fiscal Status of the Fund*

The fiscal status of the fund following poor investment performances in 2000, 2001, and 2002—together with

significant growth in fund liabilities and employer contribution rates—was the primary motivator of the 2003 PERS legislation. *See generally* Or Laws 2003, ch 67 (preamble). Those considerations provided much of the focus of the parties' advocacy before the Special Master and this court. As context for the issues that we resolve in these cases, we set out the following brief discussion of the fund's financial status, which we take from the Special Master's report:

"For the 2001-03 biennium, the [S]tate of Oregon's general fund and lottery budget was approximately $11 billion. Oregon's local governments will collect approximately $17.8 billion in own-source revenues in fiscal year 2003-04. In comparison, at the end of 2002, the fund had a total UAL of more than $15 billion [based on the fair market value of fund assets]. In January 2003, the UAL reached $16.41 billion. During the 2003 legislative session, the UAL exceeded $17 billion, but it had declined to $12.7 billion by July 2003.

"Between 1991 and 2000, the nation experienced the longest sustained period of economic growth in its history. During that time, the average investment return on the fund was approximately 15 percent per year. However, over that same period, the system's funded ratio, which compares the value of fund assets to projected liabilities, declined. In 1991, the fund's value equaled the amount of its projected future liabilities. By 2001, the value of the fund's assets equaled 89 percent of its projected future liabilities. In 2002, based on then-current actuarial assumptions, the PERS actuary projected that PERS liabilities would increase from approximately $45 billion in 2001 to approximately $65 billion by 2007. In 2002, the actuary also projected that the funded ratio would remain below 80 percent until 2010 and that the funded ratio probably would not equal 100 percent until 2027. In early 2003, that ratio declined to 65.4 percent."

(Footnote omitted.)

B. *The 2003 PERS Legislation*

The following summary addresses only those changes to the system following the 2003 PERS legislation that petitioners have challenged in this litigation.[20]

---

[20] We provide citations to the session laws respecting the particular provisions at issue later in the opinion.

## 1. *Member Accounts*

As noted, before the 2003 PERS legislation, all active PERS members contributed, either directly or by employer pick-up,[21] six percent of their salaries to their regular accounts. Earnings on those contributions also were credited to those accounts. Under the 2003 PERS legislation, all member contributions made after January 1, 2004, are placed into an "account" for each member under a new Individual Account Program (IAP) instead of being credited to PERS regular accounts. The balances held in members' IAP accounts will not be annually credited at not less than the assumed earnings rate and, at retirement, will not be subject to employer matching under the Money Match or be enhanced by annual COLAs.

## 2. *Investment in the Variable Annuity Account Program*

Under the 2003 PERS legislation, as of December 31, 2003, members no longer may contribute to the variable annuity account program. The legislation does not affect contributions credited to members' variable accounts before that date.

## 3. *The "Call"*

As explained earlier, the legislature has required PERB to create a reserve account, known as the "gain-loss" reserve, to offset any deficit created in years in which fund earnings fell below the assumed earnings rate. By statute, PERB could not maintain that reserve account in a deficit position for more than five years. PERB's process for eliminating such a deficit has been referred to as the "call." There never has been a five-year deficit in the reserve account, and, accordingly, PERB never has implemented the call. The 2003 PERS legislation eliminates the statutory provisions respecting the call.

## 4. *The Assumed Earnings Rate and Crediting of Accounts*

As noted, before the 2003 PERS legislation, the PERS statutes guaranteed all Tier One members that PERB

---

[21] Member contributions are established by statute at six percent of salary and either are withheld from the member's salary or paid, that is, "picked up," by the employer. The pick-up historically has been negotiated separately between public employers and employees.

would credit earnings on their regular accounts annually at a rate no less than the assumed earnings rate. The 2003 PERS legislation, however, prohibits the allocation of earnings to Tier One members' regular accounts in any year in which a deficit exists in the gain-loss reserve or the allocation of earnings would cause a deficit in the gain-loss reserve.[22] The amendment does not apply to members who retired before April 1, 2004. For Tier One members who retire on or after that date, the amount in their regular accounts at retirement cannot be less than the amount that those accounts would have reflected if PERB had credited those accounts with earnings at the assumed earnings rate for every year that the accounts existed. If a member's regular account balance is deficient in that respect, then PERS is required to pay the difference out of the gain-loss reserve.

### 5. Cost-of-Living Adjustments

As noted, retired PERS members are entitled to annual COLAs on their service retirement allowances not to exceed two percent per year. Under the 2003 PERS legislation, PERS must calculate two alternative service retirement allowances for certain members who retired on or after April 1, 2000, and before April 1, 2004—a "revised" service retirement allowance and a "fixed" service retirement allowance. The "revised" service retirement allowance calculates the amount that the member would have received if PERB had credited all members' regular accounts with 11.33 percent interest in 1999—instead of the 20 percent interest that PERB actually credited to members' regular accounts for that year.[23] The "fixed" service retirement allowance essentially "fixes" each member's allowance as of July 1, 2003, or

---

[22] As noted above, before the enactment of the 2003 PERS legislation, PERB set aside a portion of annual fund earnings to ensure that sufficient assets would be available to pay guaranteed benefits at the assumed earnings rate. In years when fund earnings exceeded the guaranteed amount, PERB deposited a portion of those funds into the gain-loss reserve. According to the evidence in the record, it is reasonable to fund the gain-loss reserve at a level that would fund projected Tier One guaranteed earnings credits for a 30-month period, which, using the current assumed earnings rate of eight percent, would set the reserve balance at 20 percent of the fund's value.

[23] We discuss the 1999 crediting in greater detail later in this opinion. At this point, we note that the 11.33 percent figure on which the legislature focused derives from a calculation that the PERS actuary performed, after the fact, to determine the earnings crediting that would have occurred in 1999 if PERB had

the effective date of the member's retirement (whichever is later), but then is not subject to an annual COLA. The legislation further provides that each member in the identified group shall receive the "greater" of the "revised" and "fixed" service retirement allowances.

### 6. *Actuarial Equivalency Factors*

Under an administrative rule that PERB adopted in 1993, and later amended in 1996, PERB declared that it would not reduce, by application of new actuarial equivalency factors (AEFs),[24] the service retirement allowances of PERS members who joined the system before 1999. That declaration notwithstanding, the 2003 PERS legislation directs the implementation of updated AEFs beginning July 1, 2003, and thereby modifies the AEF calculation for certain members who entered the system before 1999. Members who retired on or before June 30, 2003—one day before the effective date of the new legislation—receive service retirement allowances calculated using the AEFs in place before the legislative reforms. All other members who joined the system before 1999 and who retired or will retire on or after July 1, 2003, will receive service retirement allowances that are subject to the new legislation. Those allowances are determined using one of two calculations, whichever produces the greater benefit. The first requires that the AEFs in effect at a member's effective retirement date be applied to the member's account balance. The second creates an account balance as of June 30, 2003, that consists only of the member's contributions and earnings credited as of that date. Based on that account balance, PERB determines the member's service retirement allowance using the AEFs in effect on June 30, 2003.

### C. *The Parties and Their Claims*

The following is an overview of the parties and their primary contentions, taken from the Special Master's report:

---

funded the contingency and gain-loss reserves fully and also had not allowed employers to participate in the Variable Annuity Account for that year.

[24] As explained later in this opinion, the term "actuarial equivalency factors" refers to computational tools used to convert lump sum account balances to monthly payment streams and to change one optional benefit payment form to another. They primarily are based on assumptions concerning future earnings or investments and mortality rates.

"Petitioners are current and former public employees who are [Tier One] members of PERS. * * * Petitioners have named as [respondents] the State of Oregon and certain state agencies (the state), [PERB], and various other public employers (the nonstate [respondents]). Petitioners each assert [under state law] that the 2003 legislation impairs a statutory contract between petitioners and their public employers * * *, breaches the statutory PERS contract, and takes their property without just compensation * * *. Some of the petitioners also assert contract impairment and takings claims under the United States Constitution. Petitioners seek to have many of the provisions of the 2003 legislation declared unconstitutional and to enjoin their implementation.

"Petitioners in the *Strunk, Burt*, and *Evans* cases rely, for the sources of their claims, on the PERS statutes that existed before the enactment of the 2003 legislation and certain PERB administrative rules in effect before the legislation's enactment. Petitioners in the *Dahlin*, * * * *Sartain*, and *Whitty* cases also rely on those provisions and, in addition, assert that the PERS contract consists of other terms, including provisions of employee handbooks, oral representations, or documents that PERS officials have provided to them over the years. Those petitioners' claims allege breaches and impairments of contract and takings based on those additional purported terms.

"The state has raised several defenses to petitioners' claims. It asserts that (1) the statutory provisions and other materials on which petitioners rely are not part of the obligation of any contract to which they are parties; (2) any impairment of the obligation of petitioners' PERS contracts is insubstantial or nonexistent; (3) any impairment is justified by important public purposes; and (4) petitioners have no property interest that the 2003 legislation affects. * * *

"Nonstate [respondents] present a somewhat different array of defenses. Like the state, they first assert that many of the provisions that petitioners seek to enforce are not *statutory* contractual promises. They also contend that the 2003 legislation did not breach or impair those provisions that constitute statutory contractual promises because it did not change substantially the substance of those promises and, in any event, none of the affected provisions was beyond the reach of the legislature's power of amendment

or repeal. They assert that the 2003 legislation has 'only prospective effects.'

"In addition, nonstate [respondents] assert that PERB lacked authority to create binding contractual obligations between themselves and petitioners with respect to PERS benefits. Further, [they] argue that, even if PERB had such authority, the rules and actions on which petitioners rely were unauthorized or contrary to statute, and petitioners have no right to retain the benefits resulting from them. According to nonstate [respondents], the legislature has the exclusive authority to determine PERS benefit levels.

"Nonstate [respondents] also have raised several affirmative defenses to petitioners' breach of contract claims. Assuming that the legislature intended the statutes, rules, and other materials on which petitioners rely to constitute part of the PERS contract, [they] assert that their performance is excused on the following grounds: (1) mutually mistaken assumptions that PERB would administer the PERS system in a prudent manner to provide benefits in accordance with legislative intent; and (2) impossibility or impracticability based on extreme financial hardship."

(Emphasis in original; footnotes omitted.)

## III. DISCUSSION

### A. *General Summary of Case Law and Legal Principles*

To the extent that it provides background for some of the discussion that follows, we briefly summarize this court's decisions in *Eckles v. State of Oregon*, 306 Or 380, 760 P2d 846 (1988), *Hughes*, 314 Or 1, and *Oregon State Police Officers' Assn. v. State of Oregon*, 323 Or 356, 918 P2d 765 (1996) (*OSPOA*), which the parties cite to support many of their competing contentions in these proceedings.

*Eckles* involved legislation that had transferred surplus funds from the Industrial Accident Fund (IAF) to the General Fund for the purpose of avoiding a state budget deficit. The plaintiff, an employer insured by the State Accident Insurance Fund Corporation (SAIF), contended that the legislation violated Article I, section 21, of the Oregon Constitution by impairing the state's contractual obligation (set out in an earlier statute) to use the funds in the IAF for

only workers' compensation purposes. This court concluded that the part of the legislation that eliminated the state's obligation to use the surplus funds in the manner specified in the earlier statute constituted an unconstitutional impairment of the state's contractual obligation. 306 Or at 399. The court further concluded that the part of the legislation that directed the transfer of funds amounted to a mandate that the state breach the contract, *id.* at 400, which ordinarily would require payment of damages to SAIF employers resulting from the breach, *id.* at 402.[25]

*Hughes* involved legislation that had repealed a state income tax exemption for PERS benefits; specifically, the legislation had (1) made that exemption inapplicable to state personal income taxation; and (2) repealed the corresponding provision in the tax statutes. The plaintiffs, who were present and retired public employees, challenged the legislation under Article I, section 21, and this court ultimately held that the two statutory provisions, respectively, unconstitutionally impaired a contractual obligation and breached the PERS contract. 314 Or at 29-33. Most significant to our analysis here, the court in *Hughes* concluded that "PERS was intended to be and is a contract between the state and its employees[.]" 314 Or at 25.

*OSPOA* involved challenges to Ballot Measure 8 (1994), which had amended the Oregon Constitution in three ways relating to PERS: (1) by mandating that public employees make six percent contributions to public retirement plans, if so covered, and, correspondingly, by precluding public employers from "picking up" that contribution on behalf of their employee members; (2) by prohibiting the state from guaranteeing a rate of return on retirement contributions; and (3) by prohibiting any increase of retirement benefits based on unused sick leave. The plaintiffs brought federal impairment of contract challenges to the amendments, and, after applying state law principles to construe the underlying PERS contract, this court invalidated the amendments as unconstitutional impairments of that contract. In reaching

---

[25] The court noted, however, that the plaintiff in *Eckles* neither sought compensation nor produced any evidence that he had been damaged by the state's breach of contract. *Eckles*, 306 Or 380, 402, 760 P2d 846 (1988).

that conclusion, the court concluded that each of the statutory PERS provisions at issue—that is, the provisions permitting employer "pick-up" of the employee's contribution, guaranteeing an assumed earnings rate, and providing for inclusion of unused sick leave in benefit calculations—constituted terms of the PERS contract that applied even to work yet to be performed. 323 Or at 372-79.

We note some considerations from *Eckles* and *Hughes* that guide our analysis in these cases. First, in *Eckles*, this court clarified that the contracts provision of Article I, section 21, prohibited the impairment of a contractual *obligation. Eckles*, 306 Or at 395. As to the determination whether newer legislation amounts to an impairment of a preexisting statutory contractual obligation, the court focused on whether the legislation would change or eliminate the state's obligation under that contract. *Id.* at 399-400. By contrast, the court explained that legislation that mandated a breach on the state's part of such a contractual obligation—but did not change or eliminate the obligation itself—did not *contravene* Article I, section 21, although, in accordance with that constitutional provision, such legislation ordinarily would require payment of damages resulting from the breach. *Id.* at 400-02.

In *Hughes*, this court set out a two-step process for addressing a claim of contract impairment or breach under Article I, section 21:

> "First, it must be determined whether a contract exists to which the person asserting an impairment is a party; and, second, it must be determined whether a law of this state has impaired an obligation of that contract. General principles of contract law normally will govern both inquiries, even where the state is alleged to be a party to the contract at issue."

*Hughes*, 314 Or at 14. In its ensuing analysis, the court divided the first question into three component inquiries: (1) is there a state contract?; (2) if so, what are its terms?; and (3) what obligations do the terms provide? *See id.* at 17-29 (engaging in those inquiries). Further, as noted above, this court in *Hughes* concluded that PERS constituted a statutory contract. *Id.* at 25.

## B. *Obligation of Successive Legislatures*

■ We underscore that the claims presented here, for the most part, concern contract formation and implicate what this court has described as the "significant" proposition that, if certain circumstances are met, "one legislature may bind a succeeding legislature to a particular course of action." *Id.* at 13. That proposition is significant, in part, because "[o]rdinarily it is the function of a legislature to make laws and not contracts." *Campbell et al. v. Aldrich et al.*, 159 Or 208, 213, 79 P2d 257 (1938). However, as the court in *Campbell* went on to state:

> "[L]egislative enactments may contain provisions which, when accepted as the basis of action by individuals, become contracts between them and the state. It is also equally well established that the intention of the Legislature thus to create contractual obligations, resulting in extinguishment to a certain extent of governmental powers, must clearly and unmistakably appear. The intention to surrender or suspend legislative control over matters vitally affecting the public welfare cannot be established by mere implication."

*Id.* at 213-14.

## C. *Order of Analysis*

■ As a final preliminary matter, we note that petitioners' arguments arise under and implicate various sources of state and federal law. When, as here, we are presented with multiple bases for disposition, this court generally considers the issues hierarchically. *See, e.g., State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (so stating; addressing defendant's state constitutional law claim before considering his federal claim). Accordingly, we begin by addressing petitioners' claims under state law.

## D. *Petitioners' State Law Contractual Claims*

As noted above, *Strunk*, *Burt*, and *Evans* petitioners rely solely upon the PERS statutes and certain administrative rules as they existed before the 2003 PERS legislation as the bases for their contractual claims—that is, their claims that the 2003 legislation either impairs or breaches obligations set out in the PERS contract. *Dahlin* and *Whitty* petitioners, however, cast a broader net. They argue that, in

addition to statutory and administrative rule provisions, the PERS contract includes documents that PERB has provided to them over the years.[26] *Whitty* petitioners, moreover, also rely on the employee handbook that they received from their employer as establishing some of their contractual rights. Finally, *Strunk* and *Burt* petitioners also assert that the 2003 PERS legislation breaches not only the PERS contract but also the settlement agreement resolving litigation that followed this court's decision in *Hughes*.

1. *Handbooks and Other Materials as Contract Terms*

a. *Whitty* Petitioners

*Whitty* petitioners are each employees of SAIF, and they named PERB and SAIF as respondents to their petition for review. *Whitty* petitioners' opening brief asserts, in part:

"In addition to the [a]rguments stated by the *Strunk* Petitioners, the *Whitty* petition[ers] are relying upon the Respondent SAIF Corporation's written policy concerning retirement, stated in the SAIF Employee Handbook, as part of their contract with their employer. * * *

"The SAIF policy also refers the employee to the PERS Handbook, 'for complete details of the retirement program.' * * *

"* * * * *

"The language used by SAIF Corporation in its retirement policy statement, words such as 'established,' 'secure' and 'guarantees,' is language of contract. * * *"

---

[26] Petitioner Sartain entered into a stipulation with respondents to the effect that, with one exception, she would rely upon only statutory and administrative law sources as establishing the terms of her contract. The exception was for "a document known as the 'Notice of Entitlement' [that retired PERS members] receive upon retirement." Consistently with that stipulation, petitioner Sartain's opening brief focuses on statutory sources, but also includes the following footnote:

"The conduct of the PERS staff and PERB further confirms the contractual nature of the account balance and retirement allowance. At the time of petitioner Sartain's retirement, she was informed that her account balance was $289,633.41. * * * PERS sent her a Notice of Entitlement setting forth her balance and stating that her monthly retirement benefit would be $5,426.22."

The footnote, however, contains no argument or authority that would support an implicit assertion that the conduct of PERB or its staff through issuance of the notice of entitlement somehow became part of the PERS contract. We therefore do not include petitioner Sartain's challenge in our discussion concerning materials outside the PERS statutes (and applicable administrative rules) in formation of the PERS contract.

In response, respondents argue that (1) the PERS statutes do not reflect a legislative intent to delegate either to PERB or to SAIF the power to bind future legislatures; (2) even if the legislature had purported to delegate that power, the delegation would be an unconstitutional abdication of the legislature's lawmaking authority; (3) even if such a delegation were permissible, there is no evidence that the legislature intended to delegate such authority to PERB staff or SAIF, as opposed to PERB; and (4) at least insofar as the SAIF employee manual is concerned, it promises nothing more than the ability of its employees to participate in PERS like all other state employees.

In reply, *Whitty* petitioners argue, in part, as follows:

> "Respondents argue that the SAIF policy on retirement and the PERS Handbook are not part of Petitioners' contract because the language of the PERS statutes does not reflect an intent to delegate the power to bind future legislatures to an administrative agency. The language of the PERS statutes also does not delegate to SAIF Corporation, or any other governmental agency the power to enter into any contract with its employees. Yet, this court has held that a Multnomah County Ordinance is a sufficient basis for a retirement benefit contract. *Taylor v. Mult[.] * * * Dept[.] Sher[.] Ret[.] B[d.]*, 265 Or 445, 451, 510 P2d 339 (1973). * * * If a county can contract with its employees through enactment of an ordinance establishing a retirement benefit, certainly an independent public corporation, SAIF, can contract with employees through adoption of a policy conferring retirement benefits. * * *

> "* * * * *

> "As to whether the PERS Handbook is a part of Petitioners' contract with SAIF, the SAIF policy on retirement incorporates the benefits conferred in that Handbook by reference. * * * It did not adopt the Handbook as a 'legal reference.' "[27]

---

[27] Respondents offer additional argument to the contrary in their surreply brief. That advocacy, however, falls outside the appropriate scope of matters that properly may be addressed in surreply. Absent leave from this court, petitioners have the final word in reply as to issues in their case-in-chief. Accordingly, we have not considered respondents' surreply brief in that respect.

### b. Petitioner Dahlin

Petitioner Dahlin's opening brief asserts, in part:

"Petitioner Dahlin relied on the PERS statutes, rules, handbooks, annual statements and web site estimates when planning his retirement. Based on his review of the communications from PERS, Petitioner Dahlin believed that the Money Match would produce a greater retirement benefit than the Full Formula. Petitioner Dahlin's understanding that the Money Match calculation would exceed the value of the Full Formula benefit was confirmed by annual statements that he received from PERS beginning in 1998.

"* * * * *

"At all relevant times, the PERS handbooks * * * stated that ' "vesting" means you cannot lose your benefit rights, even if you stop working in covered employment.' "

Respondents offered essentially the same arguments in response to petitioner Dahlin as they did to *Whitty* petitioners, summarizing their response as follows:

"[P]etitioner Dahlin asserts that his contract rights—to the extent they exist—arise from PERS handbooks and his annual statements, in addition to the PERS statutes and regulations. This assertion is incorrect. There has been no legislative delegation to PER[B] that would allow the agency to bind future Legislative Assemblies. Indeed, such a delegation would be unconstitutional. Moreover, these documents on which petitioner Dahlin relies actually contain language disclosing the fact that they are not legal references or complete statements of the PERS statutes or rules, and that in [the event of] any conflict the statutes and rules shall prevail."

In reply, petitioner Dahlin states:

"[Respondents] respond that as of 2001 the Handbooks contained a disclaimer that indicated that if a conflict exists between the PERS statutes and the Handbook, the statute will control. * * *

"[Respondents'] response, however, missed the point of Petitioner Dahlin's argument. Petitioner Dahlin is not arguing that a conflict exists between the PERS statute, its administrative rules, and the PERS Handbook. Rather,

Petitioner Dahlin is arguing that the PERS Handbook is consistent with Oregon Law and the lack of a 'reservation of rights clause' is the recognition of and an embodiment of the contract theory of pensions. * * *"

### c. Discussion

■ To the extent that petitioner Dahlin and *Whitty* petitioners argue that the PERS handbooks, PERB communications, and the employment policies of SAIF form part of the PERS contract, we reiterate that this court has held that PERS is a *statutory* contract. *Hughes*, 314 Or at 25. Therefore, the question whether the materials on which petitioners in part rely constitute terms of that statutory contract is a question of legislative intent. *See generally PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993) (statutory construction involves ascertaining legislature's intent; to do so, court first examines text and context of statute at issue); ORS 174.020(1)(a) ("[i]n the construction of a statute, a court shall pursue the intention of the legislature if possible"). Even disregarding respondents' argument that the legislature lacks the power to delegate to an administrative agency or other subdivision of the state the authority to set the terms of the PERS contract, the predicate question remains: did the legislature *intend* to do so?

In that respect, petitioners point to no Oregon statute indicating that the legislature intended to permit PERB or any other entity as a general matter to set or alter any terms of the PERS statutory contract.[28] Nor has our own research revealed any support for the idea that the legislature intended to permit PERB or any other governmental entity—through the issuance of handbooks, policy statements, account summaries, or otherwise—to provide binding pronouncements of the retirement benefits that PERS will provide. We hold that the PERS handbooks, communications from PERB to PERS members, and SAIF's employment policies do not constitute terms of the PERS contract.

---

[28] As noted, with respect to the administrative rules concerning actuarial equivalency factors, all petitioners, except petitioner Sartain, argue that the legislature specifically delegated authority to PERB to adopt the rule at issue. We address that claim later in this opinion.

That holding does not meet directly the separate argument of *Whitty* petitioners that the 2003 PERS legislation breaches or impairs their separate employment contracts with SAIF. They analogize those contracts to the ordinance at issue in *Taylor*, 265 Or 445. That analogy is inapposite, however, for the simple reason that nothing about the retirement policy at issue in *Taylor* implicated a state statutory contract or any other legislative policy.[29] For *Whitty* petitioners to succeed in that argument, the retirement policy that SAIF provides to its employees would have to be independent of PERS. But that is not the case. SAIF offers its employees the PERS retirement plan, not a SAIF retirement plan or some sort of PERS hybrid. And, as we determined above, nothing in the PERS statutes indicates that the legislature intended to authorize public employers to set the terms of the PERS contract.

Accordingly, we reject the arguments of petitioner Dahlin and *Whitty* petitioners that the PERS contract includes terms outside the PERS statutes (and applicable administrative rules) and the argument of *Whitty* petitioners that the 2003 PERS legislation breaches or impairs their employment contracts with SAIF.

## 2. *The Chess Settlement*

■ Until 1991, PERS benefits were not subject to state or local income taxation. ORS 237.201 (1989). In 1989, the United States Supreme Court held that, if a state exempts from state and local taxation pension benefits paid by state and local governments, principles of intergovernmental tax immunity require like treatment of pension benefits paid by the federal government. *Davis v. Michigan Dept. of Treasury*, 489 US 803, 109 S Ct 1500, 103 L Ed 2d 891 (1989). At the time of the *Davis* decision, Oregon taxed federal pension benefits as personal income.

Responding to that and other decisions, the 1991 Legislative Assembly enacted Oregon Laws 1991, chapter 823, which repealed the tax exemption for PERS benefits,

---

[29] *Taylor* involved a retirement plan for sworn law enforcement personnel of Multnomah County. *Taylor v. Mult. Dept. Sher. Ret. Bd.*, 265 Or 445, 447, 510 P2d 330 (1973).

thereby equalizing the tax treatment of state and federal pensions. As noted earlier in this opinion, this court in *Hughes* held that that repeal of the tax exemption breached the PERS contract. *Hughes*, 314 Or at 33. The court, however, concluded that "[t]he legislature is the most appropriate branch of government in the first instance to choose among the available remedies" for that breach. *Id.* at 33 n 36.

When the legislature failed to enact a remedy, class action litigation—to which we refer as the *Chess* litigation—ensued. The trial court in *Chess* ultimately approved a settlement for damages covering all PERS retirees who were PERS members before the effective date of the 1991 tax repeal (September 29, 1991). The settlement agreement provided that the "[p]laintiffs agree to accept the remedies provided in [the legislation] as full and complete payment for all claims raised in [the class] actions." The legislature adopted the terms of the *Chess* settlement and codified them at ORS 238.375 to 238.380. ORS 238.375(3) provides:

> "No member of the system or beneficiary of a member of the system shall acquire a right, contractual or otherwise, to the increased benefits provided by [ORS 238.375 to 238.380]."

The implementation of those settlement terms resulted in an annual increase in employer contribution rates of approximately 1.4 percent, amounting to a permanent annual expense that PERB assumed would continue for 30 years.

*Strunk* and *Burt* petitioners argue that Oregon Laws 2003, chapter 67, *as amended by* Oregon Laws 2003, chapters 625 and 733, when considered generally, breaches the settlement agreement in *Chess*. Their analysis proceeds as follows: PERB understood that codifying the *Chess* settlement would increase employer contribution rates; employer contribution rates in fact increased as a direct result of that legislation; the preamble to Oregon Laws 2003, chapter 67, states that one reason for the enactment was to address the increase in employer contribution rates; some of that increase resulted from the *Chess* settlement legislation; and therefore, "[t]o the extent that the legislature has lowered PERS retirement benefits, at least in part, because of the

increase granted by [the legislation], then it has in fact repealed the benefits of [that legislation]."

Respondents disagree for various reasons, only one of which we need address. Respondents argue, we conclude correctly, that the *Chess* settlement agreement by its specific terms limited petitioners' rights to those set out in the 1991 legislation and that that legislation expressly disavowed the creation of any contractual rights. The wording of ORS 238.375(3), which codified the settlement, could not be clearer in that respect. Nothing about the context of that wording alters what we perceive to be the legislature's manifest intent. Because petitioners have failed to demonstrate a contractual right that Oregon Laws 2003, chapter 67, *as amended by* Oregon Laws 2003, chapters 625 and 733, is capable of breaching with respect to the *Chess* settlement, we reject their argument.

### 3. *Petitioners' Statutory Contract Claims*

We now turn to the central issues in these cases—that is, petitioners' contentions that various aspects of the 2003 PERS legislation unconstitutionally impair statutory contractual obligations set out in the PERS contract in violation of Article I, section 21, or, alternatively, that aspects of the 2003 legislation breach statutory contractual obligations set out in the PERS contract. We discuss each challenged aspect of the 2003 legislation separately.

#### a. Redirection of Members' Contributions to the IAP

##### (1) The Statutes

As noted, before the 2003 PERS legislation, PERS members were required to contribute, or to have employers contribute on behalf of their employee members, six percent of members' salaries to those members' regular accounts. We set out the relevant statutes below.

ORS 238.200(1)(a) (2001) provided:

"An active member of the system shall contribute to the fund and there shall be withheld from salary of the member six percent of that salary."

ORS 238.200(2) (2001) provided, in part:

> "The contributions of each member as provided in subsection (1) of this section shall be deducted by the employer from each payroll and transmitted by the employer to [PERB], which shall cause them to be credited to the member account of the member."

ORS 238.205 (2001) provided, in part:

> "Notwithstanding any other provision of this chapter, and subject to the provisions of this section, a public employer participating in the system may agree, by a written employment policy or agreement in effect on or after July 1, 1979, to 'pick-up,' assume or pay the full amount of contributions to the fund required of all or less than all active members of the system employed by the employer."

The 2003 PERS legislation, however, amended ORS 238.200 to discontinue contributions to the PERS fund:

> "a member of [PERS], or a participating employer acting on behalf of the member pursuant to ORS 238.205, is not permitted or required to make employee contributions to the fund for service performed on or after January 1, 2004. * * *"

Or Laws 2003, ch 67, § 1(4), *as amended by* Or Laws 2003, ch 625, § 9, *codified as* ORS 238.200(4). Instead, all PERS members who established membership in the system before August 29, 2003, now are members of the IAP. ORS 238A.305(1). As of January 1, 2004, those members' six percent contributions—which remain mandatory—now go into their IAP accounts, rather than into their regular accounts. Or Laws 2003, ch 733, §§ 32, 34, 35, *codified as* ORS 238A.330; ORS 238A.335. As before, employers still may agree to pick up the six percent contributions. Or Laws 2003, ch 733, § 34, *codified as* ORS 238A.335. Each IAP account is credited with earnings and losses on the member's contributions, less administrative expenses. Or Laws 2003, ch 733, § 37(1), *codified as* ORS 238A.350(1). Upon retiring, the member will receive, in a lump sum payment, the full amount of that member's IAP account, Or Laws 2003, ch 733, § 41(1), *codified as* ORS 238A.400(1), in addition to any retirement benefits for work performed before January 1, 2004, to which the member may be entitled under PERS as it

existed before the 2003 legislation. Alternatively, in lieu of the lump sum payment, the member may elect to receive the amount in his or her IAP account in installments paid over 5, 10, 15, or 20 years. Or Laws 2003, ch 733, § 41(2), *codified as* ORS 238A.400(2).

As noted earlier in this opinion, although PERS members will receive at retirement the balances held in their IAP accounts, those balances (1) are not guaranteed annual crediting at not less than the assumed earnings rate; (2) at retirement, will not be subject to the Money Match; and (3) at retirement, will not be enhanced by annual COLAs. Respondent State of Oregon characterizes the IAP accounts as "invested and credited in the same fashion as a typical 401(k) or IRA account," and we agree with that general description.

(2) The Parties' Arguments

All petitioners, except petitioner Sartain, challenge the discontinuation of PERS members' contributions to their regular accounts.[30] Petitioners argue that the 2001 versions of the statutes set out above

> "were unquestionably part of the PERS Act, were integral to the calculation of benefits under the Act, were unambiguously promissory, [and] contained no language excluding contributions attributable to future service from the general contractual protection and no reservation of right of future amendment."

In support of that assertion, petitioners note that ORS 238.250 (2001), which provided for the regular account (as that statute continues to do), has remained virtually unchanged since the adoption of the first state retirement act in 1945.

Although petitioners note that amounts from each member's IAP account will be payable at retirement as a lump sum without employer matching or application of annual COLAs, that is not the effect of the legislation that they emphasize. Instead, petitioners argue primarily that,

---

[30] As noted earlier, all petitioners challenge the 2003 PERS legislation as it relates to Tier One members. Our summary of the parties' arguments and ensuing analysis likewise focuses, for the most part, on Tier One members.

"[a]s a result of this diversion, most mid-career employees will lose the option of retiring under Money Match and will find their benefits calculated under the less generous full formula benefit. * * * Under ORS 238.300 (2001), however, petitioners were promised calculation of their benefits under the formula which would produce the highest value. * * * By diverting their contributions, Section 1 of HB 2003 [Or Laws 2003, ch 67, § 1], effectively denies petitioners the contractual protection afforded by ORS 238.300(2) (2001).[31]

"* * * * *

"As it did in *OSPOA*,[32] this court should find that this permanent elimination of petitioners' statutory right to receive a pension calculated on the full value of their account[,] including future contributions and earnings thereon, constitutes an impairment of their PERS contract or[,] at a minimum, a breach of the contractual promise that all member contributions and earnings would be directed to and maintained in that PERS member account."

Respondents counter that PERS members' contributions to their regular accounts are an obligation on each member's part, rather than a contractual right that inures to each member's benefit. To the extent that any such promise exists, respondents continue, there is no support in the text or context of the PERS statutes for a legislative promise that members could continue to contribute to their regular accounts throughout their PERS membership.

Respondents assert that that conclusion is bolstered by the fact that, when the legislature adopted the Full Formula in 1981, it simultaneously reduced the statutory contributions of higher compensated PERS members from seven percent to six percent. Or Laws 1981, ch 761, § 1 (discussed further below). Such a reduction, they argue, is inconsistent with a legislative understanding that PERS members would

---

[31] ORS 238.300 provides the various formulas for calculating service retirement allowances, and we discuss those formulas in greater detail below.

[32] As explained earlier, this court concluded in *OSPOA*, 323 Or at 374-76, that, as at issue in the context of that particular case, certain statutory contribution provisions (including the optional employer "pick-up") constituted terms of the PERS contract.

have a perpetual right to maintain contributions to the system at a particular level. Otherwise, the legislature would have grandfathered those members who, before 1981, were required to contribute seven percent of salary so as to preserve the amount of benefits that those members would receive at retirement.

Responding to petitioners' assertion that most mid-career PERS members effectively will lose the option of retiring under the Money Match, respondents counter that the PERS statutes require only that a member receive a service retirement allowance calculated under the formula that produces the highest pension amount, whichever formula that may be. There is no indication, they contend, that the legislature intended that members would have an option to have their service retirement allowances calculated under a particular formula, the Money Match or otherwise. Moreover, respondents assert that certain wording in the PERS statutes indicates that the legislature intended the Money Match to be the floor for any service retirement calculation and, consistently with that proposition, either the Full Formula or the Pension Plus Annuity provided the highest service retirement allowance for most members before the mid-1990s.[33] They conclude that, under the 2003 PERS legislation, members still will have those retirement benefits that derive from their member accounts as they existed before the 2003 PERS legislation, calculated on the full value of those accounts. As to the other statutes upon which petitioners rely, ORS 238.205 (2001) (permitting employer pick-up) and ORS 238.250 (2001) (requiring PERB to provide regular accounts for members, showing contributions and earnings), respondents argue that the 2003 PERS legislation does not alter the

---

[33] Concerning the genesis of the Money Match, the Special Master noted as follows:

"In the mid-1950s, PERS was a Money Purchase Plan with an employer matching feature. In 1968, the Money Purchase Plan was repealed, and it was replaced with the Pension Plus Annuity benefit formula. PERB later recognized that one or two members who retired in the interim had received lower benefits than they would have received under the previous system and that such a reduction was not permissible under a retirement plan that is qualified under the Internal Revenue Code (IRC). PERB asked the legislature to enact corrective legislation so that benefits earned by such members would be protected and, in response, the legislature reinstated the matching feature."

pick-up provisions and that the directive for PERB to establish PERS regular accounts for members is nothing more than "a clerical obligation imposed on PERB" to "maintain appropriate record-keeping on member's regular accounts."

In the end, respondents assert that petitioners' only true complaint respecting the redirection of PERS member contributions to the IAP is that their projected future service retirement allowances under the 2003 PERS legislation will not be as high as those allowances would have been without the legislation. And, although respondents agree that such will be the case, they disagree with petitioners' claims that that complaint has either contractual or constitutional consequences.

(3) Discussion

 We begin by noting some preliminary considerations. First, we are mindful that the "accepted proposition of the contractual nature of PERS is an essential background" for our inquiry. *Hughes*, 314 Or at 22. Further, although petitioners cite a number of statutes as significant to our analysis of their challenge to the redirection of member contributions to the IAP, we conclude that the service retirement allowance formula provisions, set out in ORS 238.300 (2001), viewed in context with other statutes that petitioners cite, are the most central to our analysis, as explained below.[34]

As noted, the crux of petitioners' analysis is that the diversion of contributions from PERS members' regular accounts to IAP accounts means that "most mid-career employees will lose the option of retiring under Money Match

---

[34] Relatedly, we decline respondents' invitation to construe certain of the statutory provisions at issue—particularly, ORS 238.200 (2001), which required members to contribute six percent of their salaries to the fund, and ORS 238.250 (2001), which required (and still requires) PERB to provide a regular account for each member—in isolation. Rather, as we address petitioners' contentions, we must view the wording of all the statutory provisions at issue in the context of their collective operation. *See Hughes*, 314 Or at 23 (rejecting state's argument as impermissibly viewing tax exemption at issue "in isolation" and as "standing alone").

In a similar vein, we note that this court's earlier conclusion in *OSPOA*, 323 Or at 374-76, that the employer pick-up provisions are part of the PERS contract does not necessarily assist our analysis in this more complex case, which requires that we view all the statutes at issue as a whole.

and will find their benefits calculated under the less generous full formula benefit." Accordingly, we proceed to assess in detail the relevant benefit formulas that PERS provides. That is, we consider whether the statutory provisions containing those formulas are part of the PERS contract and, if so, the extent of the state's obligation in that regard.

ORS 238.300 (2001)[35] provided, in part, as follows:

"Upon retiring from service at normal retirement age or thereafter, a member of the system shall receive a service retirement allowance which shall consist of the following annuity and pensions:

"(1) A refund annuity which shall be the actuarial equivalent of accumulated contributions by the member and interest thereon credited at the time of retirement * * *.

"(2)(a) A life pension (nonrefund) for current service provided by the contributions of employers, which pension, subject to paragraph (b) of this subsection, shall be an amount which, when added to the sum of the annuity under subsection (1) of this section and the annuity, if any, provided on the same basis and payable from the Variable Annuity Account, both annuities considered on a refund basis, results in a total of:

"(A) For service as a police officer or firefighter, two percent of final average salary multiplied by the number of years of membership in the system * * *.

"(B) For service as a member of the Legislative Assembly, two percent of final average salary multiplied by the number of years of membership in the system * * *.

"(C) For service as other than a police officer, firefighter or member of the Legislative Assembly, 1.67 percent of final average salary multiplied by the number of years of membership in the system * * *.

"(b) A pension under this subsection shall be at least:

[35] The 2003 Legislative Assembly amended ORS 238.300; however, those amendments do not affect the formula calculations that we discuss above. *See* Or Laws 2003, ch 67, § 4, *as amended by* Or Laws 2003, ch 625, § 22; Or Laws 2003, ch 733, § 46e.

"(A) The actuarial equivalent of the annuity provided by the accumulated contributions of the member.

"(B) For a member who made contributions before August 21, 1981, the equivalent of a pension computed pursuant to this subsection as it existed immediately before that date."

As a matter of plain text, ORS 238.300 (2001) provides, first, that a member is entitled to receive a service retirement allowance that is calculated by multiplying the member's final average salary by a factor of 1.67 percent for general service employees and then multiplying the resulting figure by the member's years of membership. That service retirement allowance then is funded by an annuity component (consisting of the actuarial equivalent of the member's account balances at retirement) and a pension component (consisting of employer contributions). ORS 238.300(1), (2)(a) (2001). That is the Full Formula.

However, if the pension component as calculated under the Full Formula is less than the actuarial equivalent of the annuity component based on a member's accumulated contributions to the fund, then the member is entitled to receive a higher pension component—that is, one composed of the actuarial equivalent of the member's accumulated contributions. ORS 238.300(2)(b)(A) (2001). That is the Money Match (*i.e.*, the employer-funded pension component "matches" the member's annuity component). And, if a member contributed to PERS before August 21, 1981, and the pension component calculated for that member based on the system as it existed immediately before that date provides a higher pension component than ones calculated under the Full Formula and the Money Match, then the member receives the higher pension amount. ORS 238.300(2)(b)(B) (2001). That is the Pension Plus Annuity.

In other words, ORS 238.300 (2001) provided (and still provides) that a retired PERS member will receive a final service retirement allowance that is calculated under the one formula of the three described above that yields the highest pension amount for that member, whichever formula that may be. At the same time, it appears to us that, notwithstanding the somewhat awkward placement of the words "at

least" in ORS 238.300(2)(b) (2001), the legislature intended to set the Full Formula as the primary formula and, generally, designed the Full Formula so as to provide a minimum level below which the pension component should not fall. That is so because the Full Formula, which, significantly, is set out in the first two parts of the statute, ORS 238.300(1) and (2)(a) (2001), sets a defined benefit that does not vary depending on fluctuations in earnings or on the size of the member's annuities from the regular and variable accounts.[36] Thus, in that context, the words "at least" in ORS 238.300(2)(b) (2001) refer to a calculation of the Full Formula pension component that equals or exceeds a calculation of a pension component calculated under the Money Match (based on the member's accumulated contributions to the fund) or the Pension Plus Annuity (based on earlier statutory requirements).

More importantly, the wording of ORS 238.300 (2001) is unambiguously promissory. Through that statute, the legislature continuously and unequivocally has communicated to PERS members that, if they retire from service at normal retirement age, they will receive a pension component of their final service retirement allowance that, (1) when combined with the actuarial equivalent of their accumulated contributions to the fund, will consist of the Full Formula amount based upon years of service, final average salary, and class of service that equals or exceeds any pension component calculated under the other two formulas; or (2) in the event that the Full Formula calculation falls short, a pension component calculated under the Money Match or the Pension Plus Annuity. In short, the state's obligation as set out in ORS 238.300 (2001) is to provide a final service retirement allowance made up of an annuity component and a pension component at the minimum level described above.

The context of ORS 238.300 (2001), which includes the development of the statute through successive legislatures, *Swarens v. Dept. of Rev.*, 320 Or 326, 331, 883 P2d 853

---

[36] There is one exception to the Full Formula's design of providing a minimum level for a pension component, pertaining to an adjustment for members who participate in the variable annuity account program. That adjustment is not at issue in these cases.

(1994), confirms that reading. ORS 238.300 and its predecessor statute, *former* ORS 237.147 (1993), have been a part of the PERS statutes since the creation of PERS in 1953.[37] During those 50 years, the benefits that PERS has provided and the manner for calculating them have changed considerably. As the Special Master noted, when the legislature created PERS, the system provided a Money Purchase Plan with an employer matching component. *See* Or Laws 1953, ch 200, § 18 (setting out benefit formula).[38] The stated goal of that formula, once combined with an annuity funded by member contributions, was to provide career employees ineligible for the federal Social Security program approximately one half of their final average salaries; for those eligible for Social Security, the target was less. *Id.* at § 13.

In 1955, the legislature increased the target replacement ratio from 50 to 60 percent of final average salary, including Social Security. Or Laws 1955, ch 131, § 5(2). That enactment also modified the member contribution rate to provide that members making more than $4,800 per year could elect to contribute an equal percentage of salary in excess of that amount, which contributions would "purchase at retirement[ ] additional benefits which will be matched by the employer." *Id.*

In 1967, the legislature repealed the provisions stating target retirement goals and abandoned calculating member contribution rates based strictly on actuarial assumptions, opting instead for a straight percentage-of-salary model. *See* Or Laws 1967, ch 622, § 4. The legislature also enacted the Pension Plus Annuity, under which retired members would receive an annuity (based on accumulated contributions and earnings) and a pension calculated as the actuarial equivalent of 1.67 percent of the member's final average salary for general service employees (1.92 percent for fire and

---

[37] The 1953 act was entitled the "Public Employe[e]s Retirement Act of 1953." Or Laws 1953, ch 200, § 1. The predecessor scheme, enacted in 1945 and similarly named the "Public Employees Retirement Act," was similar, but not identical to, the 1953 act, eventually named PERS. *See* Or Laws 1945, ch 401 (enacting original act). For a general discussion of the relationship between the 1945 and 1953 acts, see *Hughes*, 314 Or at 7 n 7.

[38] The 1953 act also provided an additional life pension for service before the employee became a member of the system. Or Laws 1953, ch 200, § 18.

police employees) multiplied by years of membership up to 30 years for general service (25 years for fire or police service). Or Laws 1967, ch 622, § 13. Finally, the legislature repealed the employer matching method for calculating the pension component. *Id.*

In 1969, the legislature restored the employer matching method (now known as the "Money Match") as one method for determining the pension component of retirement benefits. As between the Money Match and the Pension Plus Annuity, the amendment provided that the pension component of a service retirement allowance "shall be *at least* the actuarial equivalent of the annuity provided by the accumulated contributions of the [member]." Or Laws 1969, ch 640, § 7(2)(b) (emphasis added).

Other than changing the multiplier for the Pension Plus Annuity, Or Laws 1971, ch 738, § 2; Or Laws 1973, ch 695, § 4, removing the 25- and 30-year limits on years of membership, Or Laws 1971, ch 738, § 2, and including legislators in the system, Or Laws 1975, ch 137, § 3, the legislature did not amend the PERS statutes in any significant way until 1981. In that year, the legislature added the Full Formula, described in greater detail above, which has remained substantially unchanged since that time. Or Laws 1981, ch 761, § 4.[39]

As we develop more fully below, the evolution of the statutory provisions setting out the formulas for calculating PERS members' service retirement allowances, in our view, accords with the preliminary conclusion that we drew from examining the text of ORS 238.300 (2001). That is, contrary to petitioners' arguments, the legislature did not promise that PERS would be maintained so that the Money Match remains the primary calculator of member service retirement

---

[39] As respondents note, the 1981 Legislative Assembly also amended the graduated contribution rates for members based on salary, providing, instead, that the withholding for all members would be six percent unless the member made less than $1,000 per month, in which case less would be withheld. Or Laws 1981, ch 761, § 1; *former* ORS 237.071 (1981). As amended in 1981, that statute, now numbered as ORS 238.200, has remained substantially unchanged.

allowances, which it presently happens to be because it usually is the most remunerative. Instead, that statutory evolution demonstrates that the legislature promised that members would receive service retirement allowances calculated under whichever formula yields the highest pension amount for that member and that the Full Formula calculation ordinarily should equal or exceed calculations under the Money Match or, if applicable, the Pension Plus Annuity.

 Before assessing the import of the statutory context set out above, we must ensure that we are ascertaining the intent of the correct legislature—an inquiry that is critical when analyzing statutory contracts. That is so because the fundamental purpose behind such contracts is to bind future legislative action. *See generally Hughes*, 314 Or at 13 (discussing effect of binding succeeding legislature). To know when a legislature is so bound, we first must determine which legislature enacted the operative statutory contract.

 As a general matter, this court has recognized several principles that it has applied at the first level of the *PGE* analysis, 317 Or at 610-11, to assist in the construction of amendatory acts. One of those principles is the presumption that "material changes in the language of the statute create material changes in meaning." *Carlson v. Myers*, 327 Or 213, 225, 959 P2d 31 (1998). Another is a corollary to that presumption: "[I]t is presumed that such changes in meaning do not go further than is expressly declared or necessarily implied." *Id.* And, finally for our purposes here,

> " 'where a section of the statute is amended so as to read "as follows," and the section is then set forth with the changes intended to be made, those portions of the old section that are merely copied into the amendment without change are not to be considered as re-enacted or as a new statement of the law, but are to be read as a part of the earlier statute, if in conflict with another law passed after the section amended and before the amendatory act, unless there is a clear manifestation of legislative intention to the contrary. In the absence of such an intention, it is the change or the additions incorporated in the section amended only that are to be considered enacted.' "

*Jones v. General Motors Corp.*, 325 Or 404, 418, 939 P2d 608 (1997) (quoting *Allison v. Hatton*, 46 Or 370, 372, 8 P 101

(1905)); *see also State ex rel Caleb v. Beesley*, 326 Or 83, 88, 949 P2d 724 (1997) (to same general effect).

With the foregoing principles in mind, we glean the following from the progression of the statutory benefit formulas over time. From 1953 through 1967, PERS did not provide members with any minimum level of benefits. Instead, members received only the contributions and earnings in their accounts matched by an employer pension in equal amount. The key variable to that formula was earnings. And, as petitioners note, those earnings provided "the only hope that members would have of achieving an annuity which approached the goals of the system."

That changed in 1967, when the legislature repealed the employer-matching alternative and replaced it with the Pension Plus Annuity. Under that system, a retired PERS member was guaranteed a minimum pension component that would be added to whatever annuity that the contributions and earnings on the member's accounts had provided, whether those earnings had been good or bad. Thus, unlike the earlier employer-matching method, which had placed the risk of investment loss on members, under the Pension Plus Annuity, members could expect some minimum level of benefits and shared the risk of earnings shortfalls with employers.

As noted, in 1969, the legislature reinstated what is now known as the Money Match as an additional formula to calculate the pension component of a member's service retirement allowance. Such an amendment could have been a meaningful legislative act only if the legislature contemplated that the Money Match might for some retired members provide higher pension amounts. Such an expectation, however, does not support the conclusion that the legislature *promised* members that that *always* would be the case.

The final change that we determine to be relevant to understanding the evolution of the formulas for calculating service retirement allowances occurred in 1981 with the creation of the Full Formula. With that amendment, the legislature, for the first time, provided members with a formula under which the risk of earnings loss fell—and continues to

fall—squarely on employers. The changes that the 1981 amendments made to *former* ORS 237.147 (1979), now ORS 238.300, were material: they added a new, primary benefit calculator to the system and shifted the downside risk of investment return away from members. Because we presume that the legislature intended those material changes to change the meaning of the statute materially as well, we conclude that the 1981 amendment effected a reenactment of the entire section and provides the version of the statute to which we will look in ascertaining the legislature's promissory intent.

Having concluded that Oregon Laws 1981, chapter 761, section 4, enacted the operative statutory contract that is now embodied in ORS 238.300 (and also was embodied in ORS 238.300 (2001)), we find nothing about the statutory law that preceded the 1981 amendments to *former* ORS 237.147 (1979) that detracts from the preliminary conclusion that we drew from the wording of ORS 238.300 (2001), that is, that the 1981 Legislative Assembly promised PERS members that, on retirement, they would receive the retirement formula yielding the highest pension amount. Nor do we find any contrary intent revealed in the other statutes upon which petitioners rely (concerning six percent member contributions and direction of those contributions to PERS regular accounts).

Our case law is consistent with that conclusion. As an initial matter, the parties have not directed us to a prior decision interpreting the relevant statutory provisions, and we have found none. Looking more broadly to this court's prior decisions involving PERS, petitioners place heavy reliance on this court's decision in *OSPOA*, 323 Or 356. *OSPOA*, however, stands for only the proposition that the legislature promised members that the permissible employer pick-up of member contributions, assumed earnings rate for Tier One members, and unused sick-leave accrual provisions of the PERS statutory scheme were promissory and applied even to work yet to be performed. However, nothing about the court's interpretation of the statutory provisions at issue in *OSPOA* mandates a conclusion different from the one that we have

reached after analyzing the text and context of ORS 238.300 (2001).[40]

In summary, we conclude that the 1981 Legislative Assembly promised each eligible member that, at retirement, the member would be entitled to receive a service retirement allowance calculated under the formula that yielded the highest pension amount. The legislature did not alter or eliminate that promise when it enacted the 2003 PERS legislation.

Petitioners contend, however, that the statutory contractual obligation that we just have described includes an additional promise that PERS members have the right, during the course of their PERS membership, to contribute a certain percentage of their salary to their regular accounts so as to *increase* the value of their ultimate pension amount under the Money Match. We disagree.

Nothing in the text of ORS 238.200(1)(a) (2001), which required PERS members to contribute six percent of their salaries to the fund, supports petitioners' argument that the legislature intended that contribution to be immutable. As noted earlier, the 1981 Legislative Assembly lowered the member contribution rate from a high of seven percent to a uniform six percent. And, at the same time, the legislature grandfathered those members previously paying a contribution rate of less than six percent, even though it meant that those members' account balances, and therefore the service retirement allowances that the members ultimately would receive, would be smaller under the Money Match. In other words, the text of ORS 238.200(1)(a) (2001) and its statutory context do not establish clearly and unambiguously that the legislature intended to promise members

---

[40] In their reply brief, petitioners also argue that this court's decision in *Taylor*, 265 Or 445, "is a much more pivotal case in this court's developing analysis of pension benefits than is *OSPOA*." In *Taylor*, which involved a county retirement system, the court acknowledged that "contractual rights can arise prior to the completion of the service necessary to a pension." 265 Or at 451. Of course they can. The predicate question—which we determine to be dispositive in these cases—is whether the contract offer that the particular pension plan presents *contains* such a promise, *i.e.*, a promise that extends over the life of a covered member's service. And, in that respect, we find nothing inconsistent between *Taylor* and our analysis here.

that they could contribute six percent of their salaries to their regular accounts throughout their PERS membership so as to maximize their pension component calculation under the Money Match.

Applying the foregoing conclusions to petitioners' claims that the redirection of PERS members' future contributions to the IAP, as set out in the 2003 PERS legislation, either breaches or impairs a contractual obligation of the PERS contract, the answer is clear: Nothing about the creation of the IAP alters the legislature's promise that, at retirement, each member will receive a service retirement allowance calculated under the formula yielding the highest pension amount, and nothing about the IAP legislation constitutes a breach of that promise. To the contrary, under the 2003 PERS legislation, each member in the system at the time of the effective date of that legislation will, at retirement, receive a service retirement allowance consisting of an annuity component based on the member's contributions and earnings and a pension component calculated under the formula that yields the highest pension amount.

### b. The Assumed Earnings Rate

#### (1) The Statutes

Since 1975, the PERS statutory scheme has provided that the earnings to be credited annually to Tier One members' regular accounts will be no less than the existing assumed earnings rate. *See generally* Or Laws 1975, ch 333, § 2, *codified as former* ORS 237.277 (1975) (now ORS 238.255).[41] Petitioners identify the following statutory provisions as relevant to our consideration:

> "[PERB] shall provide for a regular account for each active and inactive member of the system. The regular account shall show the amount of the member's contributions to the fund and the interest which they have earned. [PERB] shall furnish a written statement thereof upon request by any member or beneficiary of the system."

---

[41] As noted, before January 1, 1996, PERS did not recognize classes of membership. *See* Or Laws 1995, ch 654, § 2 (providing limitation on benefits payable to persons establishing membership on or after January 1, 1996). In creating the "tiers" of membership in 1995, the legislature made what is now ORS 238.255 inapplicable to Tier Two PERS members. Or Laws 1995, ch 654, § 3.

ORS 238.250 (2001).

"The regular account for an active or inactive member of the system shall be examined each year. If the regular account is credited with earnings for the previous year in an amount less than the earnings that would have been credited pursuant to the assumed interest rate for that year determined by [PERB], the amount of the difference shall be credited to the regular account and charged to a reserve account in the fund established for the purpose. A reserve account so established may not be maintained on a deficit basis for a period of more than five years. Earnings in excess of the assumed interest rate for years following the year for which a charge is made to the reserve account shall first be applied to reduce or eliminate the amount of a deficit. [PERB] shall attempt to ensure that the reserve account is funded with amounts adequate to leave a zero balance in the account when all members who establish membership in the system before January 1, 1996, as described in ORS 238.430, have retired."

ORS 238.255 (2001).

"The administrative expenses of the system shall be paid from interest earned by the retirement fund; provided, that if such interest be insufficient the expense in excess thereof shall be paid from the contributions which this chapter requires participating employers to pay into the [f]und."

ORS 238.610(1) (2001).

"At the close of each calendar year in which the earnings on the * * * [f]und equal or exceed the assumed interest rate established by [PERB] under ORS 238.255, [PERB] shall set aside, out of interest and other income received through investment of the * * * [f]und during that calendar year, such part of the income as [PERB] may deem advisable, not exceeding seven and one-half percent of the combined total of such income, which moneys so segregated shall remain in the fund and constitute therein a reserve account. [PERB] shall continue to credit the reserve account in the manner required by this subsection until [PERB] determines that the reserve account is adequately funded for the purposes specified in this subsection. Such reserve account shall be maintained and used by [PERB] to prevent any deficit of moneys available for the payment of retirement allowances,

due to interest fluctuations, changes in mortality rate or, except as provided in subsection (3) or (4) of this section, other contingency. * * *"

ORS 238.670(1) (2001). As noted earlier, since 1989, the current assumed earnings rate has been set at eight percent.

The 2003 Legislative Assembly amended ORS 238.255 (2001), set out above, and broke it into new subsections (1) and (2), as follows (deleted text in brackets and italics; new text in boldface type):

"(1) The regular account for [*an active or inactive member of the system*] **members who established membership in the system before January 1, 1996, as described in ORS 238.430, and for alternate payees of those members,** shall be examined each year. If the regular account is credited with earnings for the previous year in an amount less than the earnings that would have been credited pursuant to the assumed interest rate for that year determined by [PERB], the amount of the difference shall be credited to the regular account and charged to a reserve account in the fund established for the purpose. [*A reserve account so established may not be maintained on a deficit basis for a period of more than five years. Earnings in excess of the assumed interest rate for*] **In** years following the year for which a charge is made to the reserve account, **all earnings on the regular accounts of members who established membership in the system before January 1, 1996, as described in ORS 238.430, and of alternate payees of those members,** shall first be applied to reduce or eliminate the amount of a deficit. **Only earnings on the regular accounts of members who established membership in the system before January 1, 1996, as described in ORS 238.430, and of alternate payees of those members, may be used to reduce or eliminate the amount of a deficit.**

"(2) **Notwithstanding subsection (1) of this section and except as provided in subsection (5)**[42] **of this section, [PERB] may not credit any earnings to the regular accounts of members who established membership in the system before January 1, 1996, as**

---

[42] Oregon Laws 2003, chapter 625, section 10(5), now ORS 238.255(5), provides that the amendments to ORS 238.255 do not apply to a person who was a judge member of PERS on June 30, 2003.

described in ORS 238.430, or of alternate payees of those members, in any year in which there is a deficit in the reserve account established under subsection (1) of this section, or credit any earnings to the regular accounts of those members, or alternate payees, that would result in a deficit in that reserve account. In any year in which the fund experiences a loss, [PERB] shall charge the amount of the loss attributable to the regular accounts of members who established membership in the system before January 1, 1996, as described in ORS 238.430, against the reserve account."

Or Laws 2003, ch 67, § 5, *as amended by* Or Laws 2003, ch 625, § 10. The amendments to ORS 238.255 apply to the crediting of earnings for calendar year 2003 and thereafter. Or Laws 2003, ch 67, § 6, *as amended by* Or Laws 2003, ch 625, § 11.[43]

In a separate enactment, the 2003 Legislative Assembly added a new subsection (3) to ORS 238.255 (2001), as follows:

"The regular account for an active or inactive member who established membership in the system before January 1, 1996, as described in ORS 238.430, may not be credited with earnings in excess of the assumed interest rate until:

"(a) The reserve account established under subsection (1) of this section no longer has a deficit;

"(b) The reserve account established under subsection (1) of this section is fully funded with amounts determined by [PERB], after consultation with the actuary employed by [PERB], to be necessary to ensure a zero balance in the account when all members who established membership in the system before January 1, 1996, as described in ORS 238.430, have retired; and

"(c) The reserve account established under subsection (1) of this section has been fully funded as described in paragraph (b) of this subsection in each of the three immediate preceding calendar years."

---

[43] Petitioners do not rely on the amendments made to ORS 238.250 (2001) and ORS 238.610 (2001) during the 2003 legislative session (the legislature did not amend ORS 238.670 (2001)), and we agree that those amendments do not appear relevant to the arguments that petitioners make.

Or Laws 2003, ch 3, § 1, *as amended by* Or Laws 2003, ch 67, § 5, *codified as* ORS 238.255(3).

Finally, the 2003 Legislative Assembly amended the earnings crediting process for Tier One PERS members in one other respect, by enacting a new statute that provides as follows:

"(1) Notwithstanding any other provision of this chapter, the regular account balance of a member or alternate payee described in subsection (3) of this section may not be less than the amount provided for under subsection (2) of this section for the purpose of computing retirement allowances, death benefits and amounts to be paid to a withdrawing member under ORS 238.265 and for other computations under the provisions of this chapter that are based on a member's or alternate payee's regular account balance. If the regular account balance of a member or alternate payee described in subsection (3) of this section is less than the amount provided for under subsection (2) of this section at the time of retirement or withdrawal of the account, [PERB] shall credit the account with the difference and charge the amount so credited to the reserve account established under ORS 238.255.

"(2) The minimum regular account balance for a member or alternate payee described in subsection (3) of this section is the amount that the regular account of a member or alternate payee would have contained if the regular account of the member had been credited with earnings at the assumed interest rate in every year in which the regular account of the member or alternate payee was in existence.

"(3) The provisions of this section apply only to:

"(a) A member who establishes membership in the system before January 1, 1996, as described in ORS 238.430, and who retires or withdraws the member account of the member on or after April 1, 2004; and

"(b) · An alternate payee of a member described in paragraph (a) of this subsection."

Or Laws 2003, ch 67, § 8, *as amended by* Or Laws 2003, ch 625, § 12, *codified as* ORS 238.258.

### (2) The Parties' Arguments

From the pertinent statutes as they existed before the 2003 PERS legislation, all petitioners, except petitioner Sartain, glean a promise, the general nature of which is that PERS members "are guaranteed all earnings on their individual accounts, minus allocations for administrative expenses and properly constituted reserves." Moreover, for Tier One members, petitioners assert that the legislature has assured them since 1975—the year that the predecessor statute to ORS 250.255 (2001) was enacted—that "the earnings to be credited annually to their account will be no less than the then-existing assumed interest rate." And, they continue, the legislative history of the 1975 enactment demonstrates that, if meeting that minimum crediting obligation creates a deficit in the gain-loss reserve lasting more than five years, then employers—not members—are responsible for recovering the balance. As with the provisions respecting contributions to members' regular accounts that predated the 2003 PERS legislation, petitioners view the wording of the statutory provisions respecting the crediting of earnings to those accounts as unambiguously promissory, applicable to work yet to be performed, and containing no reservation of the right to future amendment.

Based upon that understanding of the above-quoted 2001 statutory provisions, petitioners argue that the above-quoted provisions from the 2003 PERS legislation directly and indirectly either breach or impair those earlier obligations:

"There is no question but that these legislative changes eliminate the requirement that petitioners' [regular] accounts grow at a rate *at least equal* to the assumed rate *annually* as promised by the 1975 legislature. Furthermore, by removing the employer Call, these changes eliminate the requirement that after five years, any remaining deficit created by the payment of the guarantee becomes the liability of employers. * * * [Instead], all future deficits will be retired only through earnings on employee accounts. In accordance with these provisions, in 2004, [PERB] distributed zero earnings to petitioners['] accounts for the 2003 earnings."

Respondents disagree. They argue that ORS 238.255 (2001) did not promise or require that PERB would credit PERS members' regular accounts with a specific amount of earnings each year. Instead, that statute requires only that crediting occur at "the assumed rate for that year determined by [PERB]," that PERB had the discretion to change that rate, and that the legislature may (and did in 2003) confine PERB's discretion in setting the assumed rate. Moreover, respondents argue that the 2003 PERS legislation applies to only prospective crediting decisions and that newly enacted ORS 238.258 ensures that members ultimately never will receive a lower service retirement allowance than they would have received if their regular accounts had been credited at the assumed earnings rate each year. Respondents also disagree with petitioners' reading of the former call provision as requiring employers to make up any five-year deficit in the gain-loss reserve. Finally, respondents argue that nothing in the statutes upon which petitioners rely establishes a legislative promise that PERS members are entitled to have credited to their regular accounts "any earnings in excess of the assumed rate."

### (3) Discussion

■ Our assessment of the parties' arguments begins with this court's holding in *OSPOA* that the legislature intended the assumed earnings rate for Tier One members to constitute a promise that extends to work yet to be performed. Specifically, the court stated:

> "The state's promise, as material, included employee access to the return rate procedure described in ORS 237.277. Section 11 [of Ballot Measure 8 (1994)] would cancel that obligation after employees partially performed their services. Moreover, section 11 impairs the obligation of contract stated in ORS 237.277, because it would entirely eliminate that obligation with respect to employee contributions to PERS made by current employees for work performed both *before* and after the effective date of Measure 8. *Hughes*; *Taylor*."

*OSPOA*, 323 Or at 378 (emphasis in original). That holding, however, must be considered in the context of the nature of the impairment of the contractual obligation at issue in that

case. There, Measure 8 had presented an all-or-nothing scenario, in *eliminating in its entirety* the legislative promise that Tier One members would receive annual crediting to their regular accounts in an amount not less than the assumed earnings rate.

The 2003 PERS legislation, however, does something other than simply eliminate the obligation. Instead, by enacting ORS 238.258—which requires a guaranteed crediting at the applicable assumed earnings rates on a career basis at retirement—the legislature at least acknowledged the promissory nature of the guaranteed rate of return that *OSPOA* recognized. Accordingly, we are required to interpret the statutory provisions at issue in greater detail than did the court in *OSPOA*, so as to determine whether the 2003 PERS legislation is consistent with the earlier legislative promise.[44]

We address first petitioners' argument that the statutes before the 2003 PERS legislation guaranteed Tier One members not only annual earnings at a rate not less than the assumed earnings rate but also any earnings in excess of the assumed rate, less any allocations necessary for administrative expenses and to properly constituted reserves. We find no support for that broad proposition in the wording of the statutes on which petitioners rely.

ORS 238.255 (2001), for example, addressed directly the circumstance in which a Tier One member's "regular account is credited with earnings for the previous year in an amount less than the earnings that would have been credited pursuant to the assumed interest rate for that year determined by [PERB]." In such instances, PERB credited the difference to the member's regular account and charged that amount to the gain-loss reserve. Although that wording supports a legislative promise that Tier One members' regular accounts will grow annually in an amount not less than the assumed earnings rate, that text evinces no support for the proposition that Tier One members contractually are entitled to any *overage* that is not applied to administrative expenses or reserves.

---

[44] In doing so, we choose not to revisit the court's holding in *OSPOA* that the legislature's promise to Tier One members of a guaranteed rate of return applies to work yet to be performed.

Neither does the legislative direction later in that statute that "[e]arnings in excess of the assumed interest rate for years following the year for which a charge is made to the [gain-loss reserve] shall first be applied to reduce or eliminate the amount of a deficit," ORS 238.255 (2001), support petitioners' claim. Although that sentence expressly contemplated the *potential* for excess earnings, the only command in the statutory wording is that the overage first go toward restoring the gain-loss reserve. Notably absent is any directive that, following such application, PERB *must* apply any remaining earnings to PERS members' regular accounts.

Likewise, ORS 238.670 (2001), which addressed years in which the fund's earnings equaled or exceeded the assumed earnings rate and on which petitioners also rely, did not contain any affirmative promise that PERS members were entitled to a crediting of the overage, less expenses, to their regular accounts. Instead, that statute provided only that, for such years, PERB "shall set aside, out of interest and other income received * * *, such part of the income as [PERB] may deem advisable, not exceeding seven and one-half percent of the combined total of such income" to a reserve account. That statute was not a legislative directive that PERB *must* credit any remaining excess earnings to members' regular accounts. Finally, we have found nothing in the context or history of those statutory provisions that detracts from the conclusion that we have drawn from the text—that is, that the legislature made no such promise respecting excess earnings.[45]

The record in these cases establishes that PERB in fact historically has credited PERS members' regular accounts with excess earnings in good investment years. Even so, it is not for this court to codify PERB's practices. Instead, our task is to ascertain those aspects of the PERS statutes that are promissory and, from those provisions, to determine the precise nature of the obligations that they impose. It is those obligations that set the conditions that the legislature may not in the future alter without consequence.

---

[45] As noted above, petitioners also cite ORS 238.250 (2001) (PERB shall provide members with regular accounts) and ORS 238.610 (2001) (employers responsible for covering difference when administrative expenses exceed annual fund earnings) as support for their argument. We, however, see nothing in those statutes that advances petitioners' assertion.

That PERB may have been administering the system in a more generous fashion regarding crediting to members' regular accounts than the statutes required does not alter the nature of the promises that the legislature made.

For the reasons set out above, we conclude that Tier One members had no contractual right under the PERS statutes as they existed before the 2003 PERS legislation to the crediting of annual earnings in excess of the assumed earnings rate to their regular accounts. Instead, we conclude that, for Tier One members, annual crediting at—but not in excess of—the assumed earnings rate is the promise that the legislature extended. Those conclusions, moreover, undermine at least in part petitioners' subsidiary argument, *viz.*, that the legislature contractually is bound to maintain the system's allocation of the burden of funding reserves and paying administrative expenses. So long as Tier One members' regular accounts are credited annually with earnings that do not fall below the assumed earnings rate, the legislature has reserved for itself the ability to redirect any excess earnings.

Those conclusions, however, do not address fully petitioners' argument that, by changing the future timing of the crediting process, the 2003 PERS legislation removes (*i.e.*, impairs) the obligation that Tier One members' regular accounts annually be credited not less than the assumed earnings rate. In assessing that argument, we begin by comparing the statutory processes for Tier One regular account crediting both before and after the 2003 PERS legislation.

Before the 2003 PERS legislation, PERB examined the regular accounts of Tier One members annually to determine whether the earnings credited to those accounts fell below the assumed earnings rate. ORS 238.255 (2001). If they did, then PERB would credit the difference to those accounts and charge that difference to the gain-loss reserve. *Id.* That statute further provided that the gain-loss reserve could not be maintained on a deficit basis for more than five years (the call), and, respecting repayment of the deficit, the statute provided that PERB first must apply future earnings in excess of the assumed earnings rate to reduce or eliminate the deficit. And, as noted earlier in this opinion, the call provisions of the statute never have had to be invoked. Also,

before the 2003 PERS legislation, Tier One members received annual statements showing the crediting from the previous year's earnings, and those earnings were never less than the assumed earnings rate.

Under the 2003 PERS legislation, however, the crediting system for Tier One members has changed considerably. First, as we have addressed and upheld above, Tier One members no longer are authorized to contribute salary withholdings to their regular accounts. Accordingly, any future growth in those accounts will derive solely from earnings on the members' account balances as of the effective date of the 2003 legislation. Moreover, it no longer is the case that Tier One members' regular accounts necessarily will receive year-by-year annual credits in an amount not less than the assumed earnings rate. For example, if a deficit exists in the gain-loss reserve, then PERB will apply Tier One regular account earnings to the gain-loss reserve in the years following to reduce or eliminate that deficit.[46] Moreover, PERB now may not credit any earnings to Tier One members' regular accounts for any year in which to do so would cause a deficit in the gain-loss reserve, and, for any year in which the fund experiences a loss, PERB is required to charge the amount of the loss attributable to Tier One members' regular accounts against the gain-loss reserve. Or Laws 2003, ch 67, § 5, *as amended by* Or Laws 2003, ch 625, § 10, *codified as* ORS 238.255(1) and (2).[47]

As described, there can be little doubt but that the 2003 PERS legislation took what was before an *unconditional* right of Tier One members to have their regular accounts credited in an amount not less than the assumed earnings rate and changed that right to a *conditional* one. That change, standing alone, would constitute an impairment of a contractual obligation set out in the PERS contract,

---

[46] For example, for that reason, PERB credited Tier One members' regular accounts with no earnings for 2003.

[47] As noted above, under Oregon Laws 2003, chapter 3, section 1, *as amended by* Oregon Laws 2003, chapter 67, section 5, *codified as* ORS 238.255(3), Tier One regular accounts will not be credited with earnings in excess of the assumed earnings rate until the gain-loss reserve no longer has a deficit and is fully funded as determined by PERB for three consecutive years. The validity of that legislation is not before us on review.

because it amounts to an alteration of the legislature's promise respecting the crediting of members' regular accounts. *See Eckles*, 306 Or at 395, 400 (explaining gravamen of constitutional violation; contrasting impairment with breach).

The 2003 PERS legislation, however, added a new statutory provision, ORS 238.258 (quoted above), apparently to meet what otherwise seems a clear impairment of contractual obligation. That provision states that, for purposes of computing the service retirement allowance of a retired Tier One member, the member's minimum regular account balance will be "the amount that the regular account of a member would have contained if the regular account had been credited with earnings at the assumed interest rate in every year in which the regular account * * * was in existence." Or Laws 2003, ch 67, § 8(2), *as amended by* Or Laws 2003, ch 625, § 12. Therefore, the validity of petitioners' argument, as well as the validity of that aspect of the 2003 PERS legislation, depends on whether that new provision is consistent with the legislature's earlier guarantee. We conclude that it is not.

As discussed, the legislature's promise with respect to Tier One members was that those members would receive no less than the assumed earnings rate credited annually to their regular accounts. That statutory promise extends throughout PERS membership. *See OSPOA*, 323 Or at 377-78 (constitutional amendment that eliminated assumed earnings rate on contributions to member accounts for work performed both before and after date of adoption impaired contract set out in *former* ORS 237.777 (1975)). That part of the 2003 PERS legislation providing for a "minimum regular account balance," Or Laws 2003, ch 67, § 8(2), *as amended by* Or Laws 2003, ch 625, § 12, based on the assumed earnings rate over the life of a Tier One member's regular account, is not consistent with the above-described obligation. That is so because Tier One members' regular account balances currently reflect annual earnings credits that often *exceeded* the assumed earnings rate. Those prior earnings crediting decisions, whether or not they are deemed overly generous in hindsight, are now final. To the extent that those final crediting decisions are reflected in Tier One members' regular account balances, no less than the assumed earnings rate

must be credited annually to those account balances until retirement.

In creating a new, *post hoc*, career-crediting process, the 2003 PERS legislation, Or Laws 2003, ch 67, § 8, *as amended by* Or Laws 2003, ch 625, § 12, changes that obligation, ultimately resulting in many cases in account balances that will not represent the sum of all earnings that, consistently with the earlier legislative promise, *annually* have been (and would be) credited to Tier One members' regular accounts. We therefore hold that Oregon Laws 2003, chapter 67, sections 5 to 8, *as amended by* Oregon Laws 2003, chapter 625, sections 10 to 12, alter the state's earlier contractual obligation and thereby impair that obligation in violation of Article I, section 21, of the Oregon Constitution.

Having concluded that that part of the 2003 PERS legislation alters and thereby impairs the state's contractual obligation to credit Tier One members' regular accounts annually in an amount not less than the assumed earnings rate, we proceed to consider the State of Oregon and nonstate respondents' remaining alternative argument and affirmative defense that they advance to avoid the ultimate conclusion that that impairment is constitutionally significant. For the reasons set out below, we conclude that respondents' remaining argument and affirmative defense are not availing under the present circumstances.

First, respondents argue that, to violate Article I, section 21, of the Oregon Constitution, an impairment of contractual obligation must be "substantial." And, in respondents' view, any impairment resulting from the 2003 PERS legislation is not of that magnitude. Specifically, they argue:

> "This Court has not directly addressed the question whether the Legislative Assembly may, within the confines of Oregon's Contract Clause, amend or alter an obligation without impairing or breaching a statutory contract. It has implied on several occasions, however, that a lesser modification to a statutory contract may be constitutionally permissible."

For that proposition, respondents rely primarily on the statement in *Hughes* that, once vested, "an employee's

contractual interest in a pension plan may not be *substantially* impaired by subsequent legislation." 314 Or at 20 (emphasis added). Moreover, respondents argue that other state and federal courts have reached the same conclusion in the context of pension litigation and urge this court to follow suit.

We agree with respondents that this court has yet to determine whether substantiality of an impairment of a contractual obligation is required to show a violation of Article I, section 21. Further, we have considered thoroughly the well-developed arguments from both sides addressing the issue. However, we conclude that we need not answer that question in this instance. That is so because, assuming without deciding that substantiality is a required element, we deem the impairment to the obligation in the PERS contract respecting the annual assumed earnings rate guarantee to be substantial. We reach that conclusion for two reasons.

As an initial matter, although the evidence of the impact of the crediting changes to Tier One members' regular accounts was sharply contested before the Special Master, and the Special Master found that the evidence consisted of estimates that were themselves contingent, that data is sufficiently precise to permit this court to find that, for *Strunk* petitioners as an example, the provisions relating to crediting of Tier One members' regular accounts will result in a reduction of benefits (compared to those that they would have received without the legislation) in amounts varying between approximately 12 and 20 percent per month. Such significant reductions are illustrative of a substantial impairment of the assumed earnings rate guarantee.

More significantly, we deem the impairment to be substantial for the further reason that the alternative that the legislature provided—career-long crediting at the assumed earnings rate—has a retrospective effect on earnings accrued for work already performed. That is so because, in providing the career-basis remedy, the 2003 PERS legislation disregards entirely PERB's earlier crediting decisions—decisions that generally were not challenged[48]—and

---

[48] As discussed at length further in this opinion, a particular crediting decision that PERB made in 1999 was challenged as part of the *City of Eugene* litigation.

effectively replaces the resulting regular account earnings, many of which had exceeded the minimum rate of earnings, with the assumed earnings rate. Absent some legal basis for such a downward adjustment, that legislative choice amounts to nothing more than a unilateral decision to reduce benefits already earned. That, in our view, is a substantial impairment of the contractual obligation respecting the assumed earnings rate guarantee. Accordingly, we reject respondents' argument to the contrary.

Respondents next argue by way of affirmative defense that, even if the impairment is substantial, a substantial impairment can be justified if reasonable and necessary for an important public purpose. Oregon has not adopted that view. *See Hughes*, 314 Or at 14 n 16 ("the application of the rule that a state may not contract away its 'police power' under Article I, section 21, of the Oregon Constitution, does not embrace the 'balancing' analysis currently employed by the Supreme Court of the United States").

The parties introduced voluminous documentary and testimonial evidence concerning the financial status of PERS and the Oregon economy generally in support of and against what the Special Master described as respondents' "economic hardship defenses." That evidence, and specifically the recommended findings that the Special Master derived therefrom, do not convince us that the situation rises to the high threshold that would have to be met for an economic hardship defense—were we to recognize one—to succeed.

First, we emphasize that we are not dealing here with legislation that impairs private contracts. Instead, we are dealing with a statutory contract. In other words, it is one of the *parties* to the contract (the state) that now is attempting to rely on a change in circumstances to permit it to alter its contractual obligations in a constitutional manner. In that light, we note that the Special Master made, among others, the following recommended findings:

- "Oregon's state tax burden currently is approximately .7 percent less than the national average."

- "[T]here is little voter willingness to raise taxes to provide additional government revenues."

- The "capital downturn" from 2000 through 2002, although causing a greater impact on state tax revenues than previous economic downturns over the past two decades, "did not compare in magnitude or duration to the Great Depression of the 1930s."

To be sure, the Special Master's report contains other recommended findings that demonstrate that the state's recent fiscal status is both serious and has resulted in substantial detriments to the provision of governmental services across the state. We accept all those findings. Taken together, however, they do not justify a rewriting of the assumed earnings rate guarantee in a manner that would result in the elimination of earnings both promised and actually credited over time to Tier One members' regular accounts. We reject respondents' economic hardship affirmative defense and declare Oregon Laws 2003, chapter 67, sections 5 to 8, *as amended by* Oregon Laws 2003, chapter 625, sections 10 to 12, void. *See Hughes* 314 Or at 31 (law impairing obligation of contract "is a nullity").

### c. Elimination of the Variable Annuity Account Program

#### (1) The Statutes

As noted, the legislature in 1967 authorized PERS members to direct a percentage of their contributions to equity investments, by creating a variable annuity account program. Or Laws 1967, ch 622, § 24, *codified as former* ORS 237.197 (1967), *renumbered as* ORS 238.260 (1995). The 2001 version of that statute, which remains substantially unchanged from the enactment as initially worded, provided, in part, as follows:

"A member may elect at any time to have 25, 50 or 75 percent of contributions by the member to the fund on and after the effective date of the election paid into the Variable Annuity Account, credited to a variable account, and reserved for the purchase of a variable annuity. A member who has elected to have a percentage of contributions so paid, credited and reserved may elect at any time thereafter to have an additional 25 or 50 percent of contributions by

the member, but not to exceed a maximum of 75 percent, so paid, credited and reserved. An election shall be in writing on a form furnished by [PERB] and be filed with [PERB]. An election shall be effective on January 1 following the filing thereof."

ORS 238.260(3) (2001).[49] The 2003 PERS legislation, however, added a new paragraph (b) to ORS 238.260(3), stating that, "[n]otwithstanding any other provision of this section, a member may not contribute to the Variable Annuity Account after December 31, 2003." Or Laws 2003, ch 67, § 3.

### (2) The Parties' Arguments

All petitioners, except petitioner Sartain, argue that they have a statutory "right" to continue directing a percentage of their PERS contributions to equity investments via their variable accounts, and they focus not only on the use of the word "shall" in ORS 238.260(3) (2001), but also on the wording "at any time," "on and after," and "at any time thereafter" in that provision to support their claim that that right extends to future, rather than to only present, member contributions to PERS. Moreover, petitioners point to the legislative history of the 1967 enactment as support for their claim that the legislature intended, through establishment of the variable annuity account program, "to allow employees the opportunity to increase their benefits."[50] As before with respect to the statutory provisions governing PERS members' regular accounts, petitioners argue that, by permitting

---

[49] The legislature initially provided that members could contribute either 25 or 50 percent of their PERS contributions to the variable annuity account program. Or Laws 1967, ch 622, § 24(3). In 1973, the legislature increased the amount that members could direct to their variable accounts by adding the 75 percent option. Or Laws 1973, ch 695, § 5. Other than that change, and one other in 1981 that we discuss below, the substantive provisions of the statute have remained the same over time.

[50] Even after the 2003 PERS legislation, there is no need to rely on legislative history for that proposition. ORS 238.260(1) itself provided as follows:

"It is anticipated that investment of those contributions and portions of the member accounts in equities will result in the accumulation of larger deposit reserves for those members during their working years, tend to preserve the purchasing power of those reserves and the retirement benefits provided thereby and afford better protection in periods of economic inflation."

*See also* Or Laws 1967, ch 622, § 24(1) (enacting that wording).

no further contributions to the variable annuity account program, the 2003 PERS legislation breaches or impairs the PERS contract because the statutory provisions are

> "unquestionably part of the PERS Act, [are] integral to the calculation of benefits under the Act, [use] unambiguously promissory [wording], [and] contain no language excluding contributions attributable to future service from the general contractual protection and no reservation of [the] right of future amendment."

Respondents likewise advance what in essence repeats their argument concerning PERS members' regular accounts in response to petitioners' variable account claims, *viz.*, that, because members have no continuing contractual right to make contributions to PERS, they similarly have no right to direct those contributions to a variable account. Respondents view the wording "at anytime thereafter" in ORS 238.260(3) (2001) not as establishing a *right* to make future contributions but, instead, as allowing a member to change his or her election at any time so long as the variable account remains available as a statutory option. Finally, respondents emphasize that nothing about the 2003 PERS legislation impacts funds held in a member's variable account as of the effective date of that legislation.

(3) Discussion

 For many of the same reasons that we concluded that the statutory provisions respecting PERS members' regular accounts are terms of the PERS contract, we likewise conclude, and do so without further discussion, that the variable account provisions are as well. (We do not understand respondents to argue to the contrary.) Accordingly, we proceed to determine the meaning of those statutory contractual terms, specifically, whether they constitute a legislative promise that members would have a right for the duration of their membership in PERS to continue directing contributions to their variable accounts.

From a textual standpoint, and from petitioners' perspective, the salient wording of ORS 238.260(3) (2001) is the phrase "at any time," which appears two times in that

subsection.[51] Read in isolation, those broad temporal references could support petitioners' contention that the legislature promised PERS members that they would be permitted to contribute to their variable accounts (as well as to increase their contributions to those accounts) for the duration of their active membership. Ascribing such an intent to the legislature, however, becomes much less supportable when other wording in the statute is considered, particularly the wording that ties a member's right "at any time" to contribute to a variable account to the member's "contributions * * * *to the fund.*" (Emphasis added.) Likewise, a member's right to increase his or her variable account election "at any time thereafter" is tied to *"contributions by the member" to the fund.* (Emphasis added.)

As we have held above, the legislature did not promise members that they could *continue making contributions to the fund* throughout their membership in PERS. And, because we have upheld the legislature's 2003 decision to prohibit members from *further* contributing to the fund (and, instead, to direct member contributions to the IAP), there no longer will be fund contributions from which a percentage could be directed to a variable account. As we view the entirety of the wording of ORS 238.260(3) (2001), then, that wording does not support petitioners' claim of a promise of a continued right to invest in the variable annuity account program. Instead, at most, such a right of contribution exists only so long as members are permitted to contribute to the fund.

We do, however, perceive from that wording a different legislative promise respecting the variable annuity account program that extends throughout membership in PERS. That is, for any member "who has elected to have a percentage of contributions so paid," once PERB has credited

_____

[51] We do not deem the legislature's use of the words "shall" and "on and after" in ORS 238.260(3) (2001) to be indicative of a promise of a right to future contributions to the variable annuity account program. The import of the word "shall" is limited by its context—specifically, its reference to use of a PERB-approved form and to a particular effective date. Similarly, the words "on and after" merely clarify when the variable election takes effect.

those monies to the member's variable account, those contributions will be "*reserved* for the purchase of a variable annuity." ORS 238.260(3) (2001) (emphasis added). Stated differently, although the wording of the statute does not support a continued right to contribute to the variable annuity account program, the wording does evince a legislative promise to reserve until the time of retirement any monies that a member has invested in the variable annuity account program for the purchase of a variable annuity.

Turning next to context, we find little to support or detract from the preliminary observations that we have gleaned from the words of ORS 238.260(3) (2001). Again, we deem the actions of the 1981 Legislative Assembly to be the focal point for our analysis, because it was that body that fundamentally restructured the system to provide for the Full Formula benefit. Consistently with the comprehensive nature of the 1981 legislation, the legislature also added a provision to *former* ORS 237.197 (1979), *renumbered as* 238.260(12) (1995), to account for those members who had made contributions to the variable annuity account program or who had made contributions on salary in excess of $4,800 per year between 1956 and 1967. Or Laws 1981, ch 761, § 6. For such members, the legislature directed PERB to determine the difference between each member's total account balance and what that total would have been had the member either not participated in the variable annuity account program, not made excess contributions, or both. *Id.* The value of the difference, whether positive or negative, then resulted in either an increase or a decrease to the member's monthly service retirement allowance.

Through that amendment to what is now ORS 238.260(12), the 1981 Legislative Assembly not only preserved the excess contributions that some members had made before 1967 and contributions to the variable annuity account program between 1967 and 1981, but also permitted the variable annuity account program to remain as a meaningful part of the system. (Otherwise, absent the Money Match or the Pension Plus Annuity yielding a higher pension component, increases or decreases to a member's variable account would serve only to increase or decrease the amount

that an employer would have to pay to fund the pension component of the service retirement allowance under the Full Formula.) What that limited contextual evidence does not suggest, however, is that the legislature promised members that they would have the ability to contribute to their variable accounts throughout their membership in PERS. That amendment, instead, concerned only the effect that a variable account could have on the service retirement allowance that a member ultimately would receive at retirement.[52]

In light of the foregoing discussion, we conclude that there is nothing inconsistent between the earlier promise that the legislature made with respect to the variable annuity account program—that any funds placed into variable accounts would be reserved for the purchase of a variable annuity—and the 2003 Legislative Assembly's decision to discontinue permitting PERS members to contribute to their variable accounts. Consequently, there can be no breach or impairment of the obligations set out in the PERS contract in that respect.

### d. Cost-of-Living Adjustments (COLAs)

As briefly explained earlier, both before and after the 2003 PERS legislation, ORS 238.360 (2001) required (and still requires) PERB to determine and apply annual COLAs, based on the Consumer Price Index (CPI), to retired PERS members' service retirement allowances. However, parts of the 2003 PERS legislation effectively suspend COLAs on particular service retirement allowances, until specified financial conditions are met, for certain retired Tier One members. The legislature took that step in response to a trial court ruling in the *City of Eugene* litigation, also described below. *Strunk* and *Sartain* petitioners argue that that part of the 2003 legislation constitutes either an impairment or a breach of the statutory PERS contract. We address those contentions below, beginning with a discussion of the *City of Eugene* litigation.

---

[52] As noted, there is a dispute in the *City of Eugene* litigation as to that particular aspect of the variable annuity account program. The resolution of that dispute, however, does not impact our analysis in these cases.

### (1) Background

As discussed earlier in this opinion, the PERS statutes provide for the maintenance of various reserve accounts. Most significant to the *City of Eugene* litigation are the contingency reserve and the gain-loss reserve.

ORS 238.670(1) describes the parameters of the contingency reserve, providing that PERB "shall set aside" as much interest and other income received through investment as PERB "may deem advisable, not exceeding seven and one-half percent of the combined total of such income[,]" for the purpose of maintaining a contingency reserve to "prevent any deficit of money available for the payment of retirement allowances, due to interest fluctuations, changes in mortality rate or * * * other contingency." ORS 238.670(1). PERB has not funded a contingency reserve since 1979.

ORS 238.255 (2001) (now ORS 238.255(1)) describes the parameters of the "gain-loss reserve," to which PERB is required to charge certain amounts. With respect to the gain-loss reserve, the Special Master found:

"Before the enactment of the 2003 [PERS] legislation, PER[B] maintained a 'gain-loss reserve' in which it set aside a portion of annual fund earnings to ensure that sufficient assets would be available to pay guaranteed benefits at the assumed earnings rate. In years when fund earnings exceeded the guaranteed amount, PERB deposited a portion of those funds into the gain-loss reserve. The evidence showed that it is reasonable to fund the gain-loss reserve at a level that would fund projected Tier One guaranteed earnings credits for a 30-month period, which, using the current assumed earnings rate of 8 percent, would set the reserve balance at 20 percent of the fund's value."

As to PERB's treatment of the gain-loss reserve and the contingency reserve in the late 1990s, the Special Master found as follows:

"In 1999, the fund earned approximately $7.5 billion, or 24.89 percent of its value. [PERB credited 20 percent to Tier One regular accounts for that year.] PERB allocated approximately $1.3 billion to the gain-loss reserve, which left it funded at approximately 72 percent of [its] new

30-month goal. After PERB allocated 1999 earnings, the gain-loss reserve had a positive balance of $4.744 billion.

"If PERB had fully funded the contingency reserve for 1999 by crediting 7.5 percent of the fund's earnings as authorized by ORS 238.670(1) and, if PERB had fully funded the gain-loss reserve according to its 30-month goal, approximately 11.33 percent would have been available for crediting to Tier One accounts."[53]

The funding gap created by PERB's choice not to fund the two accounts fully, as the Special Master described it, meant that an imbalance existed that PERB sought to make up through assessments—*i.e.*, contribution rate orders—on employers. In response to those assessments, three local government employers, including the City of Eugene, challenged their 1998 and 2000 contribution rate orders by filing an action against PERB in Marion County Circuit Court. Several employers also challenged PERB's order allocating 1999 earnings. In part, the employers argued that their contribution rates would have been lower if PERB properly had funded the contingency and gain-loss reserves. All the challenges were consolidated and became the *City of Eugene* litigation. Several PERS members intervened in the litigation to defend PERB's crediting decisions respecting their regular accounts.

In July 2001, the trial court held that PERB had abused its discretion by not funding the contingency reserve since 1979. The court further held that PERB had abused its discretion by crediting 20 percent interest to Tier One members' regular accounts in 1999, instead of properly funding the contingency and gain-loss reserves. The court remanded the challenged rate orders to PERB with instructions that PERB issue new rate orders consistently with the court's judgment. PERB and intervenors appealed that judgment to the Court of Appeals, which transferred the litigation to this court pursuant to Oregon Laws 2003, chapter 537, section 1, where it is now pending.

---

[53] The Special Master made those findings based on evidence presented to, and findings made by, the trial court in the *City of Eugene* litigation, described in the text below.

Pursuant to the trial court's judgment, the Fiscal Services Division (FSD) of PERS recalculated the credits to Tier One members' regular accounts for 1999 and concluded that, if PERB properly had funded the contingency and gain-loss reserves in 1999, the appropriate credit to members' regular accounts for that year would have been 11.33 percent. Before FSD presented that figure to PERB for final approval, however, the legislature requested that information directly from FSD. The legislature subsequently enacted the 2003 PERS legislation. Oregon Laws 2003, chapter 67, sections 9 and 10, *as amended by* Oregon Laws 2003, chapter 625, section 13, effectively codifying the 11.33 percent figure as the correct 1999 crediting decision.[54]

After the legislature enacted Oregon Laws 2003, chapter 67, PERB and the employer parties entered into a settlement agreement purporting to resolve the *City of Eugene* litigation. That settlement agreement provided, in part:

"[E]xcept in the event of a supervening change in law (such as by a legislative enactment or further court order):

"* * * * *

"1.3 The new 1999 earnings allocation order * * * will provide that the appropriate earnings allocation to Tier [One] regular member accounts is 11.33 [percent], that 7.5 [percent] of the 1999 earnings should have been allocated to the contingency reserve established by ORS 238.670(1), and that the gain-loss reserve created by ORS 238.670(3) should have been funded to the full extent of the former PERB's policy to maintain a gain-loss reserve sufficient to credit the assumed interest rate to Tier [One] regular member accounts during a period of 30 months of 0 [percent] earnings."

After entering into that settlement agreement, PERB moved to dismiss the appeal, but intervenors opposed that motion, and this court denied it without prejudice. As a result of the

---

[54] As noted, Oregon Laws 2003, chapter 537, section 1, granted this court "exclusive jurisdiction to decide" the *City of Eugene* litigation. We do not address here the merits of the trial court's judgment in that litigation. The issues that that case presents more appropriately will be addressed in our opinion in that case.

court challenges to PERB's 1999 crediting decision, that decision was potentially subject to reversal at the time that the legislature enacted Oregon Laws 2003, chapter 67, sections 9 and 10, *as amended by* Oregon Laws 2003, chapter 625, section 13.

Oregon Laws 2003, chapter 67, sections 9 and 10, *as amended by* Oregon Laws 2003, chapter 625, section 13, apply to only Tier One members who receive service retirement allowances pursuant to the Money Match and who retired on or after April 1, 2000, but before April 1, 2004. As pertinent here, section 10, *as amended by* Oregon Laws 2003, chapter 625, section 13, requires PERB to recalculate two alternative service retirement allowances for those members, resulting in a "revised" allowance and a "fixed" allowance.

To calculate the "revised" service retirement allowance, PERB first must recalculate the affected members' regular account balances as if 11.33 percent, rather than 20 percent, had been credited in 1999. PERB then must recalculate the members' service retirement allowances based on those newly calculated account balances and apply the appropriate COLAs for each calendar year since each member's retirement to the newly calculated service retirement allowance. As a result of those calculations, PERB will have determined a new service retirement allowance for each affected member as of the date of the calculation, based on an 11.33 percent credit to each member's regular account in 1999 (*i.e.*, the "revised" service retirement allowance). Or Laws 2003, ch 67, § 10(2), *as amended by* Or Laws 2003, ch 625, § 13. PERB thereafter is required to apply annual COLAs on members' "revised" service retirement allowances. Or Laws 2003, ch 67, § 10(2)(d).

To calculate the "fixed" service retirement allowance, PERB must determine the amount payable to each affected member on July 1, 2003, or on the member's retirement date, whichever is later. The resulting "fixed" service retirement allowance may not be adjusted by annual application of a COLA. Or Laws 2003, ch 67, § 10(3), *as amended by* Or Laws 2003, ch 625, § 13.[55]

---

[55] We note that the particular sentence in Oregon Laws 2003, chapter 67, section 10(3), that precludes application of annual COLAs to "fixed" service retirement allowances was not amended by Oregon Laws 2003, chapter 625, section 13.

Finally, Oregon Laws 2003, chapter 67, section 10(4), *as amended by* Oregon Laws 2003, chapter 625, section 13, requires that each affected member be paid the greater of the newly calculated "revised" and "fixed" service retirement allowances. Stated differently, if an affected member's "fixed" service retirement allowance (which is based on a 20 percent credit in 1999, but is *not* subject to an annual COLA) exceeds that member's periodically determined "revised" service retirement allowance (which is based on an 11.33 percent credit in 1999 and *is* subject to an annual COLA), then that member will not receive annual COLAs until such time as the "revised" allowance exceeds the "fixed" allowance. From that point forward, the member will receive annual COLAs on the "revised" service retirement allowance.

(2) The Parties' Arguments

*Strunk* and *Sartain* petitioners argue that Oregon Laws 2003, chapter 67, sections 9 and 10, *as amended by* Oregon Laws 2003, chapter 625, section 13, breach the PERS statutory contract and impair contractual obligations in violation of Article I, section 21. They particularly argue, as pertinent here, that ORS 238.360 (2001), which required PERB to provide retired members with annual COLAs on their monthly service retirement allowances, is a term of the PERS contract. ORS 238.360 (2001) provided, in part:

"(1) As soon as practicable after January 1 each year, [PERB] shall determine the percentage increase or decrease in the cost-of-living for the previous calendar year, based on the Consumer Price Index * * *. Prior to July 1 each year the allowance which the member or the member's beneficiary is receiving or is entitled to receive on August 1 for the month of July shall be multiplied by the percentage figure determined, and the allowance for the next 12 months beginning July 1 adjusted to the resultant amount.

"(2) Such increase or decrease shall not exceed two percent of any monthly retirement allowance in any year and no allowance shall be adjusted to an amount less than the amount to which the recipient would be entitled if no cost-of-living adjustment were authorized."

*Strunk* and *Sartain* petitioners argue that, contrary to Oregon Laws 2003, chapter 67, section 10(3), *as amended by*

Oregon Laws 2003, chapter 625, section 13, which calculates a "fixed" service retirement allowance that is not subject to an annual COLA, ORS 238.360(1) (2001) required PERB to provide COLAs on *all* service retirement allowances. In other words, *Strunk* and *Sartain* petitioners assert that affected Tier One members who are receiving "fixed" service retirement allowances under the 2003 PERS legislation have a contractual right to receive annual COLAs on those allowances, even though the allowances were based on a regular account balance that, in the legislature's determination, included an erroneous 20 percent credit in 1999. They argue that, when a member has performed fully under the PERS contract in reliance on the promise set out in ORS 238.360(1) (2001), that member's rights have vested and the legislature may not take away COLAs without breaching the PERS contract or unconstitutionally impairing an obligation of that contract.

Respondents acknowledge that the affected Tier One members have performed fully and are entitled to receive service retirement allowances that are calculated based on amounts *properly* credited to their regular accounts. They argue, however, that petitioners seek more than that. Petitioners, respondents claim, are asserting that they have a contractual right to receive service retirement allowances that reflect an *improper* credit of 20 percent in 1999. The PERS statutes, respondents argue, do not grant petitioners the right to *erroneously* credited earnings. In fact, they assert, another statute—ORS 238.715 (which we discuss in greater detail below)—authorizes PERB to recover the over-credited amounts from petitioners, even though they are retired.

Respondents also observe that, in addition to setting out specific avenues for recouping overpayments, ORS 238.715(8) allows PERB to use "any other remedies that may be available to [it] for recovery of amounts incorrectly paid from the fund[.]"[56] Respondents argue that, in enacting Oregon Laws 2003, chapter 67, section 10, *as amended by* Oregon Laws 2003, chapter 625, section 13, the legislature

---

[56] The current versions of ORS 238.715(1) and (8) are identical to the 2001 versions of those provisions.

has provided PERB with "other remedies" for recouping the erroneously credited earnings.

### (3) Discussion

██ Before turning to our analysis of petitioners' claims, we think it helpful to clarify the precise nature of our inquiry here. First, no party appears to dispute that, in creating the "fixed" service retirement allowance coupled with the suspension of an annual COLA, the legislature's intent was to recoup what it deemed to be overpayments to the affected members' regular accounts in 1999.[57] Second, as discussed below, respondents note that the PERS statutes contemplate that PERB erroneously might pay certain amounts to a member who already has retired and that PERB generally is permitted, as a statutory matter, to recoup erroneous payments. And, third, as respondents appear to suggest, *Strunk* and *Sartain* petitioners' *particular* contractual challenges to the COLA suspension in Oregon Laws 2003, chapter 67, section 10(3), in essence raise the question whether the legislature's choice *to preclude application of annual COLAs on fixed retirement allowances* was a permissible method of facilitating such a recoupment. Stated differently, by directing PERB to suspend annual COLAs on fixed retirement allowances, does the 2003 PERS legislation either impair or breach PERB's obligation to apply annual COLAs under ORS 238.360 (2001)?

As with our analysis of the foregoing challenged aspects of the 2003 PERS legislation, we first determine whether ORS 238.360 constituted a term of the PERS statutory contract before the enactment of the 2003 legislation. ORS 238.360 (2001) provided, in part:

"(1) As soon as practicable after January 1 each year, *[PERB] shall determine the percentage increase or decrease in the cost of living for the previous calendar year*, based on the Consumer Price Index * * *. Prior to July 1 each year *the allowance which the member or the member's beneficiary is receiving or is entitled to receive* on August 1 for the month of July *shall be multiplied by the percentage figure*

---

[57] As noted, in light of the pending *City of Eugene* litigation, PERB's 1999 crediting decision remained subject to reversal at the time that the legislature enacted the 2003 PERS legislation.

*determined, and the allowance for the next 12 months begin-*
*ning July 1 adjusted to the resultant amount.*

"(2) Such increase or decrease shall not exceed two percent of any monthly retirement allowance in any year and no allowance shall be adjusted to an amount less than the amount to which the recipient would be entitled if no cost of living adjustment were authorized."

(Emphasis added.) The legislature enacted that statute in 1971, and its substance has remained unchanged, notwith-standing other interim amendments. *See former* ORS 237.060(1) (1971), *renumbered as* ORS 238.360 (1995) (set-ting out original statute).

ORS 238.360(1), as it existed in 2001 and as pres-ently worded, provides that PERS members' monthly service retirement allowances annually shall be adjusted to reflect "the percentage increase or decrease in the cost of living for the previous calendar year[.]" Like the tax provision ana-lyzed in *Hughes*, the text of ORS 238.360(1) (2001) evinces a clear legislative intent to provide retired members with annual COLAs on their service retirement allowances, when-ever the CPI warrants such COLAs. We therefore conclude that the general promise embodied in ORS 238.360(1) (2001) was part of the statutory PERS contract applicable to the group of retired members affected by the 2003 provisions at issue here. Having so concluded, we now must determine the extent of that promise.

We return to the wording of the statute and, specifi-cally, the requirement that, prior to July 1 each year, "the *allowance* which the member or the member's beneficiary *is receiving or is entitled to receive*" on August 1 for the month of July must be subject to a COLA. ORS 238.360(1) (2001) (emphasis added). The context of ORS 238.360(1) (2001), which includes other related statutes, *PGE*, 317 Or at 611, assists our reading of the emphasized wording. As noted ear-lier, ORS 238.715 (2001) provided, in part:

"(1) *If [PERB] determines that a member* of the system or any other person receiving a monthly payment from the * * * [f]und *has received any amount in excess of the amounts that the member or other person is entitled to under*

*this chapter*, [PERB] may recover the overpayment or other improperly made payment by:

"(a) Reducing the monthly payment to the member or other person for as many months as may be determined by [PERB] to be necessary to recover the overpayment or other improperly made payment; or

"(b) Reducing the monthly payment to the member or other person by an amount actuarially determined to be adequate to recover the overpayment or other improperly made payment during the period during which the monthly payment will be made to the member or other person."

(Emphasis added.) As is apparent from the text of ORS 238.715(1) (2001), the legislature has anticipated that PERB might pay amounts from the fund in error—that is, a member (or other person, such as a beneficiary) might be paid more from the fund than that member is "entitled" to "receive[ ]" under the PERS statutes. And, in the event that such an overpayment occurs, the legislature further has provided that PERB may recover that overpayment.

In light of the identical wording in ORS 238.360 (2001) and ORS 238.715(1) (2001), regarding allowances that a member is "entitled to receive" and amounts "received" that exceed those to which a member is "entitled," we conclude that the promise set out in ORS 238.360(1) (2001) respecting the application of annual COLAs does not extend to erroneous overpayments included in a member's service retirement allowance that the member was not entitled to receive. However, the promise does extend to properly calculated service retirement allowances.

Having defined the scope of the legislature's promise, we turn to the 2003 PERS legislation to determine whether—and, if so, to what extent—it is inconsistent with that promise. As explained earlier, Oregon Laws 2003, chapter 67, section 10, *as amended by* Oregon Laws 2003, chapter 625, section 13, provides that the original service retirement allowances for retired Tier One members who are affected by that section shall be recalculated in two ways, resulting in a "revised" service retirement allowance and an alternative "fixed" service retirement allowance. As also noted above, the

"revised" service retirement allowance continues to be subject to an annual COLA under ORS 238.360(1). The "fixed" service retirement allowance is set at the amount that was payable to the retired member as of July 1, 2003, or as of the member's retirement date, whichever is later, and is not subject to an annual COLA under ORS 238.360(1). The crux of the question before us, then, is whether the "fixed" service retirement allowance calculated under Oregon Laws 2003, chapter 67, section 10(3), *as amended by* Oregon Laws 2003, chapter 625, section 13, either does or does not qualify as an allowance that is subject to an annual COLA under ORS 238.360(1) (2001). Stated more specifically, does the "fixed" service retirement allowance represent payment of an "allowance" that the member was not "entitled to receive?"

The answer to that question is no. It is true that the legislature's apparent intent in creating the "fixed" service retirement allowance—most notably, when coupled with elimination of any otherwise applicable COLA—was to allow PERB to recoup certain amounts credited to the affected members' accounts in 1999 (and which the 2003 Legislative Assembly deemed to be overpayments). However, the "fixed" service retirement allowance *itself* represents a *determined allowance*—that is, an allowance expressly determined by the legislature. In light of that legislative determination, the "fixed" service retirement allowance cannot be said to transfer to the affected member any funds to which the member (again, in the legislature's determination) was not entitled. As such, the "fixed" service retirement allowance falls within the scope of the promise set out in ORS 238.360(1) (2001)— that is, that PERB annually apply a COLA to each affected member's allowance (in years in which the CPI warrants such a COLA)—because the allowance represents funds that the member, by legislative determination, is "entitled to receive."

We therefore conclude that the elimination of annual COLAs from the "fixed" service retirement allowance, as set out in Oregon Laws 2003, chapter 67, section 10(3), is inconsistent with the legislature's promise set out in ORS 238.360(1) (2001). Having done so, we next must determine whether that inconsistency amounts to a breach or an impairment of that obligation under the PERS contract. As to

that question, this court's decision in *Eckles*, 306 Or 380, is instructive.

As explained earlier, *Eckles* involved legislation that had transferred surplus funds from the IAF—which, by statute, were to be used for only workers' compensation purposes—to the General Fund. There, as here, the legislature's intent in transferring the funds had been to attain a legislative goal that, generally speaking, appeared legitimate and was not in dispute (in *Eckles*, avoiding a state budget deficit). However, it was the legislature's method for attaining that goal that, in the court's determination in *Eckles*, had contractual implications for the state. Specifically, the court concluded that the part of the legislation that had *eliminated* the state's obligation to use IAF funds in the statutorily specified manner constituted an unconstitutional impairment of the state's contractual obligation. 306 Or at 399. The court further concluded that the part of the legislation that had directed the transfer of funds *amounted to a mandate that the state breach the contract. Id.* at 400.

Applying *Eckles* to the statutory contractual issue before us now, it is indisputable that the promise set out in ORS 238.360(1) (2001) respecting annual COLAs remains part of the PERS statutory scheme applicable to the affected group of retired members. However, by precluding application of annual COLAs to "fixed" service retirement allowances determined for those affected members, Oregon Laws 2003, chapter 67, section 10(3), amounts to a directive from the legislature to PERB to breach the promise set out in ORS 238.360(1) (2001) with respect to those members. We conclude, as petitioners contend, that that aspect of the 2003 PERS legislation breaches a term of the PERS contract. *See Eckles*, 306 Or at 400-02 (so explaining in similar circumstances); *see also Hughes*, 314 Or at 32-33 (same).[58]

---

[58] Put another way, the legislature took what it deemed to be restorative action, but used as the mechanism for doing so an adjustment that implicated the COLA provision of the PERS contract. Our conclusion that that particular legislative action amounted to a breach of the PERS contract, however, implies nothing about PERB's—or, for that matter, the legislature's—authority to recover amounts determined to have been paid from the fund in error.

Having so concluded, we now must address as a final matter the disposition of petitioners' claims for relief respecting the above-described COLA provisions of the 2003 PERS legislation. As explained, Oregon Laws 2003, chapter 67, section 10(3), breaches the PERS contract by directing PERB not to provide annual COLAs on "fixed" service retirement allowances. Normally, this court leaves to the legislature, as the "most appropriate branch of government in the first instance," *Hughes*, 314 Or at 33 n 36, the choice as to which remedy to select when legislation breaches a statutory contract. Here, however, under what we deem to be unique circumstances, we conclude that the prudent dispositional action is to invalidate the offending statutory wording. Accordingly, we declare that part of Oregon Laws 2003, chapter 67, section 10(3), that provides, "[t]he fixed service retirement allowance may not be adjusted under ORS 238.360," to be void. The effect of our choice to declare that part of the law to be void is that petitioners will be returned—at least for the time being—to the same position in which they would have been if the legislature had not enacted the COLA suspension.[59]

e. Actuarial Equivalency Factors

As noted earlier in this opinion and as explained more fully below, part of the 2003 PERS legislation modifies the calculation of service retirement allowances for certain PERS members who entered the system before 1999, by adopting new actuarial equivalency factors (AEFs). All petitioners challenge that part of the legislation, as discussed below.

(1) Background

We take the following description of PERB's approach toward AEFs from the Special Master's report:

"From time to time, after consulting with its actuary,[60] PERB has adopted AEFs for use in the administration of

---

[59] Because the foregoing disposition returns petitioners to the *status quo ante*, that disposition obviates any need to consider petitioners' arguments that the temporary suspension of COLAs constitutes a taking of property under Article I, section 18, of the Oregon Constitution or their additional contractual and constitutional challenges to the "revised" service retirement allowance calculations set out in Oregon Laws 2003, chapter 67, section 10(2), *as amended by* Oregon Laws 2003, chapter 625, section 13.

[60] Since the inception of what is now PERS in 1945, the legislature has required the PERS actuary to "prepare a report evaluating the current and

the fund. AEFs are based on assumptions concerning the future earnings of the fund and members' expected mortality rates. AEFs are used to convert lump sum account balances to monthly payment streams and to change one optional benefit payment form to another. When converting a lump sum to a monthly benefit, the lump sum and the monthly benefit payments are actuarially equivalent if both forms of payment have the same present value. Two of the three types of PERS retirement benefits—Money Match and Pension Plus Annuity—are calculated based on AEFs.

"Before 1978, PERB used a substantial number of AEF tables that applied to particular categories of members. In 1978, PERB adopted two simplified sets of actuarial tables, one each for male and female members. The tables for female members produced a lower monthly retirement allowance, because they assumed that females would, on average, have longer life spans after retirement than males.

"In *Henderson v. State*, U.S. District Court Case No. CV74-538, the court concluded that the use of separate gender-based calculations was unlawful.[61] In 1978, PERB adopted the male-only actuarial factors for all PERS members. That process commonly was referred to as 'topping up' the AEF tables. The topped-up tables increased employer contribution rates by 0.49 percent.

"In 1978, PERB adopted a 7 percent assumed earnings rate for the fund. In 1979, PERB increased the assumed earnings rate to 7.5 percent. However, it did not change the system's AEFs because (1) the actuary determined that members generally were living longer after retirement; and (2) new actuarial factors would have blended assumed male and female mortality rates and, therefore, would have been

---

prospective assets and liabilities of the system and indicating its current and prospective financial condition." ORS 238.605; *see* Or Laws 1945, ch 401, § 13 (stating same). The legislature further has required that, "[i]n preparing the report[,] the actuary shall investigate the mortality, disability, service and other experience of the members of, and employers participating in the system, shall state fully the condition of the system, and shall make such recommendations as the actuary deems advisable to facilitate administering it properly." *Id.*

[61] The United States Supreme Court also has held that that practice violates Title VII of the Civil Rights Act of 1964. *See Arizona Governing Committee v. Norris*, 463 US 1073, 1084, 103 S Ct 3492, 77 L Ed 2d 1236 (1983) ("The use of sex-segregated actuarial tables to calculate retirement benefits violates Title VII whether or not the tables reflect an accurate prediction of the longevity of women as a class[.]")

lower than those produced by the use of male-only tables. PERB did not change its AEFs again until 1989.

"When PERB increased the assumed earnings rate to 8 percent in 1989, it also adopted revised mortality tables. The revised AEFs were a combination of the pre-existing 7 percent earnings and 1978 male-only mortality assumptions, and new 8 percent earnings and 1989 blended male/female mortality assumptions. PERB used the new factors only if they increased member benefits; otherwise, PERB used the preexisting factors.

"In 1993, PERB adopted [former] OAR 459-05-055 [(1993)]. That rule provided that [the] PER[S]'s actuary would perform an actuarial equivalency study every two years. The rule required the actuary to 'recommend to [PERB] assumptions, factors and the rationale for any recommended changes to the actuarial tables used by [PERS].' [Former] OAR 459-05-055(1)(b) (1993)[, renumbered as OAR 459-005-0055 (1996)]. Subsection (2) of the rule provided, in part:

" '(b) All changes to the System's annuity tables shall be prospective only for allowances effective on or after the effective date of the change;

" '(c) If the consulting actuary's recommendation to change a factor would produce a lower benefit, [PERB] will not change the current factor.'

"In the 1995 actuarial study, the actuary reported that continuing improvement in mortality rates would justify an adjustment of the system's AEFs, but he opined that [former] OAR [459-05-055 (1993)] * * * foreclosed the adoption of factors that would reduce member benefits. The actuary asked PERB to review the rule because mortality rates were expected to continue to improve, and the use of the existing AEFs was a significant cost consideration."

(Footnote omitted.) The actuary also explained in a July 1995 letter to PERB that the factors that PERB intended to adopt pursuant to *former* OAR 459-05-055 (1993) would not serve to achieve " 'true actuarial equivalenc[y]' " because of the grandfathering of higher benefit factors over the years[.]"

In 1996, PERB both renumbered and amended *former* OAR 459-05-055 (1993) (set out in part above) to provide that AEFs would be updated for only members who joined

PERS after January 1, 1999. The new rule, *renumbered as* OAR 459-005-0055 (1996), provided, in part:

"(4) * * *

"* * * * *

"(b) All changes to the System's actuarial equivalency factors shall be prospective only for that portion of an allowance attributable to service as an active member beginning on or after the effective date of the change.

"(5) Notwithstanding subsection (4)(b) of this rule, for members who established membership in PERS before January 1, 1999, as described in Oregon Laws 1995, Chapter 654, Section 2, [PERB] shall not change a factor that would produce a lower periodic or single benefit payment, and any change of factor(s) shall apply to the total allowance payable."

PERB had promulgated that rule in response to legal advice that it had received regarding maintaining the fund's status as a qualified governmental retirement plan and trust under the Internal Revenue Code (IRC).[62]

The Special Master's report explains:

"In 2001, PERB again reviewed the AEFs for the system. At that time, PERB adopted a policy of using factors based on current mortality assumptions if the factors adequately protected benefits previously earned under former AEFs. PERB reviewed various options for protecting accrued benefits, but it had not completed that process when it became apparent that the 2003 legislature intended to enact legislation on the same subject.

"In sum, before the 2003 legislation was enacted, PERB generally used AEFs that had been in effect since 1978 and that did not match the assumptions that the actuary used to value the system and make projections about system costs. Those factors understated the life expectancy of PERS members. When they were used to convert a member's account balance to a monthly allowance, the aggregate value of the monthly allowance was higher than the value of the account balance. Therefore, unless additional funds

---

[62] Following enactment of the 2003 PERS legislation, PERB again amended the rule to conform with the legislation. *See* OAR 459-005-0055(3) (2004) (requiring use of updated AEFs for members retiring after July 1, 2003).

were contributed to the system, the account balance would have dissipated before the member's average life expectancy was reached. Put another way, because the AEFs did not match the actuary's life expectancy assumptions for the system, the amount available to pay the BIF[63] upon a member's retirement was, other things being equal, insufficient to cover the projected costs for that member. PERS then had to 'true up' the BIF by transferring additional amounts from employer accounts.

"In 1995, the actuary estimated that the continued use of a 'grand[ ]fathered' approach to changes in AEFs cost the system approximately 0.5 percent of payroll per year. As more members retired under the Money Match and the amount of their benefits increased, the financial impact of using outdated factors also grew. In 2002, the actuary estimated that the immediate use of updated mortality tables would decrease employer contribution rates by approximately 2.28 percent of payroll."

(Footnote omitted.)

Oregon Laws 2003, chapter 68, section 2, requires PERB to adopt current actuarial equivalency factor tables that "use the best actuarial information on mortality available at the time [PERB] adopts the tables[.]" Those tables become effective on January 1 of the calendar year following PERB's adoption of the new tables. *Id.*

Further, Oregon Laws 2003, chapter 68, section 4, *as amended by* Oregon Laws 2003, chapter 67, section 40, and Oregon Laws 2003, chapter 625, section 16, modifies the calculation for the annuity component of the service retirement allowance for certain members who entered the system before 1999. Specifically, such members who retired (or will retire) on or after July 1, 2003, will have their annuity components calculated under the new legislation, which directs PERB to use one of two calculations, whichever produces the greater benefit. The first requires application of the AEFs in effect as of the member's effective retirement date to the retiring member's account balances on that date; the second

---

[63] As explained earlier, the BIF (or "Benefits-In-Force" reserve account) acts as a transitional account to which PERB transfers a newly retired member's account balances, together with the employer contributions necessary to pay that member's service retirement allowance.

creates an account balance as of June 30, 2003, that consists of only the member's contributions and earnings credited as of that date, and PERB then determines the member's annuity component from that balance using the AEFs in effect on June 30, 2003. That second calculation generally is referred to as the "look-back" provision.

(2) The Parties' Arguments

All petitioners, except petitioner Sartain, challenge Oregon Laws, chapter 68, section 4, *as amended by* Oregon Laws 2003, chapter 67, section 40 and Oregon Laws 2003, chapter 625, section 16, which requires PERB to adopt updated AEFs and, beginning July 1, 2003, to apply those AEFs when calculating certain retired PERS members' annuity components. They rely primarily on OAR 459-005-0055(5) (1996), which, as quoted above, provided:

> "Notwithstanding subsection (4)(b) of this rule,[64] for members who established membership in PERS before January 1, 1999, as described in Oregon Laws 1995, Chapter 654, Section 2, [PERB] shall not change a factor that would produce a lower periodic or single benefit payment, and any change of factor(s) shall apply to the total allowance payable."

They assert that, because PERB is the trustee of the fund and has been granted authority to adopt rules governing administration of the fund, the foregoing rule is a term of the PERS statutory contract. As such, they argue that the legislature may not remove that term by requiring PERB to calculate annuity components using updated AEFs, the likely effect of which will be to reduce their service retirement allowances.

As support for that contention, petitioners argue that ORS 238.630(3)(g) (2001), a predecessor version of which is discussed further below, gave PERB "the absolute authority" to establish the system's actuarial factors (specifically, those in effect since 1978) and required that such factors "shall constitute part of the system." They further argue that

---

[64] That subsection provided that "[a]ll changes to the System's actuarial equivalency factors shall be prospective only for that portion of an allowance attributable to service as an active member beginning on or after the effective date of the change."

ORS 238.650(2) (2001), which provided that "[a]ll rules adopted by [PERB] become part of the written plan document of [PERS]," reinforces their contractual right to enforce the terms of OAR 459-005-0055(5) (1996). Because Oregon Laws 2003, chapter 68, section 4, *as amended by* Oregon Laws 2003, chapter 67, section 40, and Oregon Laws 2003, chapter 625, section 16, nullifies the effect of that rule, petitioners argue, it breaches the PERS contract and impairs obligations of the contract.

Petitioner Dahlin presents the same argument, but adds a "federal law" analysis premised on his observation that PERB must maintain the fund's tax status under the IRC. His analysis is designed to illustrate that the incorporation of updated AEFs will violate provisions of the IRC, jeopardize the fund's tax status, and therefore violate petitioners' contractual rights.

For their part, respondents first observe that the PERS statutes require AEFs to yield service retirement allowances that are the " 'actuarial equivalent' of members' account balances." Yet petitioners, in respondents' view, assert a contractual right to the use of outdated factors that, by definition, cannot produce actuarial equivalency. To support that argument, respondents cite ORS 238.630(3)(g) (2001), which required PERB to adopt new AEFs from "time to time" that, once applied, will calculate the "actuarial equivalen[t] of optional forms of retirement allowances," and ORS 238.300(1) (2001), which required (and still requires) "actuarial equivalen[cy]" in converting each member's account balances at retirement into the annuity component of the member's service retirement allowance.

Respondents further dismiss the validity of OAR 459-005-0055(5) (1996) by observing that that rule departs from the aforementioned legislative mandates. Finally, respondents observe that the 2003 "look-back" calculation preserves the service retirement allowances that members would have received had PERB calculated their annuity components using the factors and account balances in place the day before the 2003 PERS legislation went into effect. Thus, they argue, Oregon Laws 2003, chapter 68, section 4, *as amended by* Oregon Laws 2003, chapter 67, section 40, and

Oregon Laws 2003, chapter 625, section 16, does not reduce retroactively the service retirement allowances to which members are entitled.

### (3) Discussion

■ As an initial matter, we briefly dispose of petitioner Dahlin's separate IRC-based claims. First, addressing fully those IRC-based claims would require an analysis of specific IRC provisions. IRC section 7476(a), however, confers jurisdiction to determine retirement plan qualification to the United States Tax Court. It follows that engaging in the analysis that petitioner Dahlin's IRC-based claims require would be outside the scope of our jurisdiction. We therefore reject petitioner Dahlin's IRC-based claims without further discussion.

■ Turning to the other challenges, our analysis again must begin with determining the specific terms of the PERS statutory contract.

*Former* ORS 237.251(3)(g) (1991), *renumbered as* ORS 238.630(3)(g) (1995), which initially provided the basis for PERB's adoption of the rule that became OAR 459-005-0055 (1996), provided:

> "[PERB] [s]hall determine the actuarial equivalency of optional forms of retirement allowances and establish from time to time for that purpose the necessary actuarial factors, which shall constitute a part of the system[.]"[65]

We again apply the *PGE* methodology, 317 Or at 610-12, to the statute to ascertain the legislature's intent and conclude that the legislature's intent is clear from the first level of analysis. As respondents argue, *former* ORS 237.251(3)(g) (1991) set out a legislative mandate that PERB periodically perform two tasks: first, to determine the "actuarial equivalency of optional forms of retirement allowances"; and, second, to "establish[,] from time to time[,] for [the purpose of determining the actuarial equivalency of optional forms of

---

[65] The text of that statutory provision was the same in 1996, when PERB renumbered and amended *former* OAR 459-05-055 (1993), *renumbered as* OAR 459-005-0055 (1996), and also was the same in 2001. The 2003 Legislative Assembly renumbered the provision as ORS 238.630(3)(f) and amended it; that amendment is not at issue here.

retirement allowances,] the necessary actuarial factors, which shall constitute a part of the system[.]" *Former* ORS 237.251(3)(g) (1991) therefore required PERB periodically to update its actuarial factors to ensure that service retirement allowances ultimately paid, regardless of the form of those allowances,[66] satisfied an "actual equivalency" standard.

Similarly, *former* ORS 237.147 (1991) *renumbered as* ORS 238.300(1) (1995), provided, in part, that the annuity component of each member's service retirement allowance "shall be the actuarial equivalent" of each member's "accumulated contributions * * * at the time of retirement." In short, both statutes clearly indicate that the legislature intended for members' service retirement allowances to satisfy an "actuarial equivalency" standard. The legislature delegated that responsibility, which included updating the system's actuarial factors, to PERB.

The PERS statutes did not define the term "actuarial equivalent" at the time that PERB adopted *former* OAR 459-05-055 (1993), *renumbered as* OAR 459-005-0055 (1996); that term remained undefined until 2003.[67] The PERS actuary, however, testified consistently with the following explanation of the term, as set out in the Special Master's report:

> "AEFs are based on assumptions concerning the future earnings of the fund and members' expected mortality rates. AEFs are used to convert lump sum account balances to monthly payment streams and to change one optional benefit payment form to another. *When converting a lump sum to a monthly benefit, the lump sum and the monthly benefit payments are actuarially equivalent if both forms of payment have the same present value.*"

(Emphasis added.) That definition suggests that the concept of actuarial equivalency, as it relates to these cases, is concerned with substituting equally one form of payment for

---

[66] ORS 238.305 (1993) allowed (and still allows in amended form) retired members to select from a variety of "optional" service retirement allowance calculations, in addition to those set out in ORS 238.300.

[67] ORS 238A.005(2) now provides:

" 'Actuarial equivalent' means a payment or series of payments having the same value as the payment or series of payments replaced, computed on the basis of interest rate and mortality assumptions adopted by [PERB]."

another—that is, a lump sum representing a member's total service retirement allowance for a stream of payments over time derived from that sum. In addition, it is clear that, if mortality rates improve, members' monthly allowances would decrease if AEFs properly are updated to reflect those improvements.

PERB, however, has adopted a rule that essentially renders the AEFs static. OAR 459-005-0055(5) (1996) provided that, for certain members,[68] "[PERB] shall not change a factor that would produce a lower periodic or single benefit payment." That text effectively states that, even if the PERS actuary recommended that PERB update the AEFs to reflect improved mortality assumptions, PERB would not do so if it would result in lower monthly service retirement allowances for certain members. Indeed, the PERS actuary testified before the Special Master that PERB had declined to update the AEFs notwithstanding his warning that the PERB-applied AEFs were not producing actuarially equivalent benefits (as *former* ORS 237.251(3)(g) (1991) and *former* ORS 237.147(1) (1991) required) and his advice that PERB not adopt OAR 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 (1996).

Petitioners argue that the last clause of *former* ORS 237.251(3)(g) (1991)—"which shall constitute a part of the system"—demonstrates a legislative intent to provide PERB with the absolute authority to establish, at its discretion, the system's actuarial factors. They argue that, because of that authority, the actuarial factors that PERB has established are part of the PERS statutory contract and cannot be changed without either breaching or impairing their contractual rights. We disagree, for two reasons.

First, petitioners' reading of the final clause of *former* ORS 237.251(3)(g) (1991) both misapprehends and devalues the clause that precedes it. Again, that provision provided:

"[PERB] [s]hall determine the actuarial equivalency of *optional forms of retirement allowances* and establish from

---

[68] Those members "established membership in PERS before January 1, 1999[.]" OAR 459-005-0055(5) (1996).

time to time for that purpose the necessary actuarial factors, which shall constitute a part of the system[.]"

As a grammatical matter, the phrase, "which shall constitute part of the system," refers to factors that *necessarily ensure actuarial equivalency* in the payment of PERS members' service retirement allowances—a standard by which, as the Special Master found, the AEFs used before the 2003 PERS legislation fell short. *See generally*, Bryan A. Garner, *A Dictionary of Modern American Usage* 648 (1998) (nonrestrictive clause provides detail as to preceding noun). Relatedly, in light of the legislature's choice to use nonrestrictive wording in the final clause, it is apparent that the legislature's primary intent was to ensure that PERB update the AEFs as necessary to produce actuarial equivalency in the calculation of members' service retirement allowances. *See id.* (nonrestrictive clauses generally provide supplemental detail relating to preceding noun, as opposed to more essential detail); *see also generally Feero v. Housley*, 205 Or 404, 415, 288 P2d 1052 (1955) (court presumes that legislature meant exactly what it stated within statutory provision).

Petitioners' suggested reading of *former* ORS 237.251(3)(g) (1991) also renders that provision internally inconsistent, effectively directing PERB to establish proper AEFs to ensure actuarial equivalency in calculating PERS members' service retirement allowances on the one hand, while providing PERB with authority to make those factors permanent on the other. That is not a plausible reading of the statute. To the contrary, the statutory wording demonstrates that the legislature intended for PERB to ensure that a retired member's stream of monthly payments would be the actuarial equivalent of that member's total service retirement allowance. And, in so doing, PERB was required, "from time to time for that purpose[,]" *former* ORS 237.251(3)(g) (1991), to establish the actuarial factors necessary to produce that result. Nowhere in chapter 237 (now chapter 238) did the legislature evince any contrary intent. And, no part of that chapter suggests that the legislature intended to give PERB the authority to make its AEFs permanent.

Based on the foregoing, we reject petitioners' argument that the legislature intended in *former* ORS

237.251(3)(g) (1991), which, as noted, provided the basis for PERB's adoption of OAR 459-05-055 (1993), *renumbered as* OAR 459-005-0055 (1996), to freeze the AEFs in place at that time, as part of the statutory contract. It follows that nothing about Oregon Laws 2003, chapter 68, sections 2 and 4, *as amended by* Oregon Laws 2003, chapter 67, section 40, and Oregon Laws 2003, chapter 625, section 16, breaches or impairs an obligation of the PERS contract.

E. *State Constitutional Claim Under Article I, Section 20*

■ Petitioner Dahlin argues that the 2003 PERS legislation discriminates on the basis of age in violation of the equal privileges and immunities clause of Article I, section 20, of the Oregon Constitution.[69] More specifically, he argues that the Special Master's findings indicate that the 2003 legislation will have a disparate impact on the service retirement allowances of "older workers" as opposed to those of younger workers. He argues that, because the 2003 legislation denies older workers benefits that it specifically confers to younger workers, it violates his rights under Article I, section 20.

Petitioner Dahlin uses various terms to describe the purported "class" to which he belongs. On one hand, he argues that the 2003 PERS legislation denies benefits to "older workers"—a term that he does not define—that it confers to younger workers, but, on the other, he asserts membership in a specific class, namely, Tier One members aged 40 and older. However, even assuming that either categorization is sufficient to define a class for the purposes of Article I, section 20, petitioner Dahlin cannot prevail as a member of either class, as explained below.

As to petitioner Dahlin's argument based on a class of "older workers," the Special Master's report states that "mid-career employees—that is, those within 10 years of retirement—[will] experience greater impacts on their future benefits" as a result of the 2003 PERS legislation. According to his report, those members are aged 42 to 52. His report

_____

[69] Article I, section 20, of the Oregon Constitution provides that "[n]o law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

indicates further that members aged 57 are expected to receive benefits greater than those received by mid-career members and even than those received by members aged 37. That data indicates that the oldest group of members are projected to receive benefits in excess of those received by many younger members. Petitioner Dahlin presents no additional evidence nor any evidence to the contrary. In fact, he relies exclusively on the findings set out in the Special Master's report, but he reaches a conclusion exactly opposite to that which is inescapable based on the data set out in that report. We conclude that, even if this court were to agree that "older workers" compose a recognizable class under Article I, section 20, petitioner Dahlin cannot prevail on his claim here because the evidence simply does not support his assertion that the 2003 PERS legislation treats "older workers" disparately from younger ones.

■ As to petitioner Dahlin's argument based on a class of "Tier One members aged 40 and older," that argument essentially asserts age discrimination within the broader "class" of Tier One members. Being a Tier One member, however, is a status created entirely by the PERS statutory scheme. As this court has explained, the legislature is free to create statutory classes and to create distinctions among those classes. *Greist v. Phillips*, 322 Or 281, 292, 906 P2d 789 (1995). What the legislature may not do, however, is create distinctions based on characteristics that exist independent of the terms of legislation. *Crocker and Crocker*, 332 Or 43, 54-55, 22 P3d 759 (2001). As noted above, petitioner Dahlin has failed to prove any distinction based on age. He therefore is left to rely entirely on his status as a Tier One member. Because that classification was created by the statutory scheme at issue and does not exist independently of that scheme, it cannot serve as a basis for petitioner Dahlin to assert an Article I, section 20, violation. We therefore reject his claim.

F. *Remaining Constitutional Claims*

In addition to the claims for relief that we have addressed, various petitioners also challenge parts of the 2003 PERS legislation based on the "takings" provisions of the Oregon Constitution and the United States Constitution,

Or Const, Art I, § 18; US Const, Amends V, XIV, and the Contracts Clause of the United States Constitution, US Const, Art I, § 10. The foregoing holdings dispose of those claims, either because we have voided the challenged legislation in light of petitioners' state contract claims or because our determination of the particular obligations set out in the PERS contract obviates the fundamental premise of petitioners' remaining claims (that is, that the PERS contract granted them "rights" that cannot be breached, impaired, or taken for public use). We therefore need not discuss those claims further.

## IV. CONCLUSION

"The function of the court is to declare the law as it is and not what it thinks it ought to be." *Wallace v. International Ass'n*, 155 Or 652, 661-62, 63 P2d 1090 (1937). We offer that nearly 70-year-old statement from our predecessors on this bench neither in apology nor as commentary on the various legislative and executive policy choices—both past and present—that these cases have brought before us. Instead, we reiterate that pronouncement here because we think that it is both correct and reflective of our efforts to resolve these compelling issues—efforts that counsel and the parties themselves advanced considerably through their diligent and capable conduct of this litigation.

We conclude that, in two respects, petitioners have prevailed on their claims for relief. First, petitioners in each of the cases correctly have argued that the provisions of the 2003 PERS legislation that alter the manner in which earnings are credited to the regular accounts of Tier One members impair an obligation of the statutory PERS contract in violation of Article I, section 21, of the Oregon Constitution. As such, those provisions are void and of no effect. Second, *Strunk* and *Sartain* petitioners are correct in their assertion that the provision of the 2003 PERS legislation that directs PERB to not apply annual COLAs to certain retired members' "fixed" service retirement allowances breaches the contrary obligation of the PERS contract to do so; that provision also is declared void and of no effect. In all other respects, we conclude that petitioners' claims for relief are not well taken.

Oregon Laws 2003, chapter 67, sections 5, 6, 7, and 8, *as amended by* Oregon Laws 2003, chapter 625, sections 10, 11, and 12, are declared void. The final sentence in Oregon Laws 2003, chapter 67, section 10(3), is declared void. In all other respects, petitioners' claims for relief are denied or dismissed.

**BALMER, J.,** concurring.

I join in each aspect of the majority's analysis and disposition of these proceedings, including those that follow from this court's decision in *Oregon State Police Officers' Assn. v. State of Oregon*, 323 Or 356, 918 P2d 765 (1996) (*OSPOA*). We appropriately have declined to revisit the questions of statutory interpretation and legislative intent that *OSPOA* addressed and decided. Our respect for that precedent, however, should not be misread as an endorsement of either the result or the reasoning in that case.

To the contrary, in my view, the court in *OSPOA* lost sight of the polestar of statutory contractual analysis: clear, unambiguous, and unmistakable promissory intent. *See Hughes v. State of Oregon*, 314 Or 1, 17, 838 P2d 1018 (1992) ("a contract will not be inferred from * * * legislation unless it unambiguously expresses an intention to create a contract"); *Campbell et al. v. Aldrich et al.*, 159 Or 208, 213-14, 79 P2d 257 (1938) (legislature's intention "to create contractual obligations * * * must clearly and unmistakably appear"; surrender of legislative control over vital public matters "cannot be established by mere implication"). Having lost that bearing, the court in *OSPOA* proceeded to misconstrue the "assumed interest rate" provision of ORS 238.255—a patently administrative provision intended to smooth fluctuations in PERS fund earnings—as both a material and a perpetual aspect of the PERS contract. *See OSPOA*, 323 Or at 377-78 (construing "assumed interest rate" provision). Oregon's public employers and taxpayers must live with the effect of *OSPOA*'s error for some time to come. Our appropriate respect for *stare decisis* in the interpretation of statutes, and more particularly of statutory contracts on which public employees have relied, compels as much. *OSPOA*, however, ought not have any more vitality than that.

I concur.

240

**DURHAM, J.,** concurring in part and dissenting in part.

I write separately to explain why I join in some but not all of the majority's analysis and conclusions.

I begin by noting that I agree with the majority's invocation of the "rule of necessity" to allow the justices of this court to address and decide the issues in these proceedings. I also agree with the majority's determinations regarding petitioners' standing and the existence of justiciable controversies; the dismissal of petitioner Dahlin's claims under 42 USC section 1983 and on behalf of certain PERS retirees; the dismissal, on ripeness grounds, of claims by petitioners in *Strunk, Burt, Dahlin,* and *Evans* challenging Oregon Laws 2003, chapter 67, sections 14b(1)(b) and 14b(2); and the denial of motions to compel production of documents in the *Strunk* and *Dahlin* proceedings.

I turn now to the majority's disposition of petitioners' other substantive challenges to the 2003 PERS legislation.

## ANNUAL CREDITING OF MEMBERS' REGULAR ACCOUNTS AT ASSUMED EARNINGS RATE

The majority declares that Oregon Laws 2003, chapter 67, sections 5, 6, 7, and 8, *as amended by* Oregon Laws 2003, chapter 625, sections 10, 11, and 12, are void, because those provisions impair the state's contractual retirement obligation with its employees in violation of Article I, section 21, of the Oregon Constitution. That section provides, in part: "No * * * law impairing the obligation of contracts shall ever be passed * * *." The cited provisions of the 2003 PERS legislation concern the legislature's cancellation of annual crediting of Tier One member regular account balances at the assumed earnings rate. I concur with the majority's conclusion in that respect. I also concur with the majority that the legislature's modification of the statutory scheme for charging public employer accounts when credited income exceeds earnings for more than five years (the "call") does not impair the statutory contract. The underlying contractual obligation to credit member regular accounts remains with the state

regardless of the state's accounting arrangements with public employers regarding the funding of member account balances.

## COST OF LIVING ADJUSTMENTS (COLAs)

The majority also concludes that Oregon Laws 2003, chapter 67, section 10(3), direct the Public Employees Retirement Board (PERB) to breach the promise of annual COLAs on certain "fixed" service retirement allowances. 338 Or at 225. I conclude that the cited section of the 2003 legislation regarding COLAs purports to eliminate a contractual obligation of the state. As a consequence, that that provision of the 2003 legislation impairs an obligation of contract in violation of Article I, section 21, and is invalid for that reason. The legislature's attempt to suspend COLAs on properly calculated service retirement allowances for the affected retired members is void.

The majority rests its breach of contract theory on its reading of *Eckles v. State of Oregon*, 306 Or 380, 760 P2d 846 (1988). In *Eckles*, this court examined two provisions of a statute, Oregon Laws 1982 (Special Session 3), chapter 2 (the "Transfer Act"). One provision of the Transfer Act, section four, eliminated the state's statutory contractual obligation to employers to use certain surplus funds in a statutory trust fund only for purposes related to the workers' compensation laws. A second provision, section two, directed the State Treasurer to transfer $81 million from that statutory trust fund to the state General Fund.

The court concluded that section four of the Transfer Act impaired the state's contractual obligation under preexisting contracts with employers and was unconstitutional in that respect. The court also concluded that section two of the Transfer Act did not alter the state's contractual obligation to employers. Requiring the State Treasurer to transfer funds did nothing to change the state's contractual promise to use the funds solely for purposes related to workers' compensation laws. In the court's view, however, section two did breach the state's promise; the transfer of the funds exposed the state to a legal obligation to compensate employers for the breach.

In my view, the elimination of COLAs in the 2003 PERS legislation is closely analogous to the elimination of the statutory contractual duty effected by section four of the Transfer Act, as discussed in *Eckles*. The majority's attempt to compare that aspect of the 2003 PERS legislation to the operation of section two of the Transfer Act, as discussed in *Eckles*, is unconvincing. I conclude that the majority misreads *Eckles*.

Nevertheless, I see no reason to dissent from the result that the majority adopts following its breach of contract analysis. The majority returns the parties to the position that they occupied before the legislature adopted its 2003 amendment, and declares that that amendment is void. As *Eckles* demonstrates, that is the proper remedy when legislation impairs the obligation of a statutory contract in violation of Article I, section 21, of the Oregon Constitution. As a consequence, I concur in that aspect of the majority opinion.

## ADOPTION OF NEW ACTUARIAL EQUIVALENCY FACTORS (AEFs)

The 2003 PERS legislation modifies the preexisting statutory scheme regarding PERB's application of actuarial equivalency factors (AEFs) to convert a member's account balance to a monthly allowance, among other things. Petitioners contend that, pursuant to a lawful delegation of rulemaking authority, PERB had adopted rules in 1993 (*former* OAR 459-05-055) and 1996 (OAR 459-005-0055) that required PERB to refrain from changing any AEF if the adoption of the new factor would have the effect of lowering a periodic or single benefit payment to a member. According to petitioners, PERB's rules "constitute[d] a part of the system," as ORS 238.630(3)(g) (2001) provided, from the time of their adoption. Therefore, petitioners argue, by amending certain statutes to require PERB to update its AEFs, the legislature impaired an aspect of the retirement contract between the state and the affected members of PERS.

Oregon Laws 2003, chapter 68, section 2, requires PERB to adopt new AEFs that "use the best actuarial information on mortality available at the time the board adopts the tables[.]" Section 4 of that law incorporates the new AEFs

as a part of the retirement calculus for members who retired on or after July 1, 2003, and exposes those retirees to the possibility of lower retirement allowances under the new AEFs. Petitioners contend that those sections of Oregon Laws 2003, chapter 68, impair the state's contractual obligation to its employees.

The majority rejects that claim, and I concur for the following reason. There is no question that PERB's 1993 and 1996 rule, in its amended 1996 form, in absolute and unconditional terms, prohibited PERB from changing any AEF to the economic detriment of any member who established PERS membership before January 1, 1999. It is unnecessary to decide in this proceeding whether PERB exceeded its rule-making authority in adopting those rules. The only true question is whether the statutes requiring establishment of AEFs by PERB reflect a contractual intention by the legislature, such that the Legislative Assembly in 2003 lacked authority to impair any obligation regarding AEFs that PERB's rules embodied.

I assume *arguendo* that the legislature may create a binding contract by a valid delegation of authority to an administrative agency to specify contractual terms through rulemaking. However, that is not what occurred here.

For many years before it enacted the 2003 PERS legislation, the legislature had required PERB to establish from time to time the necessary actuarial factors that would allow PERB to determine the actuarial equivalency of the optional forms of retirement under the system. *See, e.g., former* ORS 237.251(3)(g) (1991).[1] "Actuarial" means "relating to statistical calculation esp. of life expectancy." *Webster's Third New Int'l Dictionary* 22 (unabridged ed 2002). As a variable in the

---

[1] *Former* ORS 237.251(3) (1991), which was in effect when PERB adopted the rules in question, provided, in part:

"The board:

"(g) Shall determine the actuarial equivalency of optional forms of retirement allowances and establish from time to time for that purpose the necessary actuarial factors, which shall constitute a part of the system[.]"

That statute, renumbered as ORS 238.630(3)(g) in 1995, remained in effect without substantive modification until the legislature amended it by enacting Oregon Laws 2003, chapter 68, sections 2 and 4.

statistical calculation of actuarial equivalency, the factor of "life expectancy" has no constant and unchanging value. Rather, it is constantly in flux, shifting with the prevalence in the subject population of the various factors (*e.g.*, health history, diet, exercise, tobacco use, etc.) that influence longevity.[2] *Former* ORS 237.251(3)(g) (1991) required PERB to take account of the changing character of the factors that determine actuarial equivalency by establishing the necessary actuarial factors "from time to time."

There is no question that the legislature has delegated broad rulemaking authority to PERB. When PERB adopted the two rules now under consideration, *former* ORS 237.263 (1991), *renumbered as* ORS 238.650(1995), provided:

> "*Subject to the limitations of ORS 237.001 to 237.315, the board shall, from time to time, establish rules for transacting its business and administering the system* in accordance with the requirements of ORS 183.310 to 183.550."

(Emphasis added.) That statute has remained in effect without substantive modification through the present time. Aside from any question of the lawfulness of the 1993 and 1996 rules, that statute confirms that PERB had authority to alter those rules at any time.

PERB's broad authority to alter its rules is insufficient, standing alone, to demonstrate that PERB's rules did not reflect a legislative contractual intent while they were in effect. However, in view of PERB's duty under *former* ORS 237.251(3)(g) (1991) to evaluate the accuracy of its AEFs and publish new ones from time to time, and the necessary qualifying effect of that statute on PERB's rulemaking authority in *former* ORS 237.263 (1991), I cannot read PERB's rules to create a contractual obligation that later legislation could not

---

[2] The legislature acknowledged the inherent variability of the factors that influence the statistical determination of actuarial equivalency when it adopted the following statement as one of its premises for the enactment of House Bill 2004, which the legislature later codified as Oregon Laws 2003, chapter 68:

"Whereas actuarial equivalency factors are based on assumptions and conditions that vary over time as the demographics of a system's constituent population and the expected performance of investments of the Public Employees Retirement Fund change, so that the most reasonable expectation is that such factors, by their very nature, must vary over time to reflect those demographic and performance shifts * * *."

impair. *Former* ORS 237.263 (1991) required PERB "from time to time" to establish rules for conducting its business, and ORS 237.251(3)(g) (1991) and its statutory successors in force through 2001 also required PERB to establish new AEFs "from time to time." Those provisions underscore the impermanence of the AEF rules on which petitioners base their claim. The foregoing discussion demonstrates that the majority correctly rejects petitioners' contract impairment claims based on PERB's 1993 and 1996 administrative rules.

## PETITIONER DAHLIN'S AGE
## DISCRIMINATION CLAIM

The majority addresses and rejects the claim of petitioner Dahlin that the 2003 PERS legislation discriminates against him on the basis of age in violation of Article I, section 20, of the Oregon Constitution. I concur.

## TERMINATION OF EMPLOYEE CONTRIBUTIONS
## TO MEMBER ACCOUNT; LOSS OF CREDITS
## TO MEMBER ACCOUNT AND ENHANCEMENTS
## TO RETIREMENT ALLOWANCE

The 2003 PERS legislation terminates the long-standing statutory plan for funding a key component of public employee retirement allowances, the member account. The result is that, for affected Tier One employees, decades-old statutory requirements for credits to member accounts and employer matching contributions no longer will apply. Petitioners argue that those changes inevitably will lead to reduced retirement allowances in violation of their retirement contract with the state. Moreover, they contend, because employee retirement allowances will fall under the 2003 PERS legislation, public employers will pay COLA adjustments after petitioners retire on the basis of illegally reduced retirement allowances, thus compounding the economic injury to petitioners. To evaluate petitioners' impairment of contract claim in this respect, it is necessary to put in the proper context the requirements for member accounts that were in place before enactment of the 2003 PERS legislation.

The payment that an eligible member of the PERS system receives on retiring is known as a service retirement allowance. ORS 238.300 (2001) provided:

"Upon retiring from service at normal retirement age or thereafter, a member of the system shall receive a *service retirement allowance which shall consist of the following annuity and pensions*: * * *."

(Emphasis added.)

As that clause makes clear, two sources of funds constitute the service retirement allowance: an annuity and pensions. ORS 238.005 (2001) defined "annuity" and "pension" as follows:

"For purposes of this chapter:

"(1) 'Annuity' means payments for life derived from contributions made by a member as provided in this chapter.

"* * * * *

"(15) 'Pension' means annual payments for life derived from contributions by one or more public employers."

The phrase "contributions made by a member" in the statutory definition of "annuity" referred to the statutory obligation of active members to contribute six percent of their salaries to the Public Employees Retirement Fund (the fund). ORS 238.200(1)(a) (2001) provided:

"An active member of the system shall contribute to the fund and there shall be withheld from salary of the member six percent of that salary."

Oregon's statutory scheme for public employee retirement always has required employees' contributions to the fund that provides the financial basis for their retirement since the creation of the present retirement system 60 years ago. That scheme also has required PERB to maintain individual accounts that reflect both the amount of member contributions to the fund and any increases in the account due to interest earnings. *See* OCLA § 90-710(2) (stating those requirements in the original public employee retirement statute in 1945). Until 2003, those provisions had not changed significantly since 1945.

Several statutes in effect in 2001, as set out below, explained the nature and operation of member accounts and their central importance to the calculation of each member's service retirement allowance. ORS 238.005(13) (2001) provided, in part:

"(a) 'Member account' means the regular account and the variable account.

"(b) 'Regular account' means the account established for each active and inactive member under ORS 238.250.

"(c) 'Variable account' means the account established for a member who participates in the Variable Annuity Account under ORS 238.260."

ORS 238.200(2) (2001) provided:

"The contributions of each member as provided in subsection (1) of this section shall be deducted by the employer from each payroll and transmitted by the employer to the board, which shall cause them to be credited to the member account of the member."

ORS 238.250 (2001) provided:

"The board shall provide for a regular account for each active and inactive member of the system. The regular account shall show the amount of the member's contributions to the fund and the interest which they have earned. The board shall furnish a written statement thereof upon request by any member or beneficiary of the system."

ORS 238.255 (2001) explained the requirements for crediting the regular account of a Tier One member:

"The regular account for an active or inactive member of the system shall be examined each year. If the regular account is credited with earnings for the previous year in an amount less than the earnings that would have been credited pursuant to the assumed interest rate for that year determined by the board, the amount of the difference shall be credited to the regular account and charged to a reserve account in the fund established for the purpose. A reserve account so established may not be maintained on a deficit basis for a period of more than five years. Earnings in excess of the assumed interest rate for years following the year for which a charge is made to the reserve account shall

first be applied to reduce or eliminate the amount of a deficit. The Public Employees Retirement Board shall attempt to ensure that the reserve account is funded with amounts adequate to leave a zero balance in the account when all members who established membership in the system before January 1, 1996, as described in ORS 238.430, have retired."

The statutes set out above demonstrate that the requirements regarding member contributions of salary to the fund served two functions. First, they required a personal investment, over time, by the member in the system that ultimately would fund the member's retirement. Second, they afforded the member the opportunity, over time, to increase the size of the resulting member's regular account.

The majority correctly reports that the PERS system created three different formulas for calculating a member's service retirement allowance and promised the members that the state would calculate their benefits according to the one formula out of the three that would provide the highest level of service retirement allowance. The three formulas are the Money Match, the Pension Plus Annuity, and the Full Formula. The Pension Plus Annuity formula applies to only Tier One members who made contributions to the system before August 21, 1981. For the Tier One members who do not meet that qualification, ORS 238.300 (2001) affords two, not three, formulas, the Money Match and the Full Formula. It is undisputed that, as petitioners argue, the size of the member's service retirement allowance under the Money Match and Pension Plus Annuity formulas turns directly on the size of the accumulated percentage-of-salary contributions and interest on those contributions in the member's regular account.

The three formulas arise from the terms of ORS 238.300, which in 2001, provided:

"Upon retiring from service at normal retirement age or thereafter, a member of the system shall receive a service retirement allowance which shall consist of the following annuity and pensions:

"(1) A refund annuity which shall be the actuarial equivalent of accumulated contributions by the member

and interest thereon credited at the time of retirement, which annuity shall provide an allowance payable during the life of the member and at death a lump sum equal in amount to the difference between accumulated contributions at the time of retirement and the sum of the annuity payments actually made to the member during life shall be paid to such person, if any, as the member nominates by written designation duly acknowledged and filed with the board or shall otherwise be paid according to the provisions of this chapter for disposal of an amount credited to the member account of a member at the time of death in the event the member designates no beneficiary to receive the amount or no such beneficiary is able to receive the amount. If death of the member occurs before the first payment is due, the member account of the member shall be treated as though death had occurred before retirement.

"(2)(a) A life pension (nonrefund) for current service provided by the contributions of employers, which pension, *subject to paragraph (b) of this subsection*, shall be an amount which, when added to the sum of the annuity under subsection (1) of this section and the annuity, if any, provided on the same basis and payable from the Variable Annuity Account, both annuities considered on a refund basis, results in a total of:

"(A) For service as a police officer or firefighter, two percent of final average salary multiplied by the number of years of membership in the system as a police officer or firefighter before the effective date of retirement.

"(B) For service as a member of the Legislative Assembly, two percent of final average salary multiplied by the number of years of membership in the system as a member of the Legislative Assembly before the effective date of retirement.

"(C) For service as other than a police officer, firefighter or member of the Legislative Assembly, 1.67 percent of final average salary multiplied by the number of years of membership in the system as other than a police officer, firefighter or member of the Legislative Assembly before the effective date of retirement.[3]

"(b) *A pension under this subsection shall be at least*:

---

[3] This paragraph states the Full Formula.

"(A) The actuarial equivalent of the annuity provided by the accumulated contributions of the member.[4]

"(B) For a member who made contributions before August 21, 1981, the equivalent of a pension computed pursuant to this subsection as it existed immediately before that date.[5]

"(c) As used in this subsection, 'number of years of membership' means the number of full years plus any remaining fraction of a year for which salary was paid and contributions to the Public Employees Retirement System made. Except as otherwise provided in this paragraph, in determining a remaining fraction a full month shall be considered as one-twelfth of a year and a major fraction of a month shall be considered as a full month. Membership of a school district employee, an employee of the State Board of Higher Education engaged in teaching or other school activity at an institution of higher education or an employee of the Department of Human Services, the Oregon Youth Authority, the Department of Corrections or the State Board of Education engaged in teaching or other school activity at an institution supervised by the authority, board or department, for all portions of a school year in a calendar year in which the district school, institution of higher education or school activity at an institution so supervised in which the member is employed is normally in session shall be considered as a full one-half year of membership. The number of years of membership of a member who received a refund of contributions as provided in ORS 237.976(2) is limited to the number of years after the day before the date on which the refund was received. The number of years of membership of a member who is separated, for any reason other than death or disability, from all service entitling the member to membership in the system, who withdraws the amount credited to the member account of the member in the fund during absence from such service and who thereafter reenters the service of an employer participating in the system but does not repay the amount so withdrawn as provided in this chapter, is limited to the number of years after the day before the date of so reentering.

---

[4] This paragraph states the Money Match formula.

[5] This paragraph states the Pension Plus Annuity formula.

"(3) An additional life pension (nonrefund) for prior service credit, including military service, credited to the member at the time of first becoming a member of the system, as elsewhere provided in this chapter, which pension shall be provided by the contributions of the employer."

(Emphasis added.)

The Money Match formula in that statute derives particularly from the terms of ORS 238.300(2)(b)(A) (2001).[6] The Special Master described the operation of the Money Match formula as follows:

"[U]nder the Money Match method, a retired member receives an annuity based on his or her member account balance, which is matched by an equal annuity that the member's employer or employers funds. PERB historically has calculated the Money Match benefit by determining the balance in the member's regular account, adding the balance in the member's variable account, if any, and multiplying the combined balance by an AEF. A benefit in an equal amount is then added and charged to the employer's account. The resulting retirement allowance is therefore twice the amount of the benefit resulting from the member's own annuitized account balances."

Special Master's Report at 13.

The legislature created the Pension Plus Annuity formula in 1967, Oregon Laws 1967, chapter 622, and, as already noted, it applies only to PERS members who have made contributions before August 21, 1981. The Special Master described the operation of the Pension Plus Annuity formula as follows:

---

[6] As the majority indicates, PERS, at its inception in 1945, provided for the creation of personal accounts into which the public employee would pay an amount actuarially determined to be sufficient, with earnings on the account balance, to provide one-half of the proposed retirement allowance (typically, at the time, 50% of final average salary). OCLA § 90-714. Upon retirement, the employee would receive an annuity based on the value of the personal account, and the public employer also would provide a similar annuity, for the other one-half of the proposed retirement allowance, by "matching" the amount in the employee's individual account. OCLA § 90-719. The level of the projected retirement benefit has increased over time, and the legislature has augmented the PERS system from time to time with various reserve features to provide stability during periods of loss. However, except for one two-year period over 35 years ago, the PERS system has retained the Money Match formula as one available method of retirement benefit calculation through the present time.

"The Pension Plus Annuity method is available only to members who made PERS contributions before August 21, 1981. Under that method, PERS calculates a pension equal to 1.0 percent of the member's final average salary (1.35 percent for legislators, and police and fire employees) for each year of service. An annuity calculated by multiplying the member's account balance by an actuarial equivalency factor (AEF) is added to the pension. The retirement allowance is the sum of the formula pension and the member's annuitized account balance. Under the Pension Plus Annuity method, the retirement allowance is fully funded by employers."

The legislature created the Full Formula pension benefit in 1981. Or Laws 1981, ch 616, § 4. The Special Master described the operation of the Full Formula pension as follows:

"PERS staff calculates the Full Formula allowance by multiplying the retiring member's final average salary and years of service by a factor. The formula provides 50 percent of final average salary for career employees (25 years of police/fire service, or 30 years of general service). Thus, the Full Formula calculation consists of three components: (1) the member's final average salary; (2) the member's years and months of creditable service as of the date of retirement; and (3) a factor set by statute at 1.67 percent for general service employees and 2.0 percent for legislators, police officers, and firefighters.[7] The member is entitled to an annuity in an amount equal to the member's final average salary multiplied by the length of creditable service multiplied by the applicable statutory percentage factor.

---

"[7] The Full Formula benefit for legislators, police, and fire members provides a higher multiplier that allows those members to receive a more favorable retirement benefit, by allowing earlier retirement at a full benefit, than is provided for members in general service."

It is important to note that ORS 238.300(2)(a) (2001) provided that the Full Formula method was "subject to paragraph (b) of this subsection[.]" The cited paragraph (b) (*i.e.*, ORS 238.300(2)(b)), stated that "[a] pension under this subsection shall be at least:", and then described the Money Match and Pension Plus Annuity formulas. When I read

those passages together, they indicate, without ambiguity, that the legislature guaranteed that the pension portion of the qualified retiring member's service retirement allowance, when calculated under the Full Formula method, would not fall below the amount of the pension to which the employee would be entitled under either the Money Match formula or, if it applied, the Pension Plus Annuity formula.

The foregoing discussion indicates that the preexisting PERS system required Tier One members to contribute six percent of their salary, either through payroll deduction or by employer "pick-up," to the fund, but entitled members to accumulate those contributions, together with interest on the contributions, in each member's regular account. That scheme created a tangible incentive for Tier One members to accumulate as large a regular account as possible, because, at retirement, the state guaranteed that the size of the regular account, among other factors, would determine the size of the member's service retirement allowance. Finally, because the Money Match and, as applicable, the Pension Plus Annuity formulas operated as a financial floor beneath which the pension component could not fall, the incentive that I identify above existed for all Tier One members regardless of the particular formula that PERS used to calculate their service retirement allowance.

In 2003, the legislature amended ORS 238.200, which now prohibits any future contributions to the fund and, thus, to the member's regular account on or after January 1, 2004. ORS 238.200(4) provides, in part:

> "Notwithstanding subsections (1) to (3) of this section, a member of the system, or a participating employer acting on behalf of the member pursuant to ORS 238.205, is not permitted or required to make employee contributions to the fund for service performed on or after January 1, 2004."

The new statute continues to require members to contribute six percent of their salary,[7] but now diverts those amounts into an Individual Account Program (IAP). Regular accounts will continue to exist, but PERS no longer will credit salary

---

[7] ORS 238.200(1)(b) requires smaller salary contributions from employees who were active members on August 21, 1981.

contributions to regular accounts. The Special Master summarized the consequences of that aspect of the 2003 PERS legislation as follows:

"The diversion of member contributions to the IAP will reduce members' future account balances for purposes of employer matching under the Money Match formula. On a system-wide basis, the elimination of employee contributions from the Money Match calculation probably will cause the Full Formula option to overtake the Money Match as the most common retirement formula. Although members will receive balances held in the IAP, those balances will not be matched by employer contributions, enhanced by cost of living increases, or annuitized at the assumed earnings rate as part of a defined benefit package."

In *Hughes v. State of Oregon*, 314 Or 1, 12, 838 P2d 1018 (1992), this court considered whether the legislature had impaired the PERS contract in 1991 by modifying the statute that made retirement benefits "accrued or accruing" under PERS exempt from state income taxation. The court acknowledged the rule that the court will not infer a contract from legislation if the law "does not unambiguously express an intention to create a contract[.]" *Id.* at 14. The court, however, noted that the contractual nature of PERS was a settled matter:

"We begin from the premise that PERS is a contract between the state and its employees. The contractual nature of such pension schemes was settled in *Taylor v. Mult. Dep. Sher. Ret. Bd.*, 265 Or 445, 450, 510 P2d 339 (1973)."

*Id.* at 18. The court concluded that, because contractual intent of the legislature and the contractual nature of PERS were matters of settled law, "[t]he only remaining question, therefore, is whether and to what extent *former* ORS 237.201 (1989) [the statute that exempted "accrued or accruing" PERS benefits from state taxation] was intended to be a term of the PERS contract." *Id.* at 21 (footnote omitted). The court answered that question in the affirmative, because, considering the context of the tax exemption's enactment as a matter of "primary importance," the legislature had included the exemption "as part and parcel" of the 1953 PERS statute. *Id.* at 25.

The *Hughes* court limited its impairment holding to those PERS retirement benefits that already had accrued in the past or were accruing at present, and distinguished those categories from benefits accruing in the future, because the preexisting PERS tax exemption statute had incorporated that express distinction. Thus, the *Hughes* court concluded, the legislature had not obligated itself by its statutory contract to treat as exempt PERS benefits received for work performed after a change in the tax exemption statute.

*Hughes* relied on the *Taylor* case for the proposition that, on acceptance of employment (and completion of a required six-month period of service) with a PERS employer, subsequent legislation cannot impair the employee's vested contractual interest in a pension plan. *Hughes*, 314 Or at 20. In *Taylor*, the plaintiff was a deputy sheriff who had served for 13 years as a jail matron, and later as a corrections officer, in Multnomah County. The county adopted a retirement ordinance, known as Ordinance No. 25, for sworn personnel who provided "law enforcement" services to the county. The county refused to allow the plaintiff to participate, claiming that her work in the jail did not involve "law enforcement" services. The county soon amended the ordinance, in Ordinance No. 29, to exclude the plaintiff more clearly, and relied on its express authority under the ordinance to determine the eligibility and qualifications of county personnel to receive benefits under the county's retirement system.

This court held that the plaintiff had acquired pension rights under the original ordinance, Ordinance No. 25, because her contractual rights arose when she first had rendered service under that ordinance, *not* when she completed the service that the later Ordinance No. 29 required for receipt of pension benefits:

> "We conclude from the above authorities that Oregon has adopted not only the contractual concept of pensions, but, also, the concept that contractual rights can arise prior to the completion of the service necessary to a pension. * * * Such rights are subject, of course, to subsequent completion of the necessary service."

*Taylor*, 265 Or at 451 (citations omitted). According to *Taylor*, "[t]he adoption of the pension plan was an offer for a

unilateral contract. Such an offer can be accepted by the tender of part performance." *Id.* at 452.[8]

This court in *Taylor* quoted with approval the following rules of law from the *Restatement of the Law of Contracts* regarding the binding nature of the employer's offered terms in a retirement plan once the employee accepts the offer by tendering part performance:

> " 'If an offer for a unilateral contract is made, and part of the consideration requested in the offer is given or tendered by the offeree in response thereto, the offeror is bound by a contract, the duty of immediate performance of which is conditional on the full consideration being given or tendered within the time stated in the offer, or, if no time is stated therein, within a reasonable time.
>
> " '*Comment*:
>
> " '\* \* \* \* \*
>
> " '*b*. Tender, however, is sufficient. Though not the equivalent of performance, nevertheless it is obviously unjust to allow so late withdrawal. There can be no actionable duty on the part of the offeror until he has received all that he demanded, or until the condition is excused by his own prevention of performance by refusing a tender; but he may become bound at an earlier day. The main offer includes as a subsidiary promise, necessarily implied, that if part of the requested performance is given, the offeror

---

[8] The court in *Taylor* selected the term "unilateral contract" on the assumption that the employees could accept the employer's offer by the tender of partial performance. The *Taylor* court's subsequent discussion of the binding effect of the tender of partial performance confirms that, in the employment context, partial performance terminates the employer's power to revoke the offer. Thus, one characteristic of a truly unilateral contract—the offeror's power to revoke the offer before the offeree tenders full performance—is not applicable in this setting.

Moreover, the term "unilateral contract" may no longer provide a fully accurate conception of the factors that make the employment relationship binding. *Restatement (Second) of Contracts* § 32 (1981), which the American Law Institute adopted eight years after the *Taylor* decision, provides:

"In case of doubt an offer is interpreted as inviting the offeree to accept either by promising to perform what the offer requests or by rendering the performance, as the offeree chooses."

Under that provision, unless the employer insists on performance as the sole mode of acceptance, the employee may bind the employer to its offer either by partially performing or promising to perform. In either case, a valid acceptance terminates the employer's power to revoke the offer.

will not revoke his offer, and that if tender is made it will be accepted. Part performance or tender may thus furnish consideration for the subsidiary promises * * *.' "

*Id.* at 452-53 (quoting *Restatement of the Law of Contracts* § 45 (1932)). Applying those principles to the facts in *Taylor*, the court stated:

"As applied to the present circumstances, *plaintiff's tender of the contributions and acceptance of the plan terminated defendants' power to revoke the offer, and plaintiff would be entitled to the benefits of the plan if she continued to work for the requisite period necessary for retirement.*"

*Id.* at 454 (emphasis added).

Two additional authorities that this court discussed with approval in *Taylor* confirm the binding nature of an employer's offered inducements for employment once the employee accepts them by commencing service. In *Harryman v. Roseburg Fire Dist.*, 244 Or 631, 420 P2d 51 (1966), a public employer represented that it would allow employees to accumulate unused sick leave and pay them for it when they terminated employment. The plaintiff accepted employment. Later, the public employer revoked the sick leave policy and refused to pay the employee for the sick leave that he had accumulated during his employment. This court held that the public employer was required to honor the inducement for employment that it had made:

"When plaintiff entered upon his employment with defendant he was advised that he would receive an allowance for accumulated sick leave upon termination of employment. He accepted employment upon the assumption that the allowance for sick leave was a part of his compensation for services. Since it was a part of the inducement to accept employment, it can be regarded as a contractual term of plaintiff's employment. Defendant could not, therefore, deprive plaintiff of the allowance after he had earned it."

*Id.* at 634-35 (footnote omitted).

In *Adams v. Schrunk*, 6 Or App 580, 488 P2d 831 (1971), the Court of Appeals held that a public employer was not entitled to evade, by means of a charter amendment, a provision in its original charter that allowed employees to

accumulate time toward their eligibility for retirement by counting time spent in temporary service. This court in *Taylor* provided the following summary of the holding in *Adams* and expressly agreed with it:

> "In *Adams v. Schrunk*, 6 Or App 580, 488 P2d 831 (1971), (*rev. denied* November 16, 1971), the Court of Appeals held that Portland police officers acquired a right to have time served as temporary officers included in their periods of service necessary to entitle them to a pension. At the time of the temporary service the then existing pension plan authorized this inclusion in computing the length of service necessary for a pension, and contributions were withheld from the officers' salaries. Subsequently, the plan was amended to deny the inclusion of such service. The Court of Appeals thus recognized, as *Crawford* [*v. Teachers' Ret Fund Ass'n*, 164 Or 77, 99 P2d 729 (1940)] had not, that a contractual right could be established *before the completion* of the service necessary to a pension. We agree with that opinion."

*Taylor*, 265 Or at 450-51 (underscoring added). *See Hughes*, 314 Or at 20 n 25 (noting that, in *Taylor*, "this court expressly approved of the holding in *Adams v. Schrunk* * * *").

The *Taylor* court's statement about the earlier decision in *Crawford* is significant. *Crawford* correctly had held that a teachers' retirement fund could not alter the terms of a teacher's retirement benefits after the teacher had retired. However, the court had explained its holding in terms that indicated that contract rights did not arise before the employee had rendered complete service:

> "[W]e think the trend of modern authority and the better-reasoned cases are to the effect that contractual relations are created and that, upon full performance by the annuitant, rights accrue which cannot be impaired by subsequent legislation * * *."

*Id.* at 87-88. This court's discussion of *Adams* and *Crawford* in *Taylor* constitutes a rejection of the statement in *Crawford* that contract rights in a retirement plan do not arise before the completion of the necessary service for retirement.

The final case that is pertinent to this discussion is *Oregon State Police Officers' Assn. v. State of Oregon*, 323 Or

356, 918 P2d 765 (1996) (*OSPOA*). *OSPOA* involved a contract impairment challenge to three changes to PERS that a ballot measure, Ballot Measure 8, purported to add to the state constitution. Section 10 of the measure repeated the existing requirement that members must contribute six percent of their salary to the system, but prohibited public employers, by contract or otherwise, from "picking up" the employees' six percent payment obligation. That provision concerned the legislature's enactment of *former* ORS 237.075 (1979), *renumbered as* ORS 238.205 (1995), which authorized public employers to agree with employees or to decide unilaterally to pick up the employee contribution to PERS. *See OSPOA*, 323 Or at 373 (explaining operation of pick-up statute). Section 11 of the ballot measure withdrew the statutorily guaranteed minimum rate of return on PERS member accounts. Section 12 of the ballot measure purported to nullify a statute that allowed retiring PERS members to add accumulated unused sick leave benefits to their final average salary.

The court in *OSPOA* reviewed at length the Oregon case law, including the cases discussed in this opinion, on the subject of contractual rights that arise from public employee retirement plans. Addressing section 10, the court stated:

"Under the *Taylor* analysis, and contrary to the state's argument here, ORS 237.075, and the state's implementation of the authority contained in that statute, promised a pension benefit that plaintiffs could realize only on retirement with sufficient years of service, that is, *after* rendering labor for the state. Plaintiffs accepted that offer by working. *See Taylor*, 265 Or at 452. The change mandated by section 10 alters the state's contractual obligation, in violation of *Taylor*, by increasing plaintiffs' cost of retirement benefits for services that, absent a lawful separation of employment, they will provide in the future. That consequence, if approved, would permit the state to retain the benefit of plaintiffs' labor, but relieve the state of the burden of paying plaintiffs what it promised for that labor. That result would frustrate plaintiffs' reasonable contractual expectations that were based on legal commitments expressly made by the state.

"Once offered and accepted, a pension promise made by the state is not a mirage (something seen in the distance

that disappears before the employee reaches retirement). Nullification of an express term of plaintiffs' PERS contract with the state is an impairment for purposes of Contract Clause analysis, *Allied Structural Steel Co. v. Spannaus*, 438 US 234, 247, 98 S Ct 2716, 57 L Ed 2d 727 (1978). Section 10 expressly and substantially changes the state's contractual promise to plaintiffs with respect to the cost of their participation in the PERS retirement plan and the benefits that they will receive on retirement. Under section 10, the cost of participation to the employee increases while the benefits that the employee ultimately will receive on retirement decrease. Unquestionably, section 10 impairs the obligation of plaintiffs' PERS contract."

*OSPOA*, 323 Or at 374-75 (emphasis in original; footnote omitted).

In dissent, Justice Gillette opined that the majority, in analyzing section 10, had transformed a statutory permission into a promise to pick up all public employees' six percent contributions. *Id.* at 409 (Gillette, J., dissenting). The majority responded to Justice Gillette's criticism as follows:

"The fatal flaw in that analysis is that it 'errs in failing to consider the significance of context.' *Hughes*, 314 Or at 21 n 27. The six percent pick-up is an integral part of the underlying PERS pension contract. Unilateral termination of the six percent pick-up term of the PERS pension contract materially changes that underlying pension contract to plaintiffs' detriment and, thus, frustrates plaintiffs' reasonable reliance on the offer the state made to them and which they accepted by the tender of part performance. *Id.* at 20-21."

*Id.* at 376.

*OSPOA* went on to hold that sections 11 and 12 of Ballot Measure 8 also impaired employee contractual rights. As to those conclusions, the court was unanimous. The court struck down Ballot Measure 8 in its entirety.

I turn now to the analysis of the legislature's alteration in 2003 of the preexisting scheme for crediting member contributions in light of the case law discussed above. Both before and after the 2003 legislation, PERS members are subject, as they have been for many decades, to a legal

requirement to contribute six percent of their salary to a discrete "account" in PERS. Salary contributions no longer will be credited to, and enhance the value of, member regular accounts; instead, PERS will credit salary contributions to the IAP. Also, before and after the legislative change, the regular account and IAP of each member will earn a rate of interest. What has changed is the legislature's commitment before the 2003 legislative amendment about how PERS will increase the value of those contributions before and after retirement and, consequently, the value of each member's service retirement allowance.

First, the 2003 PERS legislation cancelled the pre-existing unconditional obligation to increase Tier One member account balances annually by the assumed interest rate. I already have indicated that I join in the majority's determination that that change impaired the PERS contract.

Second, the 2003 PERS legislation has reduced significantly the practical value of the Money Match formula by prohibiting future contributions of salary to regular member accounts and by eliminating any matching feature regarding the IAP. Before the change, PERS members could work and plan for a service retirement allowance that would reflect a pension amount not less than their accumulated salary contributions during their years of service, increased annually by at least the assumed interest rate, plus an amount not less than a pension (*i.e.*, an amount "matched" by the employer) that was the actuarial equivalent of the annuity that the members' accumulated contributions could provide. After the 2003 PERS legislation, the employer matching feature will not apply to member contributions made after July 1, 2003, either directly as one available retirement formula or as a minimum financial benchmark for the service retirement allowance.

I conclude that that aspect of the 2003 PERS legislation constitutes an impairment of contract under this court's precedents. According to *OSPOA*, Ballot Measure 8's deprivation of the employer pick-up feature of the employee regular account contribution scheme represented an impairment of contract. By dint of logic, we must recognize that the

complete prospective cancellation of that contribution scheme constitutes an even clearer impairment of contract.

This court's cases defeat the majority's contrary conclusion. According to this court's case law, the proper focus is the employer's retirement benefit plan in place at the commencement of employment, together with any enhancements to that plan that the employer implements after employment begins. In no case has this court allowed a public body to modify a retirement plan to effect a practical reduction in benefits, either directly or through an alteration of the applicable formula for calculating benefits, after inducing employees to render service in reliance on the retirement plan. As *Taylor* held, and as the *Restatement of the Law of Contracts* confirms, the premise that makes the benefit plan unchangeable by the employer's unilateral act is the employer's promise, which the law implies, that the employer will not revoke the retirement plan once the employee commences service. Because the pre-2003 PERS scheme, *i.e.*, the "offer," was in place when each petitioner commenced his or her employment, the state is bound by its implied promise not to revoke that offer once petitioners tendered partial performance.

The majority makes two points in reaching its different conclusion. First, the majority asserts that, in 1981, the legislature adopted the Full Formula and expected that that formula would be "a new, primary benefit calculator to the system." 338 Or at 191. The majority also observes that the Full Formula feature was significant because it shifted the risk of poor market performance to employers and away from employees.

The legislature's expectation about the frequency of use of the Full Formula method as a "primary benefit calculator" is just that: an expectation. As the Special Master found, "[u]ntil 1997, PERB assumed that member retirement allowances would be calculated under the Full Formula method[,]" but the Money Match emerged instead in 1997 as the predominant formula. But the erroneous assumptions by the legislature and PERB about which retirement formula might be used most frequently as a "primary benefit calculator" cannot alter the fact that the pre-2003 PERS statute

promised members that they would receive benefits calculated according to the most economically attractive formula from among *three* statutory formulas. Those incorrect assumptions about the frequency of use of the Full Formula and whether it would be the "primary benefit calculator" have no effect on the state's contractual obligation to pay the full benefits that the statute held out to employees.

The majority's point also disregards the fact, confirmed in the text of ORS 238.300(2)(b) (2001), that the legislature required the employer's Full Formula pension to be "at least" the actuarial equivalent of the Money Match and Pension Plus Annuity formulas. Thus, as a matter of clear text, the Full Formula may be the ceiling but it is not the floor for the statutory pension component.

I fail to see the significance of the fact that the Full Formula shifted greater risk of market loss to employers. The PERS statute promised members that they would receive benefits calculated according to the most economically attractive retirement benefit formula *regardless of market performance*. The addition of the Full Formula benefit in 1981 merely added one more option to the retirement calculation formulas. The risk of market loss under any of those formulas has nothing to do with their function in the calculation of promised service retirement allowances.

Finally, the majority notes that the statutory provision regarding regular accounts contains no separate wording that promises that the legislature will not terminate the accumulation of member contributions in regular accounts. This court addressed and rejected a similar argument in *Hughes* that a dissenting opinion asserted. The majority in *Hughes* emphasized that the legislature's inclusion of a tax exemption statute within a larger statutory contract was a significant contextual clue about the legislature's contractual intent; the absence of promissory terms in the tax exemption statute itself was, in the court's view, immaterial. The court cited numerous United States Supreme Court cases that held that a tax exemption was a term of a larger contract, and noted:

"The significant fact [in those cases] is that an underlying contract was present. This case presents an analogous situation where we are faced with an underlying contract—the PERS contract—and the question is whether the tax exemption statute is a term of that contract. Also significant is that in those cases the tax exemption terms are not, on their face, indicative of an intention not to repeal those exemptions. *The constitutional protection that was afforded to those provisions' obligations followed from the fact that they were part of a larger contract, not that they were promissory in and of themselves.*"

*Hughes*, 314 Or at 21-22 n 27 (emphasis added).

Applying that point from *Hughes* to this case, it is immaterial that the legislature did not append explicit wording to the regular account statute to confirm its unchangeability. What is significant is the statutory context. Did the legislature incorporate into the PERS contract the provisions for regular accounts and the calculation of retirement benefits from the accumulated benefits in those accounts? Clearly, the answer is yes. The majority's contrary answer is a legal error.

## ELIMINATION OF VARIABLE ACCOUNT

The Special Master found as follows:

"Before the enactment of Section 3 of HB 2003, PERS members could elect to have 25, 50 or 75 percent of their employee contributions allocated to variable accounts, and they were entitled to purchase a variable annuity at retirement with their variable account balances. ORS 238.260 (2001). Section 3 of HB 2003 provides that, after December 31, 2003, members no longer are permitted to direct contributions to the variable account. ORS 238.260(3)(b) (2003).

"Section 3 does not affect contributions credited to member accounts before its effective date."

The Special Master explained the operation of the variable account system before its cancellation as follows:

"Earnings on variable accounts are first allocated to pay a proportionate share of administrative expenses, and the

remainder are credited to member accounts. The PERS system never has funded a reserve from variable account earnings. For many years, PERB added the balances in the regular and variable accounts of members who retired under the Money Match, and it applied the relevant AEFs to calculate their monthly annuities. PERS then required employers to match those annuities. That practice gave members twice the difference between the earnings on their regular and variable accounts."

In essence, the variable account plan afforded members the opportunity to obtain greater growth in their regular accounts by investing a portion of their salary contributions in equities. ORS 238.260(1) explained the legislature's purpose in establishing the variable account program:

"The purpose of this section is to establish a well balanced, broadly diversified investment program for certain contributions and portions of the member accounts so as to provide retirement benefits for members of the system that will fluctuate as the value and earnings of the investments vary in relation to changes in the general economy. It is anticipated that investment of those contributions and portions of the member accounts in equities will result in the accumulation of larger deposit reserves for those members during their working years, tend to preserve the purchasing power of those reserves and the retirement benefits provided thereby and afford better protection in periods of economic inflation."

Petitioners assert that the legislature's repeal of their right to direct contributions to the variable account program is an impairment of their contract. The majority rejects that claim, relying substantially on the reasoning used to reject petitioners' claim regarding members' regular accounts. In particular, the majority points to the absence of specific words in ORS 238.260 (2001) or any earlier version of the variable account statute in which the legislature expressly promised to *continue* the variable account program. The majority draws the conclusion from that fact that the legislature thus reserved the right to repeal the variable account program at any time.

I disagree. *None* of the components of the PERS contract, including the promised retirement formulas and public

employer obligations, appears with a legislative promise that the legislature will not repeal them. The majority's reasoning departs from this court's decisions that examine retirement obligations from the standpoint of benefits offered. None of this court's cases has suggested that the absence of a promise of nonrepeal exposes a retirement plan benefit to withdrawal or cancellation.

The fact that the legislature's cancellation was only prospective does not save it from an impairment of contract challenge. When the affected employees accepted employment, the variable account plan represented one available means for increasing the size of their regular accounts. As the foregoing discussion of the regular account challenge demonstrates, our cases decline to allow employers, once employment commences, to nullify aspects of a retirement plan that employees may use to enhance their service retirement benefit. For the reasons expressed in that discussion, the majority's contrary conclusion is erroneous.

In conclusion, I respectfully dissent from the majority's conclusions regarding the legislature's amendment of the statutes regarding employee contributions to regular accounts and variable accounts, and concur, for the reasons stated, with the balance of the majority's conclusions.

Riggs and Kistler, JJ., concur with this opinion.